**LOWENSTEIN SANDLER LLP**
Gavin J. Rooney
Jewel M. Watson
65 Livingston Avenue
Roseland, New Jersey 07068
Attorneys for Defendant Vivint, Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| PAULETTE VENDITTO, on behalf of herself and all others similarly situated, | : : : | **Document Electronically Filed** |
| Plaintiff, | : : | |
| v. | : : | **CIVIL ACTION NO. 2:14-cv-04357-JLL-JAD** |
| VIVINT, INC., f/k/a APX Alarm Security Solutions, Inc., | : : : | |
| Defendant. | : : | |

---

### VIVINT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND PURSUANT TO FED.R.CIV.P. 12(B)(6)

---

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF THE CASE.......................................................................2

STANDARD OF REVIEW ...........................................................................6

ARGUMENT...............................................................................................7

    I.     THE AGREEMENT IS NOT A "RETAIL INSTALLMENT CONTRACT" WITHIN THE MEANING OF RISA AND, THEREFORE, COUNT I OF THE COMPLAINT SHOULD BE DISMISSED............................7

         A.     Only "Retail Installment Contracts," which are contracts that charge customers interest or a premium for the privilege of paying for goods or services via installment payments, are subject to N.J.S.A. 17:16C-50 and N.J.S.A. 17:16C-27. .............................................8

         B.     The Agreement Here is not a "Retail Installment Contract" under RISA. ...................................................................11

    II.    THE AGREEMENT IS NOT A "RETAIL INSTALLMENT CONTRACT" WITHIN THE MEANING OF DDRISA AND, THEREFORE, COUNT II OF PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED. ................................................................13

    III.    COUNT III SHOULD BE DISMISSED BECAUSE THE AGREEMENT SATISFIES THE HIP REGULATIONS AND, IN ANY EVENT, THE COMPLAINT DOES NOT PLEAD AN ASCERTAINABLE LOSS ARISING FROM THE ALLEGED HIP REGULATORY VIOLATION. ...........15

         A.     The Agreement satisfies the HIP Regulations. ...........................................15

         B.     The Complaint does not plead an ascertainable loss. ................................16

    IV.    THE COMPLAINT FAILS TO STATE A TCCWNA CLAIM BECAUSE, AS EXPLAINED ABOVE, THE AGREEMENT DOES NOT VIOLATE RISA, DDRISA, OR THE HIP REGULATIONS; NOR DOES THE AGREEMENT OTHERWISE VIOLATE ANY "CLEARLY ESTABLISHED" LEGAL RIGHT.......................................................18

         A.     The Agreement's warranty provision does not violate N.J.S.A. 56:12-16 of TCCWNA. ...........................................19

B.      Sections 15 and 16 of the Agreement do not violate any "clearly established" right of a consumer...............................................................20

V.      THE COMPLAINT'S INDIVIDUAL COUNT SHOULD BE DISMISSED BECAUSE IT DOES NOT ALLEGE FACTS TO PLAUSIBLY SET FORTH A CFA CLAIM........................................................23

CONCLUSION......................................................................................................26

# TABLE OF AUTHORITIES

**PAGES**

C<small>ASES</small>

Ashcroft v. Iqbal,
    556 U.S. 662, 127 S.Ct. 1937 (2009).........................................................................6, 7

Assoc. Gen. Contractors of Cal., Inc. v. Carpenters,
    459 U.S. 519 (1983)............................................................................................7

AXA Corporate Solutions Assur. v. Great American Lincs, Inc.,
    No. 10-02023, 2012 WL575050  (D.N.J. Feb. 21, 2012).......................................22

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)...........................................................................................6, 7

Contrast Perez v. Rent-A-Center, Inc.,
    186 N.J. 188 (2006) ...............................................................................4, 8, 10, 12

Cox v. Sears Roebuck & Co.,
    138 N.J. 2 (1994) ...............................................................................................24, 25

D'Ercole Sales v. Fruehauf Corp.,
    206 N.J. Super. 11 (App.Div. 1985) ....................................................................24

Fowler v. UPMC Shadyside,
    578 F.3d 210 (3d Cir. 2009)...............................................................................7

Girard Acceptance Corp. v. Wallace,
    76 N.J. 434 (1978) .............................................................................................8

Green v. Continental Rentals,
    292 N.J. Super. 241 (Law Div. 1994)...................................................................12

Luppino v. Mercedes-Benz USA, LLC,
    2010 U.S. Dist. LEXIS 83584 (D.N.J. Aug. 13, 2010)...........................................7

Martinez-Santiago v. Public Storage,
    No. 14-302, 2014 WL 4053960 (D.N.J. Aug. 28, 2014) ..................................22, 23

McGarvey v. Penske Automotive Group, Inc.,
    No. 08-5610, 2011 WL 1325210 (D.N.J. March 31, 2011).............................20, 21

McGarvey v. Penske Automotive Group, Inc.,
    639 F.Supp.2d 450 (2009) .................................................................................25

Meshinsky v. Nichols Yacht Sales, Inc.,
    110 N.J. 464 (1988) .......................................................................................17

New Jersey Citizen Action v. Schering-Plough Corp.,
    367 N.J. Super. 8 (App. Div. 2003) ...............................................................17

Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,
    998 F.2d 1192 (3d Cir. 1993)..........................................................................6

Phillips v. County of Allegheny,
    515 F.3d 224 (3d Cir. 2008)...........................................................................6

Ramanadham v. New Jersey Mfrs. Ins. Co.,
    188 N.J. Super. 30 (App. Div.1982) .............................................................17

Rolo v. City Investing Co. Liquidating Trust,
    155 F.3d 644 (3d Cir. 1998)............................................................................7

Synnex Corp. v. ADT Security Serv., Inc.,
    394 N.J. Super. 577 (App. Div. 2007) ..........................................................22

Tessler & Son, Inc. v. Sonitrol Sec. Sys.,
    203 N.J. Super. 477 (App. Div. 1985) ..........................................................22

Turner v. Aldens, Inc.,
    179 N.J. Super. 596 (App. Div. 1981) ..........................................................12

**STATUTES**

N.J.S.A. 17:16C-1 et seq...................................................................................1

N.J.S.A. 17:16C-1(b) ...................................................................................9, 12

N.J.S.A. 17:16C-2 .........................................................................................10

N.J.S.A. 17:16C-21 to 25 .................................................................................8

N.J.S.A. 17:16C-27 .................................................................................8, 9, 10

N.J.S.A. 17:16C-35 to 39 .................................................................................8

N.J.S.A. 17:16C-50.....................................................................................8, 11

N.J.S.A. 17:16C-61.1 et seq........................................................................1, 13

N.J.S.A. 17:16C-61.3 .....................................................................................14

N.J.S.A. 17:16C-61.5 .....................................................................................14

N.J.S.A. 17:16C-61.5(a) ...........................................................................................14

N.J.S.A. 17:16C-61.5(b) ...........................................................................................14

N.J.S.A. 17:16C-61.6 .................................................................................................14

N.J.S.A. 56:12-14 to 18 ..............................................................................................1

N.J.S.A. 56:12-15.......................................................................................................18

N.J.S.A. 56:12-16..................................................................................................19, 20

N.J.S.A. 56:8-1et seq. ................................................................................................1

N.J.S.A. 56:8-2...........................................................................................................17

N.J.S.A. 56:8-19...........................................................................................................

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ....................................................... passim

Federal Rule of Civil Procedure 12 9(b) ........................................................................25

**REGULATIONS**

N.J.A.C. 13:45A-16.1 to 16.2 .......................................................................................1

N.J.A.C. 13:45A-16.1A ..........................................................................................15, 16

N.J.A.C. 13:45A-16.2(a)(12)(iii) ..........................................................................15, 16

Defendant Vivint, Inc. ("Vivint") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the First Amended Class Action Complaint and Jury Demand ("Complaint") filed by Plaintiff Paulette Venditto.

## PRELIMINARY STATEMENT

Plaintiff's purported claims arise out of a contract for the provision of home security monitoring services.  Plaintiff's principal contention is that Vivint refused to release her from her term monitoring contract, as she contends that her recorded oral agreement to extend the contract's term by 42 months is unenforceable because it was not reduced to writing.  But plaintiff is not content to simply plead an individual dispute between herself and Vivint, which could be resolved expeditiously in small claims court.  Instead, she seeks to inflate her dispute into a massive class action on behalf of all New Jersey customers who signed home security monitoring contracts with Vivint, on the theory that the form of agreement used by Vivint violates a series of New Jersey statutes and regulations.  Specifically, plaintiff alleges that her contract with Vivint violates the Retail Installment Sales Act of 1960 ("RISA"), N.J.S.A. 17:16C-1 et seq.; the Door-to-Door Retail Installment Sales Act of 1968 ("DDRISA"), N.J.S.A. 17:16C-61.1 et seq.; the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 et seq.; the New Jersey Home Improvement Practices Regulations (the "HIP Regulations"), N.J.A.C. 13:45A-16.1 to -16.2; and the Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA"), N.J.S.A. 56:12-14 to -18.

The Complaint, however, fails to plead facts that, if proven, would plausibly set forth a claim for relief under these statutes.  The Complaint's RISA and DDRISA counts should be dismissed because the security monitoring agreement at issue is patently ***not*** a "retail installment contract" within the meaning of those statutes.  That agreement charged plaintiff a

"service fee" for the provision of ongoing services relating to her alarm system; it was not a financing transaction involving the timed sale of goods (such as a "rent-to-own" agreement) whereby plaintiff paid interest for the privilege of paying for goods over time. Similarly, the Complaint does not state a CFA claim arising from an alleged violation of the HIP Regulations because plaintiff does not plead an ascertainable loss. And, in any event, the contract did not violate the HIP Regulations because it clearly set forth the fees to be paid by plaintiff. Finally, the Complaint seeks a $100 penalty under TCCWNA for each of these alleged RISA, DDRISA, HIP Regulation violations, and for other alleged violations of TCCWNA. As explained below, however, the Complaint fails to plead any such violations.

The Court should also dismiss the "individual" count pled on behalf of the named plaintiff alone (and not pled on behalf of the putative class), which relates to the extension of her contract. Notably, plaintiff does not plead a cause of action sounding in contract, or for declaratory judgment, to resolve the issue of whether she is bound to the oral extension that she agreed to on a recorded telephone call. Instead, plaintiff alleges that Vivint's refusal to release her from the contract extension, the assessment of a $15 reprocessing fee, and the use of "high pressure sales tactics" all violate the CFA and render Vivint liable for treble damages and attorney's fees. But such a contract dispute does not constitute a misrepresentation, material omission, or unconscionable commercial practice made actionable under the CFA, and accordingly this claim too should be dismissed.

## STATEMENT OF THE CASE

The following facts are derived from the allegations of the Complaint and a review of its exhibits. They are accepted as true only for purposes of this Rule 12(b)(6) motion to dismiss.

-2-

On June 19, 2009, Plaintiff Paulette Venditto entered into an Alarm System Purchases and Services Agreement (the "Agreement") with APX Alarm Security Solutions, which is presently known as Vivint.  Compl. ¶ 4-11; see Compl. Ex. A.  The "initial term" of the Agreement ran for a total of 39 months, and therefore expired on September 19, 2012. Compl. Ex. A at § 2.3.  The fundamental purpose of the Agreement was to provide plaintiff with a security monitoring service for her premises, so that the appropriate authorities could be contacted for help in the event of an emergency or intrusion.  Plaintiff enjoyed Vivint's security services for several years (2009 to 2012), without apparent incident or complaint.

The preprinted form of the Agreement provided for the customer's payment of certain fees – specifically, a $198.00 non-refundable "activation fee" in Section 2.1 and a monthly service fee of $49.99 "for monitoring" in Section 2.3.  Compl. Ex. A at §§ 2.1, and 2.3. However, the marked-up Agreement actually signed by plaintiff reflected agreed-upon discounts off of these amounts, so that plaintiff was to be charged an initial activation fee of $99 and a monthly service fee of $44.99.   Finally, Section 2.3 of the Agreement contains preprinted language indicating that the "total cash price [plaintiff] will pay for the services" would be $1,949.61, which represented the $49.99 per month service fee charged over the 39-month term of the Agreement.  Compl. Ex. A at § 2.3.  The preprinted form, however, was not marked up to disclose the "total cash price you will pay for the services" at the lesser rate of $44.99 per month (which, of course, would have been $1,754.61).  Accordingly, the preprinted "total cash price . . . for the services" actually overstated that amount by $195.  And, in Section 2.2, the Agreement waived any fee for the installation of the monitoring equipment.  Compl. Ex. A at § 2.2.

The Agreement provided for an ongoing security monitoring service for plaintiff's home.  It did not reflect the conditional sale or timed purchase of goods, nor did the Agreement

provide that the customer would take title to anything at the end of the term of monthly payments.  Contrast Perez v. Rent-A-Center, Inc., 186 N.J. 188, 210 (2006) ("A sale is conditional when possession of the goods is transferred to the buyer who will receive title at some future time upon payment of the full price or upon the happening of some other condition or contingency.").  Instead, title to the equipment passed to the plaintiff at the conclusion of the three-day cancellation period following the transaction.  Notably, Section 2.3 confirmed that "there is no financing charge or cost of credit (0% APR) associated with this agreement."  Compl. Ex. A at § 2.3.  In addition, the Agreement provided Vivint with the right to retrieve only its communications equipment and other property from the customer's premises in the event of the contract's termination.  Compl. Ex. A at § 12.

On March 5, 2012, plaintiff received a call from a Vivint representative to discuss renewal of the Agreement – which, as noted above, would have expired a few months later, on September 19, 2012.  Compl. at ¶ 37.  The Vivint representative offered to maintain the same monthly service fee ($44.99) after the Agreement's expiration, provided that plaintiff agreed to extend the contract term by another 42 months. While not precisely clear from the Complaint, it appears that plaintiff admits that she provided her oral consent to this offer (which consent was documented through a recording of the conversation). Id.  The Complaint alleges that this extension does not bind plaintiff because she never *signed a written authorization*, which she contends the Agreement required. Compl. at ¶ 38-39.[1]  The Complaint further alleges that plaintiff contacted Vivint in August and September 2012 to cancel the Agreement -- after,

---

[1]   The Complaint contends that Section 18 of the Agreement required Plaintiff's signature on a written extension of its term.  But Section 18 addresses "change[s]" to the Agreement, not an extension of the term, and therefore it does not preclude enforcement of plaintiff's oral consent to extend the term.

apparently, she entered into an agreement with another alarm service provider -- and that she sent Vivint a written notice of cancellation in February 2014. Compl. at ¶¶ 40, 44.

In June 2014, plaintiff filed her complaint in the Superior Court of New Jersey. On July 10, 2014, Vivint removed the action to this Court pursuant to the Class Action Fairness Act of 2004. On August 15, 2014, Vivint filed a motion to dismiss in lieu of an answer pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff responded to Vivint's motion to dismiss by filing the First Amended Class Action Complaint and Jury Demand ("Complaint") on September 2, 2014.

Plaintiff divides the Complaint's claims into four counts advanced on behalf of herself and the putative class (defined as all New Jersey residents who signed alarm monitoring agreements with Vivint) and a single count advanced only on her own behalf. Among the class claims, Count I alleges that the Agreement violated RISA and the CFA because it did not identify the cash price of the goods, the down payment, or the unpaid cash balance, and failed to comply with other requirements applicable to retail installment contracts. Count II alleges violations of DDRISA and the CFA, contending that the Agreement did not provide plaintiff with a three-day right to rescind the agreement required by DDRISA. Count III alleges that the Agreement is a retail installment contract that violated the HIP Regulations, and therefore violated the CFA, because the "total cash price you will pay for the services" identified in Section 2.3 did not include the $99 activation fee of Section 2.1. Finally, Count IV alleges that Vivint owes a $100 penalty under TCCWNA for each of the Agreement's supposed violations of RISA, DDRISA, and the HIP Regulations. In addition, Count IV alleges that the Agreement's limitation-of-liability provision (Section 15) and indemnification provision (Section 16) violates

New Jersey law, and that the Agreement's warranty provision (Section 5) violates TCCWNA, again meriting a $100 penalty for each alleged violation.

For the claim made only by plaintiff, not the class, the Complaint alleges a cause of action under the CFA arising from Vivint's "attempted renewal" of the Agreement through a telephone call, Vivint's alleged refusal to cancel the Agreement, Vivint's assessment of a "$15 processing fee," Vivint's "misrepresentation" that she would be liable for the balance of the Agreement if she canceled, and the use of so-called "high pressure sales tactics."

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for failure to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 127 S.Ct. 1937, 1949 (2009) quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  See also Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("[S]tating … a claim requires a complaint with enough factual matter (taken as true) to suggest the required element.") (internal quotations omitted).  To decide a motion to dismiss, a court may consider the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

Under the well-known standard articulated in Twombly, courts should engage in a two-step analysis to determine whether the factual allegations nudge the claim "across the line from conceivable to plausible."  Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009) quoting Twombly, 550 U.S. at 570.  First, the court should identify any conclusory allegations that, as a matter of law, are not entitled to a presumption of truth; such allegations should be discarded.  Id.  Second, the court should look to the remaining well-plead and non-conclusory factual allegations to

determine whether there is a "reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.  A district court "retain[s] the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." Twombly, 550 U.S. at 558 (quoting Assoc. Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528 n. 17 (1983)).  See also Fowler v. UPMC Shadyside, 578 F.3d 210, 11 (3d Cir. 2009).

The fact that the Complaint pleads claims on behalf of a putative class adds nothing to the Rule 12(b)(6) analysis; instead, the Complaint must allege facts relevant to the named plaintiff's experience that are sufficient to survive a motion to dismiss. Luppino v. Mercedes-Benz USA, LLC, 2010 U.S. Dist. LEXIS 83584, *14 (D.N.J. Aug. 13, 2010) ("Plaintiffs' allegations regarding the experience of members of the putative class, in general, cannot fulfill the requirement of pleading with adequate specificity") citing Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 659 (3d Cir. 1998) (stating that "[u]ntil the putative class is certified, the action is one between the [the the named plaintiff] … and the defendants. Accordingly, the … Complaint must be evaluated as to these particular plaintiffs.").

## ARGUMENT

**I.   THE AGREEMENT IS NOT A "RETAIL INSTALLMENT CONTRACT" WITHIN THE MEANING OF RISA AND, THEREFORE, COUNT I OF THE COMPLAINT SHOULD BE DISMISSED.**

The Agreement is not a "retail installment contract" within the meaning of RISA because it did not involve the timed or conditional sale of goods.  RISA applies to financing transactions where the customer has the option to take ownership of goods after a period of payments, such as a "rent-to-own" contract. Here, by contrast, the Agreement provided for ongoing security monitoring of plaintiff's home and other services, for which plaintiff would be invoiced on a monthly basis through a "service fee."  RISA does not apply to contracts for ongoing services billed on a monthly basis – otherwise, all service contracts for electricity,

natural gas, telephone, cellular, cable television, internet service, and even legal representation would fall within its reach.  Accordingly, the Complaint's RISA claim, and the CFA claim based upon that alleged RISA violation, should be dismissed.

> **A.  Only "Retail Installment Contracts," which are contracts that charge customers interest or a premium for the privilege of paying for goods or services via installment payments, are subject to <u>N.J.S.A.</u> 17:16C-50 and <u>N.J.S.A.</u> 17:16C-27.**

In <u>Perez</u>, the New Jersey Supreme Court explained that the New Jersey Legislature enacted RISA in 1961 to remedy an imbalance in the usury laws, which historically applied to cash loans, but not to the sale of goods on credit.  Recognizing that retailers could prey upon the poor by offering immediate possession of goods in return for an agreement to pay an outrageous interest rate for the privilege of paying the purchase price over time, the Legislature enacted RISA to govern such sales of goods on credit.  186 N.J. at 203-4.  "In response to the drumbeat of scholarly criticism and consumer complaints, some states, including New Jersey, recognized that the credit sale of goods required regulation and began to adopt retail installment sales acts that set interest rate limits on credit sales transactions."  <u>Id.</u> at 204 (citations omitted).  RISA was "part of a package of laws designed to protect consumers from overreaching by others … and also to promote the availability of financing to purchase various goods and services."  <u>Girard Acceptance Corp. v. Wallace</u>, 76 N.J. 434, 439 (1978).  "Among other things, [RISA] prescribed the general form that retail installment contracts should take, <u>N.J.S.A.</u> 17:16C-21 to 25; required certain financial disclosures, <u>N.J.S.A.</u> 17:16C-27; and detailed prohibited practices, <u>N.J.S.A.</u> 17:16C-35 to 39."  <u>Perez</u>, <u>supra</u>, at 205.

As the Court held in <u>Perez</u>, RISA was enacted to "regulat[e] charges associated with the timed sale of goods."  186 N.J. at 209.  By its terms, the statute only applies to "retail installment contracts," which are defined as:

> [A]ny contract, other than a retail charge account or an instrument reflecting a sale pursuant thereto, entered into in this State between a retail seller and a retail buyer evidencing an agreement to pay the retail purchase price of goods or services, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time. This term includes a security agreement, chattel mortgage, conditional sales contract, or other similar instrument and any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation a sum substantially equivalent to or in excess of the value of the goods, and, by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.

N.J.S.A. 17:16C-1(b).   Accordingly, RISA applies to financing transactions whereby the consumer pays for goods or services over time and, at the end of payment term, becomes (or has the option of becoming) the owner of the goods or services.

Seeking to educate consumers entering into retail installment contracts, N.J.S.A. 17:16C-27 further provides that such contracts must contain certain disclosures regarding the financial implications of the payments over time.  These disclosures include:

> (a) The *cash price of the goods* which are the subject matter of the retail installment contract;
>
> (b) The *down payment* made by the retail buyer, indicating whether made in cash or in goods or partly in cash and partly in goods. The amount of the payment in cash and in goods shall be shown separately. A description of the goods, if any, sufficient for identification, shall be shown;
>
> (c) The *unpaid cash balance* which shall be the difference between the cash price (subsection (a)) and the down payment (subsection (b));
>
> (d) The amount, if any, if a separate charge is made therefor, included for insurance and other benefits, specifying the coverages and benefits;
>
> (e) The amount of official fees;

(f) The *principal balance*, which is the sum of subsections (c), (d) and (e);

(g) The amount of the *time price differential*;

(h) The *time balance*, which is the sum of subsections (f) and (g), owed by the retail buyer to the retail seller, the number of installments required, the amount of each installment expressed in dollars and the due date or period thereof;

(i) The *time sales price*, which is the sum of subsections (b) and (h).

N.J.S.A. 17:16C-27 (emphasis added).  To state the obvious, N.J.S.A. 17:16C-27's references to "down payment," "unpaid cash balance," "principal balance," "time price differential," "time balance," and "time sales price" demonstrate that RISA applies to the financed sale of goods or services on credit by the payment of principal and interest over time.

In Perez, the New Jersey Supreme Court examined the definition of a "retail installment contract" under RISA.  Perez involved a "rent-to-own" contract that required the plaintiff to pay $18,613.32 over 22 months to assume immediate possession of household furnishings that had a retail value of $9,301.72 – which, in effect, imposed upon the plaintiff an annual percentage interest rate of 80%.  186 N.J. at 196-97.  Defendant Rent-A-Center sought to escape RISA's reach by arguing that the agreement was not a retail "installment contract" because it allowed the customer to stop making payments at any time by returning the furnishings, and did not require the customer to take ownership of the furnishings at the end of the period of payments.  Id. at 207-8.  While recognizing that the agreement lay near the boundaries of the statutory definition, the Perez court concluded that the rent-to-own contract was nevertheless a "retail installment contract" under RISA because it required the customer "to pay the retail purchase price of goods in installments."  Id. at 209-10.  Key to the court's determination was that "while '[a] portion of each of [Plaintiff's] payments was assigned to

-10-

defray the cost of the goods … [the]  remainder of each payment was interest for the privilege of paying for the goods in installments."  Id. at 209.

**B.** **The Agreement Here is not a "Retail Installment Contract" under RISA.**

The Agreement at issue here is not a "retail installment contract" within the meaning of RISA because it does not involve the timed sale of goods.  To the contrary, it is a contract for the provision of an ongoing service.  Accordingly, the Complaint's various alleged violations of RISA (e.g., that the Agreement "violated RISA at N.J.S.A. 17:16C-50 by charging [her] an 'Activation Fee' on the Alarm Agreement" and "fail[ed] to set forth the down payment made by Plaintiff," and which in turn "constitute unconscionable commercial practices in violation of CFA") all fail because RISA does not apply to this transaction.

The Agreement provides for ongoing monitoring services billed through monthly invoices.  In this regard, the Agreement is little different from other arrangements for the provision of ongoing services billed through periodic invoices, such as service contracts for electricity, natural gas, cellular telephones, cable television, or high-speed internet access. Specifically, Section 2.3 of the Agreement provides for "service fees" billed on a monthly basis "for monitoring" of the security alarm system.  Section 9 obligates the customer to keep her telephone lines in constant working order, so that Vivint can maintain communications with the monitoring equipment installed on the customer's premises.  Section 7 specifies the monitoring services to be provided; specifically, in the event of an alarm notification Vivint would (a) contact the customer, to determine if it is a false alarm, and (b) if the customer cannot be contacted, or if the alarm is a bona fide one, notify the applicable police or private security authorities of the alarm.  This ongoing security monitoring service is what the Agreement required plaintiff to pay for on a monthly basis.

-11-

At the end of the Agreement's term, plaintiff was not entitled to "own" anything as a consequence of having made the monthly service payments.  Instead, plaintiff owned the alarm equipment after the three-day right of rescission had expired.  Accordingly, the Agreement was <u>not</u> a contract "to pay the retail purchase price of goods in installments." <u>Perez</u>, 186 N.J. at 209-10.  To dispel any doubt on this point, Section 2.3 of the Agreement states that "there is no financing charge or cost of credit (0% APR) associated with this agreement."  A contract that does not charge interest or a premium for the privilege of making monthly payments does not fall within the statutory scope of RISA.  <u>See</u> <u>Turner v. Aldens, Inc.</u>, 179 N.J. Super. 596, 602 (App. Div. 1981) ("We have no doubt that the evil sought to be remedied by [RISA] is the charging of excessive interest to New Jersey consumers.").

The Complaint appears to suggest that RISA applies to the Agreement merely because it provides for monthly payments.  But there is a key distinction between *(1)* installment payments on a purchase contract which charges interest for the privilege of paying over time and *(2)* periodic payments for an ongoing service. And while <u>N.J.S.A.</u> 17:16C-1(b) does refer to "goods or services," the kind of "service" that could fall within the definition of a "retail installment contract" would, by necessity, be one involving a financing arrangement -- <u>i.e.</u>, where the consumer receives the entire service up front and then pays for it over time (and pays a premium for the privilege of doing so).  Any other reading of the statute would extend it to all contracts for ongoing services that do not involve any sort of financing arrangement. Because a retail installment contract derives the purchase price from a defined retail price point, such a contract also has a defined endpoint based on the purchase price and interest calculations after which the consumer will assume ownership of the goods.  <u>See</u> <u>Green v. Continental Rentals</u>, 292 N.J. Super. 241, 252-253 (Law Div. 1994) (concluding that the leases at issue were in fact rent-

to-own contracts subject to RISA because the substance of the agreements demonstrated that the economic incentive of the transaction was ownership, not leasing). Plaintiff cannot change this result by recharacterizing the activation fee of Section 2.1 and the initial services payment made under Section 2.3 as a so-called "down payment." Compl., ¶ 17. They were simply the initial payments required to induce Vivint to begin providing the ongoing security monitoring service.

By contrast, a monthly service contract can – and often does – continue for an indefinite period of time, so long as the vendor continues to supply the service to the customer. And when the contract terminates, the vendor stops providing and the customer ceases receiving the service – without the customer then "owning" anything. That is exactly the case here. Section 2.4 provides that the contract term started on the day that the Agreement was signed; would continue for an initial term of 39 months; and would then continue from year to year thereafter unless canceled by either party in writing no later than 30 days before the end of the original term or renewal term. Consequently, as long as plaintiff chose to pay for the service, Vivint was to provide plaintiff with the service. And after the Agreement terminates, the plaintiff then "owns" nothing that she did not own when she made the first monthly payment.

For these reasons, the Agreement is a service contract, not a retail installment contract, and therefore the RISA count should be dismissed.

## II.   THE AGREEMENT IS NOT A "RETAIL INSTALLMENT CONTRACT" WITHIN THE MEANING OF DDRISA AND, THEREFORE, COUNT II OF PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED.

The Complaint's DDRISA count (Count II) shares the same deficiency as its RISA claims and should be similarly dismissed. Like RISA, DDRISA only applies to "retail installment contracts." See N.J.S.A. 17:16C-61.1, et seq. As discussed at length above, the Agreement is not a retail installment contract because it does not charge Vivint customers

interest or a premium for the privilege of paying for goods or services via installment payments and does not vest the customer with ownership of anything after that period of payments.

DDRISA provides certain added protections to consumers solicited to sign a retail installment contract by door-to-door salesmen. N.J.S.A. 17:16C-61.3 ("The Legislature hereby finds and declares that the consumer is frequently induced to enter into retail installment sales contracts for goods which he does not need through the unsolicited and often unethical persuasion of certain door-to-door sellers.").  Specifically, DDRISA enables the consumer to cancel the purchase made during a door-to-door sales call within three business days. N.J.S.A. 17:16C-61.5.  DDRISA also specifies the requirements for written disclosures that a door-to-door salesperson must provide to consumers, including the specific language for a required notice of a right to cancel the contract.  N.J.S.A. 17:16C-61.6. The Complaint alleges that the Agreement violated these requirements, by making the activation fee of Section 2.1 non-refundable and by including a "Notice of Cancellation" clause which allegedly failed to comply with DDRISA's requirements. Comp., ¶¶ 76-78.

But as its name suggests, DDRISA does not apply to all door-to-door sales.  The scope of DDRISA is specifically limited to "retail installment sales" or "retail installment contracts."   See N.J.S.A. 17:16C-61.5(a) ("Any retail installment sale of goods or retail installment contract for sale of goods . . . which is entered into at a place other than the place of business of the retail seller may be rescinded by the retail buyer. . . ."); N.J.S.A. 17:16C-61.5(b) ("Within 10 business days after receipt of such notice of intent to rescind the retail installment sale or retail installment contract, a retail seller shall. . . .); N.J.S.A. 17:16C-61.6 ("At the time of executing every week to week installment sale or retail installment contract subject to the provisions of Section 5 of this act, the retail seller shall deliver to the retail buyer two copies of

-14-

receipt. . . .").  As discussed at length above, the Agreement is not a retail installment contract; consequently, the Complaint's DDRISA claim fails and should be dismissed.

**III.    COUNT III SHOULD BE DISMISSED BECAUSE THE AGREEMENT SATISFIES THE HIP REGULATIONS AND, IN ANY EVENT, THE COMPLAINT DOES NOT PLEAD AN ASCERTAINABLE LOSS ARISING FROM THE ALLEGED HIP REGULATORY VIOLATION.**

The Complaint contends that "by omitting the cost of the 'Activation Fee' [disclosed in Section 2.1] from the 'total cash price' [listed in 2.3]" the Agreement violates the HIP Regulations and the CFA. Compl. at ¶ 83. But like RISA and DDRISA, the HIP Regulations do not apply to ongoing services. In an attempt to create a HIP violation, the Complaint conflates the cost of home improvements with the activation fee for the service itself.  A plain reading of the Complaint, the Agreement, and the HIP Regulations demonstrates that these allegations do not advance a plausible claim for relief due to the absence of a HIP Regulation violation and the lack of an ascertainable loss.

**A.    The Agreement satisfies the HIP Regulations.**

The Agreement satisfies the HIP Regulations' requirement that all home improvement contracts include the total price or other consideration to be paid by the buyer, including all finance charges.  Specifically, Section 2.2 of the Agreement, titled "Installation & Equipment Charges," sets forth the cost of the "home improvement" at issue, namely the alarm monitoring system. The HIP Regulations only pertain to disclosure of the purchase price of physical improvements to a home. See N.J.A.C. 13:45A-16.1A (limiting what constitutes "home improvement" to physical improvements). N.J.A.C. 13:45A-16.2(a)(12)(iii) requires that all home improvement contracts include the total price or other consideration to be paid by the buyer, including all finance charges.  The HIP Regulations define "home improvement" as:

> the remodeling, altering, painting, repairing, renovating, restoring, moving, demolishing, or modernizing of residential or

> noncommercial property or the making of additions thereto, and includes, but is not limited to, the installation . . . of . . . security protection devices . . .

N.J.A.C. 13:45A-16.1A.  Therefore, the actual installation of Vivint's alarm monitoring system qualifies as a home improvement because it is a permanent physical improvement to the dwelling.  Section 2.2 of the Agreement sets forth the cost of the alarm monitoring system, which in this case was waived, and thus satisfies N.J.A.C. 13:45A-16.2(a)(12)(iii). Consequently, the Agreement satisfies the HIP Regulations' requirements for home improvement contracts and does not violate the HIP Regulations and CFA.

The ongoing cost of the monitoring service associated with the system is not subject to the HIP Regulations because the monitoring service is not a permanent physical improvement to the home.  Plaintiff's contention that the fees for Vivint's monitoring of the alarm system are subject to the HIP Regulations is misplaced.  While a "home improvement" includes the "installation" of "security protection devices," N.J.A.C. 13:45A-16.1A does not extend to charges for ongoing communications service for security equipment.  In other words, the HIP Regulations only require the Agreement to state the total cost of the installation of the alarm system itself -- which the Agreement makes clear in Section 2.2 is $0. Moreover, the concept of disclosing "a total price" contemplates a discreet improvement project with a defined completion, which allows for a total price to be calculated.  On the other hand, the "total price" of an ongoing service cannot be calculated because that price will depend on how long the customer keeps the service and any later price increase lawfully imposed. The HIP Regulations are not meant to apply to such an ongoing service contract, like the Agreement at issue here.

**B.**      **The Complaint does not plead an ascertainable loss.**

The Complaint attempts to plead a CFA claim arising out of an alleged violation of the HIP Regulations.  To state a private claim for relief under the CFA, a complaint must

allege that he or she plaintiff suffered an "ascertainable loss of moneys or property, real or personal, *as a result of*" an act made unlawful by the statute.  N.J.S.A. 56:8-19 (emphasis added). This "as a result of" requirement means that a CFA plaintiff must "plead and prove a causal nexus between the alleged act of consumer fraud and the damages sustained."  New Jersey Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 15 (App. Div. 2003).  See Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 473 (1988) (N.J.S.A. 56:8-19 requires plaintiff to show he "suffers a loss due to" an unlawful practice); Ramanadham v. New Jersey Mfrs. Ins. Co., 188 N.J. Super. 30, 33 (App. Div.1982) (plaintiff must establish "the extent of any ascertainable loss, particularly proximate to a misrepresentation or unlawful act of the defendant condemned by the [Act]").  An unlawful act under the CFA may consist of a misrepresentation, material omission, unconscionable commercial practice, or violation of regulations adopted pursuant to the CFA.  N.J.S.A. 56:8-2.  While the showing of a regulatory violation may establish a CFA violation, N.J.S.A. 56:8-19 still requires a private plaintiff to plead, and then prove, an ascertainable loss incurred as a result of the regulatory violation.

The Complaint fails to plead an ascertainable loss caused by an alleged regulatory violation.  The Complaint alleges that the Agreement violates the HIP Regulations because Section 2.3's disclosure of "the total cash price you will pay us for the services" did not include the activation fee set forth in Section 2.1.  But it is silent as to any injury thereby caused to the plaintiff.  Certainly, the Complaint alleges no facts to plausibly suggest that plaintiff was deceived into believing that she would pay less to Vivint than she actually had to pay.  As explained above, the $1,949.61 identified in section 2.3 as the "total cash price … for the services" actually *overstated* the money plaintiff would pay over the Agreement's 39-month term by $195. Accordingly, plaintiff paid less than $1,949.61 even if one assumes *arguendo* that

section 2.3's disclosure should have included the $99 activation fee.  And, in any event, the Agreement's disclosures were clear and deceived no one. Section 2.3 makes clear that the total fee over the 39 months of the Agreement would be $1,949.61 for the "service." The activation fee appears in a separate section, Section 2.1, which is clearly labeled as a separate "Activation Fee."  The "service" fee was never represented to include the "activation" fee.

Consequently, Plaintiff's HIP claims should be dismissed.

## IV.   THE COMPLAINT FAILS TO STATE A TCCWNA CLAIM BECAUSE, AS EXPLAINED ABOVE, THE AGREEMENT DOES NOT VIOLATE RISA, DDRISA, OR THE HIP REGULATIONS; NOR DOES THE AGREEMENT OTHERWISE VIOLATE ANY "CLEARLY ESTABLISHED" LEGAL RIGHT.

The final "class" count in the Complaint (Count IV) asserts claims under TCCWNA, which allows a consumer to recover a $100 penalty upon showing that a seller required a consumer to enter into a contract containing a provision "that violates any clearly established legal right of a consumer or responsibility of a seller . . . as established by State or Federal law. . . ."  N.J.S.A. 56:12-15.  Here, the Complaint pleads the alleged infractions of RISA, DDRISA, and the HIP Regulations discussed above as the violations of plaintiff's "clearly established legal right[s]," which supposedly render Vivint liable for a $100 per-violation penalty under TCCWNA.  But for the reasons explained above, there are no such violations, and accordingly these TCCWNA claims must also fail.  In addition, paragraphs 87 to 90 of the Complaint allege other supposed TCCWNA violations – specifically, that (i) the Agreement's interest provision (Section 2.6) and limited warranty provision (Section 5) fails to state whether they are, or are not, enforceable in New Jersey, and (ii) the limitation-of-liability and indemnity provisions (Sections 15 and 16) violate "clearly established" New Jersey law.  As demonstrated below, these claims also fail.

-18-

**A.  The Agreement's warranty provision does not violate <u>N.J.S.A.</u> 56:12-16 of TCCWNA.**

TCCWNA provides that consumer contracts may not advise consumers that some of their provisions may be unenforceable in certain jurisdictions, without identifying which specific provisions are not enforceable in New Jersey.  However, this provision does <u>not</u> apply to warranties.  As TCCWNA states:

> No consumer contract, notice or sign shall state that any of its provisions is or may be void, unenforceable or inapplicable in some jurisdictions without specifying which provisions are or are not void, unenforceable or inapplicable within the State of New Jersey; <u>provided, however, that this shall not apply to warranties</u>.

<u>N.J.S.A.</u> 56:12-16.

The Complaint asserts that Section 5 of the Agreement violates TCCWNA because it advises that "[s]ome states do not allow a limitation on the duration of implied warranties."  Compl, ¶ 90.  Section 5, however, is clearly a *warranty* provision:

> This *warranty* does not include batteries or alarm screens.  We make no other express *warranty* including any *warranty* of merchantability of the system or its fitness for any special purpose.  We do not *warrant* that the system will always detect, or help prevent any burglary, fire, hold-up or other such event.  We do not *warrant* that the system cannot be defeated or compromised or that it will always operate.  This *warranty* does not cover repairs that are needed because of an accident, acts of God, your failure to properly use the system, or if someone other than us attempts to repair or change the system, or any other reason except a defect in the equipment or our installation.  We are not liable for consequential or incidental damages.  You agree that this is our only *warranty* and we have given you no other *warranty* for the system.

Agreement, Section 5 (emphasis added).  Section 5 then advises that limitations on the scope of the warranty may not apply in certain states:

> (D) State Law:  Some states do not allow a limitation on the duration of implied *warranties* or the exclusion or the limitation of consequential or incidental damages, so the above limitations or

> exclusions may not apply to you.  The *warranty* gives you specific legal rights and you may also have other rights which may vary from state to state.

Id. (emphasis added).  As a warranty provision, therefore, Section 5 is not subject to N.J.S.A. 56:12-16 and this TCCWNA theory fails to state a claim.

The Complaint further alleges that Section 2.6 of the Agreement violates this same TCCWNA provision.  Compl., ¶ 89.  However, all that Section 2.6 states is that Vivint will charge interest on dilatory payments owed by the consumer "in the maximum amount permitted by state law."  Compl. Ex. A.  It does not advise that any provision of the Agreement may be "void, unenforceable or inapplicable in some jurisdictions. . . ."  N.J.S.A. 56:12-16.  Nothing in TCCWNA requires Vivint to disclose in the Agreement the "maximum amount" of interest permitted by law, either in New Jersey or in all 50 states.  Therefore, this claim also fails to state a claim for violation of N.J.S.A. 56:12-16.

**B.     Sections 15 and 16 of the Agreement do not violate any "clearly established" right of a consumer.**

Paragraph 87 of the Complaint alleges that the Agreement violates TCCWNA because its limitation-of-liability provision (section 15) and indemnity provision (section 16) violate "clearly established" New Jersey law.  In McGarvey v. Penske Automotive Group, Inc., No. 08-5610, 2011 WL 1325210 (D.N.J. March 31, 2011), Judge Simandle addressed what it means for a contractual provision to violate a "clearly established" legal right of a consumer under TCCWNA.  In McGarvey, a plaintiff sought to amend its class action complaint to assert a TCCWNA claim arguing that a warranty violated a prohibition on tying arrangements contained in the Magnuson Moss Warranty Act, 15 U.S.C. § 2302.  Judge Simandle agreed that "the New Jersey legislature intended to impose [TCCWNA] liability only upon those vendors whose violation of a consumer statute was so clear that no reasonable vendor could fail to know that its

conduct was prohibited." Id. at *4.  Applying that standard to the case at hand, Judge Simandle

denied leave to amend on futility grounds because:

> At the time the warranties were made, there was no unambiguous
> statutory text, helpful legislative history, relevant precedent, or
> determinative regulatory interpretations [prohibiting the provision].
> . . . In other words, there was no established standard putting
> Defendant on notice that its conduct was prohibited. . . . [and,]
> therefore[,] Plaintiffs cannot state a claim under the [TCCWNA]
> for the violation of this right.

Id. at *5.

The Complaint does not allege that the Agreement violates a "clearly established"

right under this standard.   The first challenged provision, Section 15, provides an

acknowledgment by the customer that he or she understands that:  Vivint is "not an insurer of

[the customer's] premises, property or personal safety of persons"; security systems will not

always detect or prevent a home invasion; the service is not priced dependent upon the value of

the customer's premises or property; and it would be difficult to determine what percentage of a

loss would be caused by Vivint's failure to perform.   Accordingly, Section 15 limits the

consumer's remedy against Vivint to the lesser of $1,000 or twelve times the monthly service fee

paid by the customer.  Significantly, the Complaint cites no "statutory text, legislative history,

relevant precedence, or determinative regulatory interpretation" to show that this provision is

unenforceable. McGarvey, supra at *5.

Quite to the contrary, a limitation-of-liability provision such as Section 15 is

enforceable in a security monitoring contract.  Vivint's only possible duty to the consumer arises

out of its contract to perform the security monitoring service.  If a consumer experienced a loss

due to a home intrusion, the consumer would sue Vivint for an alleged breach of that duty.

Parties can, and do, commonly bargain to limit the liability of a security monitoring company for

a failure to perform its contractual obligations – and particularly so where, as here, the damages a

plaintiff might claim far out strip the price of the service provided.  In fact, "New Jersey courts have consistently upheld exculpatory provisions in cases where a plaintiff has sought to recover from the company that installed and maintained a security system protecting plaintiff's property." AXA Corporate Solutions Assur. v. Great American Lincs, Inc., No. 10-02023, 2012 WL575050, at *4 (D.N.J. Feb. 21, 2012).  See also Synnex Corp. v. ADT Security Serv., Inc., 394 N.J. Super. 577, 588-89 (App. Div. 2007) (Public policy favors the enforcement of exculpatory provisions in contracts for alarm systems, whether or not negligence is at issue; the property owner is in a better position than the security company to insure against the loss of that property, and these clauses are typically intended to facilitate security system contracts by allocating responsibility for the maintenance of insurance coverage, which is readily available to property owners.); Tessler & Son, Inc. v. Sonitrol Sec. Sys., 203 N.J. Super. 477, 481-86 (App. Div. 1985) (recovery precluded by limitation-of-liability provisions even in cases of gross negligence on the part of the security company.).[2]

Plaintiff evidently hopes to support this TCCWNA claim by citing to Judge Simandle's recent opinion in Martinez-Santiago v. Public Storage, No. 14-302, 2014 WL 4053960 (D.N.J. Aug. 28, 2014).  That case, however, involved a property owner's attempt to escape its common-law duty to maintain a safe premises for the benefit of business invitees by requiring consumers to sign an exculpatory clause in a storage unit rental contract.  Id. at *9. Judge Simandle noted that the issue was "whether a duty owed to business invitees may be waived in consumer contracts," and he held that "there is a public interest in holding a [business] to its general common law duty to business invitees—to maintain its premises in a condition safe

---

[2]  Further, the Agreement provides consumers with the ability to bargain for a different limitation of liability.  Section 15 informs the consumer that he or she may obtain a higher limitation for an additional charge, in which event a different rider would govern the liability related the alarm's system failure. Compl. Ex. A at § 15.  Id.

from defects that the business is charged with knowing or discovering. . . ."  Id.  This case, however, does not involve a premises owner seeking to escape its common-law duty to maintain a safe premise for invitees.  Vivint did not own any property – only plaintiff did so.

Section 16 parallels Section 15; while Section 15 addresses claims by the consumer, Section 16 addresses claims by third parties, such as plaintiff's invitees into her home.  The Agreement, of course, cannot limit the damages those third parties might claim against Vivint, but it can (and does) require plaintiff to indemnify Vivint for the same kinds of claims that parallel Section 15's limitation of liability (i.e., Vivint's alleged failure of performance, or negligence in providing security monitoring services).  The provision is not overbroad.  In fact, Section 16 states that plaintiff's  "obligation to pay us for such harm or damages shall not apply if the harm or damages happens while one of [Vivint's] employees or subcontractors is in or about your premises, and such harm or damages is solely caused by that employee or subcontractor."  Compl. Ex. A at § 16.  The Complaint cites no authority to suggest that this provision violates any "clearly established" law.

Accordingly, the Complaint fails to allege any TCCWNA violations and therefore the TCCWNA count should be dismissed.

## V.   THE COMPLAINT'S INDIVIDUAL COUNT SHOULD BE DISMISSED BECAUSE IT DOES NOT ALLEGE FACTS TO PLAUSIBLY SET FORTH A CFA CLAIM.

While not pled on behalf of the putative class, the final count of the Complaint alleges a CFA claim against Vivint arising from her particular interactions with Vivint.  The Complaint alleges that Vivint's attempted renewal of the Agreement through a telephone call, Vivint's alleged refusal to cancel the Agreement, a $15 reprocessing fee charged to her account, a "misrepresentation" that she would be liable for the balance of the Agreement if she canceled,

and "high pressure sales tactics" all violate the CFA.  Compl. ¶ 93.  But as explained below, none of these factual allegations plausibly state a CFA violation.

*The renewal of the Agreement, and Vivint's assertion of rights based upon that renewal*.  Vivint's renewal of the Agreement's term by a recorded telephone call is not an unlawful act prohibited by the CFA. See Compl. ¶ 93.  The Complaint does not allege any misrepresentation, material omission, or unconscionable commercial practice in connection with that renewal. Moreover, Vivint did not violate the CFA when it asserted its rights based upon that renewal of the Agreement.  The Complaint fails to allege how this assertion of rights constituted a misrepresentation, material omission, or unconscionable commercial practice.  The fact that plaintiff disputes the enforceability of her recorded oral extension of the Agreement's term – because, she alleges, it was recorded but not reduced to a writing -- does not mean that Vivint violated the CFA when Vivint sought to enforce the contract extension.  Contract disputes such as this are not the stuff of CFA claims. Cox v. Sears Roebuck & Co., 138 N.J. 2, 18 (1994) ("Because any breach of warranty or contract is unfair to the non-breaching party, the law permits that party to recoup remedial damages in an action on the contract; however, by providing that a court should treble those damages and should award attorneys' fees and costs, the Legislature must have intended that substantial aggravating circumstances be present in addition to the breach.") citing D'Ercole Sales v. Fruehauf Corp., 206 N.J. Super. 11, 25 (App.Div. 1985) ("But a breach of warranty, or any breach of contract, is not per se unfair or unconscionable, and a breach of warranty alone does not violate a consumer protection statute.").

*The $15 reprocessing fee.*  The Complaint alleges that Vivint violated the CFA by charging plaintiff an alleged $15 reprocessing fee, which the Complaint contends was not authorized by the Agreement and was an unconscionable commercial practice prohibited by the

CFA.  But the Complaint does not allege that plaintiff paid this $15 fee, and therefore she has no ascertainable loss.  Quite to the contrary, the Complaint alleges that plaintiff made her last payment in February 2014, before Vivint assessed the $15 fee in March 2014.  Compl, ¶¶ 34-35.

Moreover, "[t]he New Jersey Supreme Court has explained that '[t]he standard of conduct that the term 'unconscionable' implies is lack of good faith, honesty in fact and observance of fair dealing." McGarvey v. Penske Automotive Group, Inc., 639 F.Supp.2d 450, 464 (2009) citing Cox v. Sears Roebuck & Co., supra, 138 N.J. 2, 18 (finding that the "Legislature must have intended that substantial aggravating circumstances be present in addition to the breach" to substantiate a finding of unconscionability). Moreover, "courts in this District have recognized that CFA claims targeting allegedly unconscionable commercial conduct 'are subject to Rule 9(b)'s heightened pleading standards.'" McGarvey, supra, 639 F.Supp.2d at 464-65 (internal citations omitted) (such acts must rise to the level of "bad faith or were otherwise dishonest [necessary] … to satisfy the CFA's unconscionable commercial practice requirement.").   Here, the Complaint's scant allegations fails to set forth how the assessment of a single $15 fee shows "dishonest" acts in "bad faith."

*High-pressure sales tactics.*   The Complaint alleges that Vivint used "high pressure sales tactics" -- supposedly, the installation of the alarm equipment immediately, upon consummating the sale -- to deter plaintiff from exercising the three-day right to cancel.  But again, the immediate installation of equipment upon the placement of the order does not show "dishonesty" or "bad faith" sufficient to make out an unconscionable commercial practice. Moreover, the Complaint does not plead an ascertainable loss and it does not allege that plaintiff would have cancelled the Agreement within the three-day period but was dissuaded from doing so because the equipment had already been installed. Quite to the contrary, the Complaint alleges

that plaintiff used and enjoyed the alarm monitoring system from 2009 to 2012 without incident or complaint.

For these reasons, the Complaint's individual CFA count should be dismissed.

## **CONCLUSION**

Based on the foregoing, the Court should grant Vivint's Rule 12(b)(6) motion and dismiss the Complaint, with prejudice.

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**
Attorneys for Defendant Vivint, Inc.

By: /s/ Gavin J. Rooney

Dated:  October 1, 2014                          Gavin J. Rooney, Esq.