# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

PAULETTE VENDITTO, on behalf of
itself and others similarly situated,

               Plaintiff,

    v.

VIVINT, INC., f/k/a APX Alarm
Security Solutions, Inc.,

               Defendants.

Civil Action No. 2:14-cv-04357
(JLL)(JAD)


## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT VIVINT INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Daniel I. Rubin
Henry P. Wolfe
THE WOLF LAW FIRM, LLC
1520 U.S. Highway 130 - Suite 101
North Brunswick, NJ 08902
Tel. 732-545-7900; Fax 732-545-1030

David C. Ricci
Law Office of David C. Ricci, LLC
51 JFK Parkway, First Floor West
Short Hills, New Jersey 07078
Tel. 973-218-2627; Fax 973- 206-6955
*Attorneys for Plaintiff and the putative class*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. ii

TABLE OF AUTHORITIES ..................................................................... iv

PRELIMINARY STATEMENT ................................................................. 1

PLAINTIFF'S FACTUAL ALLEGATIONS AND LEGAL CLAIMS ................... 3

LEGAL ARGUMENT ............................................................................. 8

I.  STANDARD GOVERNING MOTIONS TO DISMISS UNDER RULE 12(B)(6). ............................................................................................... 8

II.  PLAINTIFF'S AMENDED COMPLAINT PROPERLY SETS FORTH CLAIMS FOR RELIEF UNDER THE CONSUMER FRAUD ACT ON BEHALF OF PLAINTIFF AND THE PUTATIVE CLASS BASED ON VIOLATIONS OF THE RETAIL INSTALLMENT SALES ACT .................... 10

    A.  RISA applies to the Alarm Agreement .................................... 10

    B.  Defendant's Violations of RISA Give Rise to CFA Claims ................... 15

III.  PLAINTIFF'S AMENDED COMPLAINT PROPERLY SETS FORTH CLAIMS FOR RELIEF UNDER THE TRUTH-IN-CONSUMER CONTRACT, WARRANTY AND NOTICE ACT .................................................... 17

    A.  The Alarm Agreement Violates the Retail Installment Sales Act by Charging an Impermissible Fee, Omitting Plaintiff's Down Payment, Misstating the Total Cash Price and Unpaid Cash Balance, and Providing an Improper Notice ................................................... 19

    B.  The Alarm Agreement Violates the Door-to-Door Retail Installment Sales Act by Providing an Improper Notice of Cancellation ................... 20

    C.  The Alarm Agreement Violates the Home Improvement Practices Regulations by Failing to Include the Activation Fee in the Disclosed Total Cash Price ................................................................. 22

    D.  The Exculpatory Clauses in the Alarm Agreement are Contrary to Clearly-Established New Jersey Law ....................................... 26

    E.  The Alarm Agreement Improperly Fails to Specify Whether the Limitation of Consequential and Incidental Damages and the Interest Term Apply in New Jersey .................................................. 33

IV. THE AMENDED COMPLAINT PROPERLY SETS FORTH PLAINTIFF'S INDIVIDUAL CFA CLAIM BASED ON DEFENDANT'S UNLAWFUL CONDUCT IN CONNECTION WITH THE RENEWAL OF PLAINTIFF'S CONTRACT..................................................................................34

CONCLUSION ....................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alston v. Parker*,
  363 F.3d 229 (3d Cir. 2004) .............................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .........................................................................................10

*AXA Corporate Solutions Assur. v. Great American Lines, Inc.*, No. 10-2023,
  2012 U.S. Dist. LEXIS 21606, 2012 WL 575050 (D.N.J. February 21, 2012)...35

*Barrows v. Chase Manhattan Mortgage Corp.*,
  465 F. Supp. 2d 347 (D.N.J. 2006).....................................................................27

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................................9

*Bosland v. Warnock Dodge, Inc.*,
  396 N.J. Super. 267 (App. Div. 2007), *aff'd*, 197 N.J. 543 (2009).....................20

*Cox v. Sears Roebuck & Co.*,
  138 N.J. 2 (N.J. 1994)................................................................................. 18, 42

*Gershon v. Regency Diving Ctr.*,
  368 N.J. Super. 237 (N.J. Super. Ct. App. Div. 2004) .......................................29

*Grayson v. Mayview State Hosp.*,
  293 F.3d 103 (3d Cir. 2002) ..............................................................................10

*Hojnowski v. Vans Skate Park*,
  187 N.J. 323 (N.J. 2006)...................................................................... 28, 30, 34

*Huffmaster v. Robinson*,
  221 N.J. Super. 315 (Law Div. 1986) ................................................................26

*Korrow v. Aaron's, Inc.*, No. 10-6317,
  2011 U.S. Dist. LEXIS 95306, 2011 WL 3794231 (D.N.J. Aug. 25, 2011)  17, 18

*Kugler v. Romain*,
  58 N.J. 522 (N.J. 1971).....................................................................................41

*Kuzmiak v. Brookchester, Inc.*,
  33 N.J. Super. 575 (N.J. Super. Ct. App. Div. 1955) .........................................30

*Levin v. Lewis*,
  179 N.J. Super. 193 (App. Div. 1981).................................................................26

*Lucier v. Williams*,
  366 N.J. Super. 485 (N.J. Super. Ct. App. Div. 2004) .................................. 29, 32

*Martinez-Santiago v. Public Storage*, No. 14-302,
  2014 U.S. Dist. LEXIS 112710 (D.N.J. August 14, 2014) ..............................3, 32

*McCarthy v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
  48 N.J. 539 (1967) ...........................................................................................34

*McGarvey v. Penske Auto Group, Inc.*,
    486 Fed. Appx. 276 (3d Cir. 2012) .................................................................27
*Merin v. Maglaki*,
    126 N.J. 430 (N.J. 1992)..................................................................................11
*New Jersey Citizen Action v. Schering-Plough Corp.*,
    367 N.J. Super. 8 (N.J. Super. Ct. App. Div. 2003) ...........................................17
*New York v. Hill*,
    528 U.S. 110 (2000) .........................................................................................10
*Scibek v. Longette*,
    339 N.J. Super. 72 (App. Div. 2001)................................................................26
*Synnex Corp. v. ADT Security Serv., Inc.*,
    394 N.J. Super. 577 (N.J. Super. Ct. App. Div. 2007).................................. 34, 35
*Tessler & Son v. Sonitrol Sec. Sys.*,
    203 N.J. Super. 477 (N.J. Super. Ct. App. Div. 1985).......................................30
*United Consumer Financial Services Co. v. Carbo*,
    410 N.J. Super. 280 (N.J. Super. Ct. App. Div. 2009).......................................27
*Valhal Corp. v. Sullivan Assoc., Inc.*,
    44 F.3d 195 (3d Cir. 1995) ..............................................................................29

**Statutes**
15 *U.S.C.* §1601 ...............................................................................................14
15 *U.S.C.* §1602 ...............................................................................................14
*N.J.A.C.* 13:45A-16.................................................................................. passim
*N.J.S.A.* 17:16C-1 ..................................................................................... passim
*N.J.S.A.* 17:16C-24 ............................................................................................7
*N.J.S.A.* 17:16C-27 ........................................................................................7, 21
*N.J.S.A.* 17:16C-42 ..................................................................................... 13, 38
*N.J.S.A.* 17:16C-50 ......................................................................... 7, 13, 18, 21
*N.J.S.A.* 17:16C-61.1 .........................................................................................6
*N.J.S.A.* 17:16C-61.5 ................................................................................ 7, 22, 23
*N.J.S.A.* 17:16C-61.6 ................................................................................ 7, 22, 23
*N.J.S.A.* 56:12-15 .................................................................................... passim
*N.J.S.A.* 56:12-16 .................................................................................... passim
*N.J.S.A.* 56:12-17 ............................................................................................20
*N.J.S.A.* 56:12-18 ............................................................................................20
*N.J.S.A.* 56:8-19 ............................................................................................8, 28
*N.J.S.A.* 56:8-2 ........................................................................................ passim

**Other Authorities**

Norman J. Singer & J.D. Shambie Singer,
  SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION (7th ed. 2009)...........11
RESTATEMENT (SECOND) OF CONTRACTS §195 (1981) ...........................................27

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................9
Fed. R. Civ. P. 8(a)(2)..............................................................................9

## PRELIMINARY STATEMENT

This case arises out of the door-to-door sale of alarm equipment and services to Plaintiff Paulette Venditto, an elderly woman living alone in Roselle, New Jersey. Ms. Venditto first attempted to cancel her contract with Defendant Vivint, Inc. (hereinafter "Defendant" or "Vivint") on August 1, 2012, more than thirty days prior to the expiration of the initial contract period, but was informed that she was not allowed to cancel, based upon a telephone discussion concerning the extension of the agreement term that was never committed to writing as required under the contract. Ms. Venditto continued to attempt to cancel the contract and eventually retained counsel to assist her, but Vivint maintained that her cancellation was not allowed. In addition to thwarting Ms. Venditto's cancellation efforts, the written alarm contract includes numerous terms which violate New Jersey statutes, regulations, and decisional law, and charges Ms. Venditto and other New Jersey consumers fees which are not permitted under New Jersey consumer protection laws.

The Amended Complaint plainly and sufficiently sets forth claims on behalf of Ms. Venditto and the putative class under the New Jersey Consumer Fraud Act ("CFA") and the Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA") based on Defendant's imposition of fees prohibited by the Retail Installment Sales Act ("RISA") and on numerous facial violations of other New

1

Jersey consumer protection laws in the body of the Defendant's standard form contract. Defendant's argument that RISA does not apply to its contract, which provides for the sale and installation of alarm equipment and 39 months of monitoring service, and which lists a "total cash price" of $1,949.61 payable in monthly installments, is contrary to the plain language of RISA, which covers "any contract…evidencing an agreement to pay the retail purchase price of goods or services…in two or more installments over a period of time." *N.J.S.A.* 17:16C-1(b). Defendant's argument that RISA only covers contracts that impose interest is contrary to the plain language of the statute, and to the Legislature's intent that the statute be applied broadly to accomplish its remedial purpose.

Even assuming that RISA did not apply to Defendant's alarm sale and service contract, Plaintiff's TCCWNA claims based on violations of other New Jersey laws would still stand[1], and those claims are also sufficiently pled. For example, the Amended Complaint sets forth a TCCWNA claim based on overreaching exculpatory clauses in Defendant's contract that are essentially similar to clauses that Chief Judge Simandle recently ruled give rise to TCCWNA claims. *See Martinez-Santiago v. Public Storage*, No. 14-302, 2014 U.S. Dist. LEXIS 112710 (D.N.J.

---

[1] TCCWNA is violated when a seller offers a contract that contains a provision that violates any other New Jersey or federal law. *N.J.S.A.* 56:12-15. TCCWNA can also be violated if the contract contains a clause stating that a provision may not be valid in some states, without specifying whether it is valid in New Jersey. *N.J.S.A.* 56:12-16.  In either case, TCCWNA provides a private action for statutory damages of $100. *N.J.S.A.* 56:12-17.

August 14, 2014). Defendant's contract also contains facial violations of the New Jersey Home Improvement Regulations, which apply regardless of whether the contract is subject to RISA. Finally, the contract contains provisions stating that some of the provisions may not be enforceable in some states, without stating whether they are enforceable in New Jersey, in direct violation of TCCWNA at *N.J.S.A.* 56:12-16.

The Amended Complaint also sufficiently sets forth claims under the CFA on behalf of Ms. Venditto only, based on Defendant's deceptive and unconscionable commercial conduct in attempting to verbally renew her contract without memorializing the purported modification in writing, as required by the terms of the agreement, and then refusing to cancel the renewal despite receiving timely notice from Ms. Venditto to do so.

## PLAINTIFF'S FACTUAL ALLEGATIONS AND LEGAL CLAIMS

On June 19, 2009, a salesperson came to Plaintiff Paulette Venditto's residence to offer the sale of a home alarm system and monitoring services on behalf of Vivint's predecessor in interest APX Alarm Security Solutions, Inc.  Doc. 11, Am. Compl. ¶¶6-7. Ms. Venditto agreed to purchase the alarm system and monitoring services, and the alarm equipment was installed that same day. *Id.* at ¶9. In connection with the transaction, Vivint's predecessor prepared and directed Ms. Venditto to sign an Alarm System Purchase and Service Agreement (the "Alarm Agreement"). *Id.* at ¶9, Ex. A.

The Alarm Agreement states that Plaintiff would be charged a $99.00

"Activation Fee" (marked down from the pre-printed price of $198.00), which was designated as "Non-Refundable." *Id.* at ¶12(a), Ex. A. The initial term of the contract was thirty-nine months, and Plaintiff would be charged a $44.99 monthly services fee (marked down from the pre-printed price of $49.99) plus taxes. *Id.* at ¶12(c), Ex. A. The Alarm Agreement identifies the "total cash price" as $1,949.61. *Ibid.*

The price for installation and equipment charges is listed as "$ _0_ (See SOP)." *Id.* at ¶12(b). The "SOP" refers to the "Schedule of Protection," a separate document that was attached to the Alarm Agreement. *Id.* at ¶23, Ex. A. Notwithstanding the absence of a listed price for installation and equipment on the face of the Alarm Agreement, the Schedule of Protection does set forth specific prices for both the alarm equipment and the cost of the installation, including the following: "Keypad & Siren" $399.00, "Door/Window" $99.00, "Door" $99.00, "Window" $99.00, "Motion" $195.00, "Key Fob" $99.00, "Lifetime" $199.00, "Installation" $199.00, and "Installation Charge" $198.00. *Id.* at ¶25, Ex. A.

The Alarm Agreement states that Vivint may retake possession of some or all of the alarm equipment listed in the Schedule of Protection if the customer failed to make payments under the contract. Specifically, Section 12(C) provides that Vivint may cancel service if the customer fails to "pay the service charge due to us, after we have given you ten days' notice that we are cancelling service because of non-payment", and that:

[i]f service is canceled or this agreement is terminated for any reason,

4

> you authorized [sic] us to…enter your premises to disconnect your system from our monitoring equipment and remove our communications equipment and software and all of our signs and decals from your premises for our then prevailing disconnect fee… You understand that the System may not work with equipment used by other alarm companies or monitoring centers. You agree that you will grant us access to your premises to allow us to repossess or disable the equipment.

Am. Compl. ¶26, Ex. A.

Plaintiff made a down payment of $147.14, consisting of the $99.00 activation fee, the first month's $44.99 monthly services fee, and $3.15 in sales tax. *Id.* at ¶17. Plaintiff's down payment was not reflected anywhere on the Alarm Agreement, nor does the Alarm Agreement set forth the remaining unpaid cash balance (the difference between the total cash price and the down payment). *Id.* at ¶¶18-19.

The Amended Complaint alleges that Vivint charged an "Activation Fee" that was not permitted under the Retail Installment Sales Act of 1960, *N.J.S.A.* 17:16C-1, *et seq.*, and that the charging of this fee in violation of RISA constitutes an unconscionable commercial practice in violation of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8-1 *et seq. Id.* at ¶¶64-68. Plaintiff alleges an ascertainable loss for this violation of the CFA in the amount of $99.00, the "Activation Fee" that she paid. *Id.* at ¶69.

Plaintiff also contends that the Alarm Agreement contains numerous terms both on the face of the contract and buried in fine print on the reverse side of the document which violate several New Jersey consumer protection statutes and

regulations, including RISA, the Door-to-Door Retail Installment Sales Act of 1968 ("DDRISA"), *N.J.S.A.* 17:16C-61.1, *et seq.,* the CFA, and the New Jersey Home Improvement Practices Regulations promulgated under the CFA, *N.J.A.C.* 13:45A-16.1 to -16.2 ("HIP Regulations"). The Amended Complaint further alleges that the Alarm Agreement includes terms which violate clearly-established New Jersey case law. By including terms which violate clearly-established New Jersey statutes, regulations, and decisional law, the Alarm Agreement violates the Truth-in-Consumer Contract, Warranty and Notice Act at *N.J.S.A.* 56:12-15. The Amended Complaint also alleges that the Alarm Agreement improperly states that some of its provisions may not apply to all consumers, yet fails to set forth whether the provisions apply or do not apply in New Jersey, in direct violation of TCCWNA at *N.J.S.A.* 56:12-16.

Plaintiff's Amended Complaint describes the manner by which the Alarm Agreement terms violate specific New Jersey laws and regulations, including the following:

➢ The Alarm Agreement charges an "Activation Fee," which is a fee that is not permitted to be charged under RISA at *N.J.S.A.* 17:16C-50, Am. Compl. ¶¶12(a), 65-69, 86(a);

➢ The Alarm Agreement fails to set forth the down payment made by Plaintiff, in violation of RISA at *N.J.S.A.* 17:16C-27, Am. Compl. ¶¶18, 71, 86(d);

➢ The Alarm Agreement fails to accurately set forth the total cash price and the unpaid cash balance, in violation of RISA at *N.J.S.A.* 17:16C-27, Am. Compl. ¶¶16, 19, 86(c), (e);

➤ The "Notice to Customer" in the Alarm Agreement was inconsistent with the notice required by RISA at *N.J.S.A.* 17:16C-24 because it failed to state that the customer was entitled to receive a copy of the contract "at the time you sign," Am. Compl. ¶¶20, 86(f);

➤ The Alarm Agreement states that the "Activation Fee" is "Non-Refundable," which misrepresented Plaintiff's right to cancel the contract and obtain a full refund within three business days in violation of DDRISA at *N.J.S.A.* 17:16C-61.5, Am. Compl. ¶¶12(a), 76, 86(b);

➤ The notice of cancellation attached to the Alarm Agreement fails to set forth a description of the goods sold, the amount of money paid by Plaintiff at the time the contract was entered into, or a notice that failure to exercise the cancellation option does not interfere with any other remedies the retail buyer may have against the retail seller, in violation of DDRISA at *N.J.S.A.* 17:16C-61.6, Am. Compl. ¶¶21, 77, 86(g), (h); and

➤ The Alarm Agreement omits the "Activation Fee" from the "Total Cash Price" listed on the face of the contract, in violation of the HIP Regulations at *N.J.A.C.* 13:45A-16.2(a)(12)(iii) and the CFA, Am. Compl. ¶¶14, 83, 86(i).

The Amended Complaint further describes additional provisions in the Alarm Agreement which violate clearly-established New Jersey decisional law:

➤ The limitation of liability and indemnification terms in Sections 15 and 16 of the Alarm Agreement are unenforceable and contrary to New Jersey case law holding that a party may not contract in advance to release liability resulting from intentional or reckless conduct, Am. Compl. ¶¶30, 32, 87.

In addition to the inclusion of terms which violate New Jersey law, the Amended Complaint identifies two terms which are limited by reference to State law, but which fail to state whether the limitations apply in New Jersey:

➤ Section 5 of the Alarm Agreement, titled "Repair Service," states, *inter alia*, that the contract's limitation of consequential and incidental damages terms are not allowed in some States, but does not indicate whether the limitations are allowed or not allowed in New Jersey, Am. Compl. ¶¶28, 90;

7

> ➤ Section 2.6 of the Alarm Agreement states that Plaintiff may be assessed late charges "in the maximum amount permitted by State law," but fails to indicate whether interest and other fees can be charged under RISA and other New Jersey laws, Am. Compl. ¶¶12(e), 89.

Based upon the charging of the "Activation Fee" and the inclusion of the foregoing terms in the Alarm Agreement, Plaintiff seeks relief for herself and all other New Jersey consumers who entered into an Alarm Agreement with Vivint or its predecessor during the applicable limitations period as follows: three times the amount of the "Activation Fee" charged in violation of RISA and the CFA, pursuant to the CFA at *N.J.S.A.* 56:8-19; and a statutory penalty for the Alarm Agreement's inclusion of terms contrary to clearly-established New Jersey law in violation of TCCWNA, pursuant to *N.J.S.A.* 56:12-17.

Plaintiff also seeks additional damages under the CFA arising out of her attempts to cancel the Alarm Agreement. The factual basis for Plaintiff's individual claims is set forth in section IV, *infra*.

## LEGAL ARGUMENT

## I.   STANDARD GOVERNING MOTIONS TO DISMISS UNDER RULE 12(B)(6).

A motion to dismiss under FED. R. CIV. P. 12(b)(6) should be granted only if the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair

notice of what the … claim is and the grounds upon which it rests.'" *Id.* at 555 (alteration in original). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ibid.* (alteration in original); *see also* FED. R. CIV. P. 8(a)(2). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Dismissal with prejudice is a "harsh remedy[,]" *New York v. Hill*, 528 U.S. 110, 118 (2000), and is only appropriate if amendment would be futile. *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004). The Third Circuit has therefore held that "[w]hen a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

## II.  PLAINTIFF'S AMENDED COMPLAINT PROPERLY SETS FORTH CLAIMS FOR RELIEF UNDER THE CONSUMER FRAUD ACT ON BEHALF OF PLAINTIFF AND THE PUTATIVE CLASS BASED ON VIOLATIONS OF THE RETAIL INSTALLMENT SALES ACT

### A. <u>RISA applies to the Alarm Agreement</u>

"Construction of any statute necessarily begins with consideration of its plain language. Such language should be given its ordinary meaning, absent a legislative intent to the contrary." *Merin v. Maglaki*, 126 N.J. 430, 434-435 (N.J. 1992) (citations omitted). RISA's plain language leaves no doubt that the statute applies to Defendant's Alarm Agreement. RISA applies to "retail installment contracts" for goods or services costing less than $10,000, and defines "retail installment contract" as follows:

> …**any contract**…entered into in this State between a retail seller and a retail buyer **evidencing an agreement to pay the retail purchase price of goods <u>or services</u>, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time.** This term includes a security agreement, chattel mortgage, conditional sales contract, or other similar instrument and any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation a sum substantially equivalent to or in excess of the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.

*N.J.S.A.* 17:16C-1(b)(emphases added). This definition plainly covers the Defendant's Alarm Agreement.  The Agreement obligates the buyer to purchase alarm equipment and a finite amount of monitoring services  (39 months' worth of services as indicated in preprinted text on the form contract), and lists a total cash

price for those services of $1,949.61, to be paid in monthly installments of $49.99[2]. Am. Compl., Ex A. Thus, it is clear that Alarm Agreement is a "contract… evidencing an agreement to pay the retail purchase price of… goods or services, which are primarily for personal, family or household purposes… in two or more installments over a period of time" and that it is therefore a "retail installment contract" subject to RISA.

Defendant's argument that the Alarm Agreement is not subject to RISA because it does not expressly impose a finance charge is contrary to the plain language of the statute, and seeks to impose restrictions on the applicability of RISA that are not within the statute itself. This sort of constriction of the statute is contrary to the Supreme Court's directive in *Perez v. Rent-A-Center, Inc.*,186 N.J. 188 (N.J. 2006) to construe RISA liberally and inclusively:

> In enacting RISA, the stated legislative purpose was protection of the public interest through the regulation of the charges associated with the time sale of goods [and services]…[T]he Legislature signaled that it intended to sweep into the Act as many cognate agreements as possible, even those that did not strictly fall within a denominated category. That broad mandate, along with **the well-established notion that remedial statutes like RISA should be liberally construed** to achieve their salutary aims, *Barratt v. Cushman & Wakefield*, 144 N.J. 120, 127, 675 A.2d 1094 (1996), require **questions regarding the applicability of the statute to be resolved in favor of consumers for whose protection RISA was enacted.**

---

[2] In Ms. Venditto's contract, the pre-printed "$49.99" is stricken with $44.99 handwritten above it.

11

*Perez*, 186 N.J. at 209; *see also* Norman J. Singer & J.D. Shambie Singer, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION (7th ed. 2009) § 60:2 ("A liberal construction is ordinarily one which makes the statutory rule or principle apply to more things or in more situations than would be the case under a strict construction.").

Defendant's argument that RISA only covers installment contracts that impose interest or finance charges is based on the false premise that RISA's sole purpose is to regulate interest and finance charges. On the contrary, RISA prohibits *any* fees or charges other than those expressly authorized by the statute (*see N.J.S.A.* 17:16C-50), and includes various provisions regulating fees *other* than interest or finance charges. *See, e.g.*, *N.J.S.A.* 17:16C-42 (a)-(c) (regulating late fees); *N.J.S.A.* 17:16C-42 and -50 (regulating attorney's fees, court costs and other expenses incurred in collections); *N.J.S.A.* 17:16C-30 and -33 (regulating certain types of insurance premiums); *N.J.S.A.* 17:16C-1 and -27 (regulating official fees, such as lien recording fees or motor vehicle license and transfer fees); and *N.J.S.A.* 17:16C-42(e) regulating return check fees.[3] Indeed, the Court in *Perez* recognized that RISA was concerned with "regulation of the charges associated with the time sale of goods [and services]" generally, and not just interest or finance charges. *Perez*, 186 N.J. at 209.

---

[3] Notably, Defendant's "Activation Fee" is not a fee authorized by RISA, and is therefore prohibited by RISA at *N.J.S.A.* 17:16C-50.

That the Legislature did not intend for RISA to be limited to contracts that impose interest or a finance charge is also evident from the fact that the statute defines "retail installment contract" to expressly include certain contracts that do not charge interest or finance charges. As noted above, in addition to traditional installment sale contracts, RISA defines "retail installment contract" to include:

> … any contract for the bailment or leasing of goods by which the bailee or lessee **agrees to pay as compensation a sum substantially equivalent to <u>or</u> in excess of the value of the goods**, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.

*N.J.S.A.* 17:16C-1. By including contracts that only require the customer to pay "a sum substantially equivalent to…the value of the goods" in order to "become…the owner of such goods",  the Legislature clearly signaled its intention that RISA was to cover installment sales contracts for goods and services regardless of whether they impose  interest or finance charges.[4]

Defendant's comparison of its standard 39-month Alarm Agreement to utility service agreements is factually inapt. Such agreements are typically month-to-month contracts, terminable at will, and do not state a total "cash price" with a disclosed "APR" over a fixed term. By contrast, Defendant purposely drafted its

---

[4] There is notable precedent for consumer credit legislation to apply even where no interest is imposed. The federal Truth in Lending Act, 15 *U.S.C.* §1601 *et seq.* ("TILA") covers any credit transaction "which is payable by agreement in more than four installments **<u>or</u>** for which the payment of a finance charge is or may be required." 15 *U.S.C.* §1602(g).

contract to clarify that the customer was purchasing a defined amount of services (39 months' worth), with a singular "cash price" of $1,949.61, to be paid in monthly installments, with a disclosed "0% APR." The contract's disclosure of a "0% APR" is an acknowledgment by Defendant that the Alarm Agreement was a type of transaction in which interest *could* have been charged – i.e., an installment sale over time for 39 months of services, and not a "pay as you go" utility contract.

Moreover, unlike a month-to-month utility contract, the Defendant's monitoring "Services Agreement" is part and parcel of a larger contract for the sale of proprietary alarm equipment (for which Defendant does not impose any additional cost, apart from the monthly charges designated as "service" charges), and the contract gives Defendant the right to repossess the equipment if the customer fails to pay the Alarm Agreement. *See* Am. Compl., Ex. A ¶12. This ongoing right of repossession is directly contrary to Defendant's argument that title to the equipment passed to Plaintiff at the conclusion of the three-day cancellation period. Def. Brief at p. 4. Plaintiff did not hold title to the equipment at the end of three days, because Defendant could retake possession of the equipment at any time if Plaintiff failed to make her monthly payments.

Thus, it is evident that the monthly payments under the "Alarm System Purchase and Services Agreement" are not merely for monthly services, but necessarily encompass payment for the installation and purchase of the alarm equipment installed at the beginning of the contract. This fact is reinforced by the

14

listing of separate prices for the alarm system components and the cost of installation of the Schedule of Protection attached to the Alarm Agreement. Am. Compl. ¶¶23-25, Ex. A. The identification of specific prices in the Schedule of Protection for each component of the alarm system as well as the installation of these components reinforces the inseparable nature of the equipment and services sold.

Moreover, as alleged in the Amended Complaint, Defendant represented to Plaintiff that she would be liable for the entire remaining balance of the Alarm Agreement if she canceled the contract. Am. Compl. ¶93(d). This shows that Defendant itself sees the contract term as a single quantum of services that the customer becomes obligated to purchase at the time of the contract, as opposed to separate months of services that the customer purchases on a "pay-as-you-go" basis.

### B.  Defendant's Violations of RISA Give Rise to CFA Claims

In *Perez v. Rent-A-Center*, the New Jersey Supreme Court ruled that the imposition of charges in violation of RISA may also constitute unconscionable commercial conduct in violation of the CFA at *N.J.S.A.* 56:8-2. *Perez*, *supra*, 186 N.J. at 220. In *Korrow v. Aaron's, Inc.*, No. 10-6317, 2011 U.S. Dist. LEXIS 95306, 2011 WL 3794231 (D.N.J. Aug. 25, 2011), the Hon. Joel A. Pisano summarized this holding in *Perez* as follows:

> [T]here is no private right of action under RISA…The CFA, however, does provide a private right of action for any unconscionable commercial practice or fraud in connection with the sale of any merchandise. *N.J.S.A.* 56:8-2. The statute also instructs that it should be applied in conjunction with other statutes or common law: "The rights, remedies and prohibitions accorded by the provisions of this act are hereby declared to be in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State." *N.J.S.A.* 56:8-2.13. **The Supreme Court of New Jersey clearly interpreted this as allowing RISA claims to be asserted under the CFA**

*Id.* at *6 (emphasis added, some internal citations omitted). Judge Pisano concluded that "it has been clearly established by the Supreme Court of New Jersey that RISA claims may be asserted under the CFA and Defendant's motion to dismiss on those grounds must be denied." *Id.* at *7.

"To state a claim under the CFA, a plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 12-13 (N.J. Super. Ct. App. Div. 2003) (*citing Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 24 (N.J. 1994)). Here, Plaintiff sufficiently pled ascertainable loss because she was charged an "Activation Fee" that Defendant was prohibited from charging under RISA at *N.J.S.A.* 17:16C-50. This same theory of ascertainable loss was held in *Korrow* to sustain a viable CFA claim sufficient to survive a motion to dismiss:

For each alleged deficiency in Defendant's contract, Plaintiff has pled a violation of RISA, or "unlawful conduct." Plaintiff has also pled that she paid monies that included the allegedly unlawful interest and allegedly unlawful charges and fees. In addition, the Supreme Court of New Jersey has held that a contract that unlawfully imposes a debt upon a consumer necessarily constitutes a loss under the CFA, *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 22, 647 A.2d 454, 464 (1994), and Plaintiff has pled such unlawful contract practices in this case. Finally, Plaintiff has pled that the alleged RISA violations caused her ascertainable losses. As such, without addressing the merits of Plaintiff's RISA claims themselves, Plaintiff has sufficiently pled her case under the CFA to survive the motion to dismiss at this early stage in the proceedings.

*Korrow* at *8-9. Thus, Plaintiff has sufficiently pled a CFA claim based on Defendant's imposition of an "Activation Charge" that Defendant was prohibited from charging by RISA.

## III.   PLAINTIFF'S AMENDED COMPLAINT PROPERLY SETS FORTH CLAIMS FOR RELIEF UNDER THE TRUTH-IN-CONSUMER CONTRACT, WARRANTY AND NOTICE ACT

The New Jersey Truth-in-Consumer Contract, Warranty, and Notice Act prohibits the offering, giving, or displaying of any consumer warranty, notice, or sign that "includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed." *N.J.S.A.* 56:12-15.

TCCWNA further provides that "[n]o consumer contract, notice or sign shall state that any of its provisions is or may be void, unenforceable or inapplicable in

some jurisdictions without specifying which provisions are or are not void, unenforceable or inapplicable within the State of New Jersey; provided, however, that this shall not apply to warranties." *N.J.S.A.* 56:12-16.

In enacting the law, the New Jersey Legislature believed that the inclusion of such unlawful provisions in a contract, warranty, notice, or sign "deceive[d] a consumer into thinking they are enforceable and for this reason the consumer often fails to enforce his rights." L. 1981, c. 454, eff. Feb. 10, 1982, Assem. Comm. State., A.B. 1660 (May 1, 1980).

The New Jersey Supreme Court recently confirmed that "[T]he rights, remedies, and prohibitions conferred by the TCCWNA are 'in addition to and cumulative of any other right, remedy or prohibition accorded by common law, Federal law or statutes of this State.'" *Shelton v. Restaurant.com*, 214 N.J. 419, 428 (N.J. 2013) (*quoting* N.J.S.A. 56:12-18). The *Shelton* court also noted that when TCCWNA was enacted, "[T]he Governor's signing statement described the bill as 'strengthening provisions of the CFA." *Id.* at 432 (*quoting Governor's Statement on Signing Assembly Bill No. 1660* (Jan. 11, 1982)). The statute "did not recognize any new consumer rights but merely imposed an obligation on sellers to acknowledge clearly established consumer rights and provided remedies for posting or inserting provisions contrary to law." *Ibid*. Violations of the act entitle the aggrieved consumer to a civil penalty of not less than $100.00, actual damages, or both, together with attorney's fees and court cost *N.J.S.A.* 56:12-17.

"[A] consumer contract that violates a clearly established legal right under the CFA regulations is also a violation of the TCCWNA." *Bosland v. Warnock Dodge, Inc.*, 396 N.J. Super. 267, 279 (N.J. Super. Ct. App. Div. 2007), *aff'd*, 197 N.J. 543 (N.J. 2009).

In this case, the Alarm Agreement contains multiple provisions which violate RISA, DDRISA, and the HIP Regulations, and thus violate TCCWNA at *N.J.S.A.* 56:12-15. The Alarm Agreement also contains terms which violate TCCWNA directly by attempting to impose limitations on liability that are contrary to clearly-established New Jersey law in violation of *N.J.S.A.* 56:12-15, and by failing to specify whether the contract's limitations on damages and maximum late charges are allowed in New Jersey, in violation of *N.J.S.A.* 56:12-16.

**A.** **The Alarm Agreement Violates the Retail Installment Sales Act by Charging an Impermissible Fee, Omitting Plaintiff's Down Payment, Misstating the Total Cash Price and Unpaid Cash Balance, and Providing an Improper Notice**

As described above, the New Jersey Retail Installment Sales Act applies to the Alarm Agreement, and the Alarm Agreement charged Plaintiff an "Activation Fee" which was not permitted by RISA at *N.J.S.A.* 17:16C-50. In addition to the imposition of this fee, the Alarm Agreement failed to set forth Plaintiff's down payment, and misstated the total cash price and the unpaid cash balance due on the contract. RISA provides that "[e]very retail installment contract shall set forth the

following separate items" including the cash price, the down payment made by the retail buyer, and the unpaid cash balance. *N.J.S.A.* 17:16C-27. The Alarm Agreement's failure to accurately set forth these items constitutes a violation of RISA.

RISA sets forth the clearly-established rights of Plaintiff and responsibilities of Vivint's predecessor at the time the Alarm Agreement was signed. The violations of RISA in the Alarm Agreement constitute violations of TCCWNA at *N.J.S.A.* 56:12-15.

**B. <u>The Alarm Agreement Violates the Door-to-Door Retail Installment Sales Act by Providing an Improper Notice of Cancellation</u>**

The Door-to-Door Retail Installment Sales Act ("DDRISA") applies to all retail installment contracts that are in excess of $25.00 and "entered into at a place other than the place of business of the retail seller…." *N.J.S.A.* 17:16C-61.5. DDRISA requires that all retail sellers must provide two copies of a receipt which "clearly and conspicuously sets forth: (1) The retail seller's name and place of business; (2) A description of the goods sold; and (3) The amount of money paid by the retail buyer or the cash value of any goods delivered to the retail seller at the time the retail installment sale or retail installment contract was entered into." *N.J.S.A.* 17:16C-61.6(a).

DDRISA provides that the retail buyer has a right to cancel the door-to-door retail installment sale and obtain a full refund of all amounts paid within three

business days of the date the contract is signed. *N.J.S.A.* 17:16C-61.5(a). Upon receipt of a cancellation notice, among other requirements, the retail seller must pick up any goods delivered to the purchaser, and "[r]efund to the retail buyer **all amounts of money paid** by the retail buyer…." *N.J.S.A.* 17:16C-61.5(b) (emphasis added).

In this case, the Alarm Agreement was a retail installment contract entered into at Plaintiff's residence, subjecting the contract to the requirements of DDRISA. However, the Alarm Agreement states that the "Activation Fee" was non-refundable, which misrepresented Plaintiff's right to obtain a refund of "all amounts of money paid" in the event she chose to cancel the contract within three business days pursuant to DDRISA at *N.J.S.A.* 17:16C-61.5(b). By designating the "Activation Fee" as non-refundable, the Alarm Contract misrepresents Plaintiff's clearly-established right under DDRSIA to cancel the contract and obtain a full refund. In addition, the "Notice of Cancellation" in the Alarm Agreement does not set forth the amount of money paid by Plaintiff, a description of the goods sold, or a statement that failure to exercise the cancellation option does not interfere with any other remedies the retail buyer may have against the retail seller. This information is required by DDRISA to be provided in the notice of cancellation. *N.J.S.A.* 17:16C-61.6(a)-(b).

DDRISA sets forth the clearly-established rights of Plaintiff and responsibilities of Vivint's predecessor at the time the Alarm Agreement was

signed. The violations of DDRISA in the Alarm Agreement constitute violations of TCCWNA at *N.J.S.A.* 56:12-15.

**C. The Alarm Agreement Violates the Home Improvement Practices Regulations by Failing to Include the Activation Fee in the Disclosed Total Cash Price**

The New Jersey Home Improvement Practices Regulations were promulgated by the Division of Consumer Affairs "to implement the provisions of the Consumer Fraud Act, *N.J.S.A.* 56:8-1 et seq., by providing procedures for the regulation and content of home improvement contracts and establishing standards to facilitate enforcement of the requirements of the Act." *N.J.A.C.* 13:45A-16.1(a). The HIP Regulations apply to all "home improvements," which are defined to include the "construction, installation, replacement, improvement or repair" of such varied items as "fire protection devices, security protection devices, central heating and air conditioning equipment, water softeners, heaters, and purifiers, solar heating or water systems, insulating installation, siding, wall-to-wall carpeting or attached or inlaid floor coverings…." *N.J.A.C.* 13:45A-16.1A. The HIP Regulations unquestionably apply to the installation of fire and security protection devices, such as the equipment installed by Vivint. The inclusion of unattached and removable materials such as water softeners and wall-to-wall carpeting in the regulatory definition of "home improvements" demonstrates that the Regulations are not limited to "physical improvements" as argued by Vivint, Def. Brief at p. 15, and expressly apply to "installation."

The HIP Regulations require that all home improvement contracts "shall clearly and accurately set forth in legible form and in understandable language all terms and conditions of the contract, including, but not limited to, the following: … (iii) The total price or other consideration to be paid by the buyer, including all finance charges." *N.J.A.C.* 13:45A-16.2(a)(12)(iii). The HIP Regulations do not contain any exception for the cost of equipment, installation, or services. All home improvement contracts must "clearly and accurately set forth" the "total price or other consideration to be paid by the buyer." In this case, Vivint failed to do so, by omitting the "Activation Fee" from the "Total Cash Price" disclosed on the contract.

For the reasons set forth above, the cost of the alarm equipment and installation was an inseparable component of the price set forth in the Alarm Agreement. The Statement of Protection attached to the Alarm Agreement lists the cost of each of the alarm equipment and installation, and the Court should reject Vivint's argument that the alarm installation and equipment were provided at no cost. Vivint's claim that the cost of the monitoring services could not be accurately disclosed is similarly unavailing, since the Alarm Agreement began with a fixed, thirty-nine month term, and the cost of monitoring services for that term could be, and was, calculated and set forth in the contract.

The HIP Regulations require "clear and accurate" disclosures of the total price. Even assuming that Vivint can prove that it did not ultimately charge

Plaintiff the "Total Cash Price" of $1,949.61 clearly set forth in bold print in the contract, this understatement of the total price does not constitute a "clear and accurate" disclosure of the actual price to be paid by the Plaintiff.

The violation of a regulation promulgated pursuant to the CFA, such as the HIP Regulations, constitutes a *per se* violation of the CFA itself. *Cox v. Sears, Roebuck & Co.*, 138 N.J. 2, 18 (N.J. 1994) ("…the regulations impose strict liability for such violations."). "The Consumer Fraud Act should be … construed to confer upon the Attorney General the broadest kind of power to act in the interest of the consumer public." *Levin v. Lewis*, 179 N.J. Super. 193, 200 (N.J. Super. Ct. App. Div. 1981). Thus, New Jersey's courts have enforced the CFA regulations strictly, even when the regulatory violation was "innocent, technical and committed in good faith." *Scibek v. Longette*, 339 N.J. Super. 72, 80 (N.J. Super. Ct. App. Div. 2001) (*citing Huffmaster v. Robinson*, 221 N.J. Super. 315, 322 (N.J. Super. Ct. Law Div. 1986)). "When viewed as part of the general scheme of the [CFA], the regulations should be liberally construed in favor of the consumer." *Levin*, 179 N.J. Super. at 200.

In this case, Plaintiff has pleaded the HIP Regulations violation only as a predicate to a TCCWNA claim. Am. Compl. ¶86(i). Accordingly, Plaintiff is not required to demonstrate an ascertainable loss resulting from Vivint's violation of the HIP Regulations. *Barrows v. Chase Manhattan Mortgage Corp.*, 465 F. Supp. 2d 347, 362 (D.N.J. 2006) ("[TCCWNA] can be violated if a contract or notice

simply contains a provision prohibited by state or federal law, and it provides a remedy even if a plaintiff has not suffered any actual damages."); *McGarvey v. Penske Auto Group, Inc.*, 486 Fed. Appx. 276, 278 (3d Cir. 2012) (noting that the plaintiff "sufficiently stated a [TCCWNA] claim" based on a violation of the Magnuson-Moss Warranty Act even in the absence of actual damages, which are required to pursue a private cause of action under that statute); *United Consumer Financial Services Co. v. Carbo*, 410 N.J. Super. 280, 306 (N.J. Super. Ct. App. Div. 2009) ("the act of offering a consumer contract that violates a legal right of a consumer under the law is sufficient to establish a violation of this statute.").

In arguing that Plaintiff must plead an ascertainable loss in order to demonstrate a violation of the HIP Regulations, Vivint fails to account for the distinction between demonstrating a violation of the CFA at *N.J.S.A.* 56:8-2, which includes strict liability for violation of the regulations promulgated under the Act, and the prerequisites for a private cause of action under the CFA at *N.J.S.A.* 56:8-19, which requires the demonstration of an ascertainable loss.

By failing to include the "Activation Fee" in the "Total Cash Price" set forth in the contract, the Alarm Agreement violated the HIP Regulations at *N.J.A.C.* 13:45A-16.2(a)(12)(iii), which also constitutes a violation of the CFA at *N.J.S.A.* 56:8-2. The HIP Regulations and the CFA were clearly-established law at the time the Alarm Agreement was executed. By offering and entering into a contract that contained a provision which violated Plaintiff's clearly-established legal rights and

Vivint's clearly-established responsibilities under the HIP Regulations, Vivint violated TCCWNA at *N.J.S.A.* 56:12-15.

### D. <u>The Exculpatory Clauses in the Alarm Agreement are Contrary to Clearly-Established New Jersey Law</u>

In New Jersey, "[e]xculpatory agreements have long been disfavored in the law because they encourage a lack of care." *Hojnowski v. Vans Skate Park*, 187 N.J. 323, 333 (N.J. 2006) (*citing Gershon v. Regency Diving Ctr.*, 368 N.J. Super. 237, 247 (N.J. Super. Ct. App. Div. 2004)). "For that reason, courts closely scrutinize liability releases and invalidate them if they violate public policy." *Id.* at 333 (*citing Lucier v. Williams*, 366 N.J. Super. 485, 491 (N.J. Super. Ct. App. Div. 2004)). The New Jersey courts apply an increased level of scrutiny where the contract is one of adhesion in which the terms are presented on a "take it or leave it basis," and the parties are of unequal bargaining power. *Lucier*, 366 N.J. Super. at 492. "Where the provision limits a party's liability, we pay particular attention to any inequality in the bargaining power and status of the parties, as well as the substance of the contract." *Id.* at 492 (*citing Valhal Corp. v. Sullivan Assoc., Inc.*, 44 F.3d 195, 204 (3d Cir. 1995) (additional citations omitted)).

Under clearly-established New Jersey Supreme Court and appellate court precedent, it is contrary to New Jersey public policy for a contract to include a purported advance waiver of liability based upon intentional, reckless, willful or wanton misconduct. "It is well settled that to contract in advance to release tort

liability resulting from intentional or reckless conduct violates public policy….”
*Hojnowski*, 187 N.J. at 333 (*citing Kuzmiak v. Brookchester, Inc.*, 33 N.J. Super.
575, 580 (N.J. Super. Ct. App. Div. 1955); RESTATEMENT (SECOND) OF
CONTRACTS §195 (1981)); *Tessler & Son v. Sonitrol Sec. Sys.*, 203 N.J. Super. 477,
484 (N.J. Super. Ct. App. Div. 1985) (“We hold that an exculpatory clause may
expressly excuse or limit liability for negligent contract performance, but that such
a clause does not operate to bar a claim of willful and wanton misconduct.”).

Notwithstanding this well-settled precedent, the exculpatory clauses in the
Agreement purport to release Vivint from all liability, even in cases of intentional
or reckless conduct.  First, Section 15, titled “APX is not an Insurer; Limitation of
Liability” states in part:

> Even if a court decides that our breach of this agreement, or a failure
> of the System, or our negligence, or a failure of the installation,
> monitoring or repair serve caused or allowed any harm or damage
> (whether property damage, **personal injury or death**) to you or
> anyone in your premises, you agree that our liability shall be limited
> to the lesser of $1000.00 or twelve (12) times the monthly services
> fee, and this shall be your sole and exclusive remedy regardless of
> what legal theory (**including without limitation**, negligence, breach
> of contract, breach of warranty or product liability) is used to
> determine that we were liable for the injury or loss.

[Am. Compl. Ex. A (emphasis added)]

A plain reading of this term limits Vivint’s liability to $1,000.00 or twelve
times the monthly services fee in all instances, regardless of the legal theory of
damages alleged. By its own terms, the limitation of liability would apply to an

27

intentional tort claim resulting in "personal injury or death" and "regardless of what legal theory" was alleged, even if that claim was premised upon intentional, reckless, willful or wanton misconduct.

This reading of the limitation of liability term is corroborated by Section 16, titled "Third Party Indemnification and Subrogration," which as Defendant correctly notes "parallels Section 15…." Def. Brief at 22. The indemnity term states in relevant part:

> If anyone other than you asks us to pay for any harm or damages (including property damage, personal injury or death) connected with or resulting from (i) our breach of this agreement, (ii) a failure of the System or service, (iii) our negligence, (iv) **any other improper or careless activity of ours in providing the System or services**, or (v) a claim for indemnification or contribution, you will pay us (A) any amount which a court orders us to pay or which we reasonably agree to pay and (B) the amount of our reasonable attorney's fees and any other losses or costs that we may pay in connection with the harm or damages. Your obligation to pay us for such harm or damages shall not apply if the harm or damages happens while one of our employees or subcontractors is in or about your premises, and such harm or damages is solely caused by that employee or subcontractor….

[Am. Compl. Ex. A (emphasis added)]

Vivint's attempt to release liability based on intentional or reckless misconduct is even more explicit in this indemnity term, as the coverage for "improper or careless activity" is stated separately from negligence, breach of contract, or a failure of the system.

Both Section 15 and Section 16 of the Agreement purport to limit and otherwise release Vivint from liability, even if that liability were to arise from

intentional, reckless, willful, or wanton misconduct. Under clearly-established New Jersey precedent, these exculpatory terms are contrary to New Jersey public policy. The fact that the terms are buried in the fine print on the reverse side of a non-negotiable and adhesive consumer contract further supports this finding. *Lucier*, 366 N.J. Super. at 492.

A contract containing terms contrary to public policy violates TCCWNA. In *Martinez-Santiago v. Public Storage*, No. 14-302, 2014 U.S. Dist. LEXIS 112710 (D.N.J. August 14, 2014), Chief Judge Simandle held that the plaintiff properly stated class action claims under TCCWNA, based on the presence of exculpatory terms in a storage contract which were contrary to New Jersey public policy. The court found that the contract's limitation of liability term would allow the storage facility to escape liability for negligent or careless activity, in contravention of its common law duty to maintain its premises for business invitees. *Id.* at 33-34. In denying the storage company's motion to dismiss the plaintiff's TCCWNA claims, the court noted that "one of the wrongs that the TCCWNA sought to address was the inclusion of provisions in consumer contracts that are not enforceable but appear to be so, thereby discouraging consumers from enforcing their rights…." *Id.* at 35. Judge Simandle quoted recent New Jersey Supreme Court precedent stating:

> Far too many consumer contracts, warranties, notices and signs contain provisions [that] clearly violate the rights of consumers. Even though these provisions are legally invalid or unenforceable, their very inclusion in a contract, warranty, notice or sign deceives a

consumer into thinking that they are enforceable and for this reason the consumer often fails to enforce his rights.

[*Id.* at 35-36 (*quoting Shelton*, *supra*, 214 N.J. at 431 (*quoting* Sponsors' Statement, <u>Statement to Assembly Bill No. 1660</u> (May 1, 1980))]

The limitation of liability term at issue in *Martinez-Santiago* was more limited than the term in Vivint's contract, as it provided that the storage company could still be liable for "fraud, willful injury or willful violation of law." *Id.* at 34. Section 15 contains no such limitation. However, similar to Section 16 of the Alarm Agreement, the indemnity term in *Martinez-Santiago* was not subject to the fraud limitation and is closely analogous to the indemnity term in this case, in that it would require indemnification "for any loss, even if it arises out of a claim for injury caused by Defendant's negligent, reckless or intentional conduct." *Id.* at 38. The plaintiff in *Martinez-Santiago* argued that such an unlimited indemnity term was void and unenforceable under TCCWNA, and Judge Simandle found that "[t]here is no reason to disregard this argument." *Id.* at 38.

Based on the foregoing, the exculpatory clauses in the Vivint Agreement are contrary to clearly-established New Jersey law, and therefore violate TCCWNA at *N.J.S.A.* 56:12-15.

The cases cited by Vivint are not to the contrary. In *Synnex Corp. v. ADT Security Serv., Inc.*, 394 N.J. Super. 577 (N.J. Super. Ct. App. Div. 2007), the court

upheld an exculpatory clause in an alarm contract between two business entities. The court stated that:

> [W]e emphasize that this case only involves the validity of an exculpatory clause as applied to property loss for which the buyer of an alarm system may obtain its own insurance coverage. It does not involve the validity of such a clause as applied to a personal injury claim, with respect to which different policy considerations would have to be evaluated.

*Id.* at 594 (*citing Hojnowski*, 187 N.J. at 333; *McCarthy v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 48 N.J. 539, 543 (1967). The court noted that the exculpatory clause was "set forth in large capital letters," *id.* at 582, and that the property owner "is a large corporation that could have negotiated for a contract without an exculpatory clause or purchased a security system from another vendor." *Id.* at 591. The court emphasized that the exculpatory clause "simply allocates responsibility to Synnex to maintain insurance coverage for the theft of its property," *id.* at 584, and that the contract "expressly recognizes this purpose of the exculpatory clause, by providing that '[c]ustomer agrees to look exclusively to customer's insurer to recover for injuries or damage in the event of any loss or injury and releases and waives all right of recovery against ADT arising by way of subrogation.'" *Id.* at 589. The Vivint Agreement terms in this case include no such reference to insurance coverage.

The court in *Tessler & Son v. Sonitrol Sec. Sys.*, *supra*, noted that "an exculpatory clause may expressly excuse or limit liability for negligent contract

performance, but [] such a clause does not operate to bar a claim of willful and wanton misconduct." *Tessler, supra,* 203 N.J. Super. at 484.[5]

The case of *AXA Corporate Solutions Assur. v. Great American Lines, Inc.*, No. 10-2023, 2012 U.S. Dist. LEXIS 21606, 2012 WL 575050 (D.N.J. February 21, 2012), also involved the application of an exculpatory clause in a commercial transportation contract between two business entities. *Id.* at *2.  Relying on New Jersey case law, the court found that a term limiting liability in the event of a breach of contract or negligence was not contrary to New Jersey public policy. *Id.* at *10. The court did not make any findings with respect to an exculpatory clause purporting to waive liability in instances of intentional or reckless misconduct.

As described above, Plaintiff in this action challenges the exculpatory terms in the Vivint contract as overbroad and contrary to public policy in their application to claims of intentional, reckless, willful, or wanton misconduct. The fact that courts have upheld exculpatory clauses in alarm contracts between sophisticated business entities with respect to negligent contract performance in property damage claims does not override the clearly-established New Jersey law prohibiting the application of exculpatory clauses to intentional and reckless misconduct, especially in contracts of adhesion. The exculpatory clauses in

---

[5] The New Jersey Appellate Division has specifically called into question the *Tessler* court's suggestion that an exculpatory clause could bar suit for grossly negligent performance. *Steluti v. Casapenn Enterprises, LLC*, 408 N.J. Super. 435, 457 n. 6 (N.J. Super. Ct. App. Div. 2009).

Vivint's Agreement would apply to such misconduct, and are therefore contrary to clearly-established New Jersey law, in violation of TCCWNA.

**E.  The Alarm Agreement Improperly Fails to Specify Whether the Limitation of Consequential and Incidental Damages and the Interest Term Apply in New Jersey**

As Vivint acknowledges in its brief, TCCWNA at *N.J.S.A.* 56:12-16 prohibits contract terms which state that any provisions may be "void, unenforceable or inapplicable in some jurisdictions without specifying which provisions are or are not void, unenforceable or inapplicable within the State of New Jersey…." The challenged provision in Section 5 of the Agreement is not simply a warranty term. Section 5 is titled "Repair Service," and states, "We are not liable for consequential or incidental damages" arising out of a failure of the system or malfunction of system components. Am. Compl. Ex. A. Subpart (D) then provides: "Some states do not allow a limitation on the duration of implied warranties **or the exclusion or the limitation of consequential or incidental damages, so the above limitations or exclusions may not apply to you**." *Ibid.* (emphasis added).

This term does exactly what TCCWNA at *N.J.S.A.* 56:12-16 prohibits: it states that the exclusion and limitation of damages term may not apply in some States, but fails to set forth whether the exclusion and limitation applies or does not apply in New Jersey. The exclusion and limitation of consequential and incidental damages is closely related to the limitation of liability term in Section 15 of the

Agreement. For the reasons set forth above, that limitation is contrary to public policy, and would not apply in New Jersey. TCCWNA requires that the contract specifically disclose that the exclusion and limitation term would not apply in New Jersey, and the Agreement's failure to do so is a violation of *N.J.S.A.* 56:12-16.

Similarly, Section 2.6 of the Agreement violates TCCWNA at *N.J.S.A.* 56:12-16 by failing to set forth whether New Jersey law permits interest to be charged on late payments. Defendant argues that "all that Section 2.6 states is that Vivint will charge interest on dilatory payments owed by the consumer 'in the maximum amount permitted by state law.'" Def. Brief at p. 19. However, RISA does not permit interest to be charged on late payments and limits the imposition of late fees on retail installment contracts to an amount not to exceed $10.00 on each minimum payment due. *N.J.S.A.* 17:16C-42(b)-(c).

By failing to specify "the maximum amount permitted by law" in New Jersey with respect to the late charges, Section 2.6 of the Alarm Agreement also violated TCCWNA at *N.J.S.A.* 56:12-16.

## IV.   THE AMENDED COMPLAINT PROPERLY SETS FORTH PLAINTIFF'S INDIVIDUAL CFA CLAIM BASED ON DEFENDANT'S UNLAWFUL CONDUCT IN CONNECTION WITH THE RENEWAL OF PLAINTIFF'S CONTRACT.

The Amended Complaint alleges that on or around March 5, 2012, prior to the expiration of the initial contract term, Plaintiff received an unsolicited phone call from Vivint's representative, offering to extend the term of the Alarm

Agreement for forty-two months. Am. Compl. at ¶37. Notwithstanding Plaintiff's alleged verbal agreement to the proposed extension, the proposed modification of the contract was not reduced to writing. *Id.* at ¶¶38-39.

Following the March 2012 phone call, Plaintiff decided that she wished to cancel the agreement, and called Vivint on or about August 1, 2012 and again on September 5, 2012, asking to cancel the contract prior to the September 19, 2012 end date of the initial contract term. *Id.* at ¶40. Vivint refused to cancel the contract, based on Plaintiff's prior oral agreement to renew. *Id.* at ¶41. Plaintiff called Vivint again on or about February 21, 2013 and May 6, 2013, and restated her request to cancel the contract, but Vivint refused her cancellation request. *Id.* at ¶42. Plaintiff continued making monthly service payments to Vivint up to and including February 18, 2014. *Id.* at ¶43.

On February 20, 2014, Plaintiff sent Vivint a formal cancellation letter, which Vivint received on February 24, 2014. *Id.* at ¶44, Ex. B. Vivint still would not honor Plaintiff's cancellation request, and continued to send her monthly bills, which included a $15.00 processing fee and late charges. *Id.* at ¶¶45-46, Exs. C, D.

Plaintiff alleges that Vivint's attempted verbal renewal and refusal to cancel the Alarm Agreement despite her repeated cancellation requests before and after the expiration of the initial contract term constitute an unconscionable commercial practice, deception, fraud, false pretenses, false promises and/or misrepresentations in violation of the Consumer Fraud Act at *N.J.S.A.* 56:8-2. *Id.* at ¶93. Plaintiff

further challenges Vivint's misrepresentation that she would be liable for the entire account balance if she attempted to cancel her agreement, as well as the imposition of the $15.00 processing fee, and the fact that the alarm equipment was installed on the same day that the sales representative first arrived at Plaintiff's residence to offer the sale of the alarm equipment and services. *Ibid.*

In support of her claims, Plaintiff points to Section 18 of the Alarm Agreement, which states that the contract "may only be changed by a written agreement signed by you (and if married, your spouse) and us. It may not be changed by any oral statements or representations made by our sales representative." Am. Compl. Ex. A. Contrary to Vivint's argument, the oral modification from the initial thirty-nine month contract period to add an additional forty-two month period from the date of the phone call (for a total contract length of almost seventy-five months) is a "change" to the contract terms, which under the plain text of Section 18 of the Alarm Agreement was required to be reduced to writing in order to be effective. Instead, Vivint acted contrary to the terms of its own agreement, and then continually thwarted Plaintiff's efforts to cancel the contract based upon the invalid oral contract modification. Plaintiff contends that Vivint's conduct in this regard constitutes an unconscionable commercial practice.

The Consumer Fraud Act prohibits the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation … in connection with the sale or

36

advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid…." *N.J.S.A.* 56:8-2. "Merchandise" includes both goods and services. *N.J.S.A.* 56:8-1.

The New Jersey Courts have defined "unconscionability" as a lack of "good faith, honesty in fact and observance of fair dealing." *Kugler v. Romain*, 58 N.J. 522, 544 (N.J. 1971). An "unconscionable commercial practice" under the CFA is an "amorphous concept obviously designed to establish a broad business ethic" and therefore such claims are determined "on a 'case-by-case basis.'" *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 472 (N.J. 1988) (*quoting Kugler*, 58 N.J. at 543).

To establish that Vivint committed an unconscionable commercial practice in violation of the CFA, it is not necessary for Plaintiff to prove actual deceit or an intent to mislead. *N.J.S.A.* 56:8-2 (unconscionable practices declared unlawful "whether or not any person has in fact been misled, deceived or damaged thereby"); *Meshinsky*, 110 N.J. at 472 ("To prove a violation of section 56:8-2, it is not necessary to show actual deceit or a fraudulent act; any unconscionable commercial practice is prohibited.").

Under the foregoing standards, Plaintiff has pleaded sufficient facts which, if proven, would support a claim for an unconscionable commercial practice under the CFA. Vivint's alleged conduct rises beyond a mere contractual dispute. Plaintiff alleges that Vivint acted in bad faith by failing to comply with the written

modification requirement in its own contract, and then aggravating this breach by repeatedly refusing Plaintiff's requests to cancel the contract. Vivint then further compounded the breach by continuing to charge monthly service fees and by attempting to collect charges, including the $15.00 reprocessing fee, which are not authorized by the Alarm Agreement, even after Plaintiff sent a formal cancellation letter. *See Cox*, 138 N.J. at 23 ("an improper debt or lien against a consumer-fraud plaintiff may constitute a loss under the Act, because the consumer is not obligated to pay an indebtedness arising out of conduct that violates the Act.").

Based on Vivint's conduct, Plaintiff suffered an ascertainable loss in the amount of all fees charged and all payments made after the expiration of the initial Alarm Agreement term on September 19, 2012. *Id.* at ¶95. She seeks treble her ascertainable loss, as well as a declaratory judgment that her contract with Vivint expired at the end of the initial thirty-nine month period and was not renewed. *Id.* at ¶96. Vivint does not address either of these requests for relief in its brief.

Plaintiff has adequately pleaded facts in support of her individual claim under the CFA, therefore Vivint's motion to dismiss this claim should be denied.

## **CONCLUSION**

For all of the reasons set forth herein, Defendant Vivint Inc.'s motion to dismiss Plaintiff's Amended Complaint should be denied.


Dated:  October 20, 2014                    Respectfully submitted,

                                                       _s/ Daniel I. Rubin_____
                                                       THE WOLF LAW FIRM, LLC
                                                       *Attorneys for Plaintiffs and the putative*
                                                       *class*