Daniel I. Rubin (NJ Attorney ID 015552005)
The Wolf Law Firm, LLC
1520 U.S. Hwy. 130, Suite 101
North Brunswick, NJ  08902
(732) 545-7900 – Phone
(732) 545-1030 – Fax

David C. Ricci (NJ Attorney ID 037622011)
Law Office of David C. Ricci
51 JFK Parkway, First Floor West
Short Hills, New Jersey 07078
(973) 218-2627 – Phone
(973) 206-6955 – Fax
*Attorneys for Plaintiff and those similarly situated*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAULETTE VENDITTO, on behalf of herself and others similarly situated, | Civil Action No: 2:14-cv-04357(JLL)(JAD) |
| Plaintiff, | |
| vs. | **SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |
| VIVINT, INC., f/k/a APX Alarm Security Solutions, Inc., | |
| Defendant. | |

## PRELIMINARY STATEMENT

1. This putative class action charges Defendant Vivint, Inc. (formerly known as APX Alarm Security Solutions, Inc.), a corporation with its principal business address at 4931 North 300 West, Provo, Utah, with contracting for and charging unlawful fees in its alarm equipment sales and monitoring service contracts, in violation of applicable New Jersey consumer protection laws, including the Retail Installment Sales Act of 1960 ("RISA"), N.J.S.A. 17:16C-1, *et seq.,* the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 *et seq.*, and the the Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA"), N.J.S.A. 56:12-14 to -18.   Plaintiff Paulette Venditto, residing at 214 Victory Street, Roselle, New Jersey, seeks, on behalf of herself and all others similarly situated, treble recovery of the unlawfully charged fees and equitable relief pursuant to the CFA, and statutory damages under TCCWNA.

2. Plaintiff further charges Defendant with using a standard form Alarm System Purchase and Services Agreement that contains terms which violate the clearly-established legal rights of Plaintiff and those similarly situated and the clearly-established responsibilities of Defendant under RISA, the Door-to-Door Retail Installment Sales Act of 1968 ("DDRISA"), N.J.S.A. 17:16C-61.1, *et seq.,* the New Jersey Home Improvement Practices Regulations (hereinafter the "HIP Regulations"), at N.J.A.C. 13:45A-16.1 to -16.2, and the Door-to-Door Home Repair Sales Act of 1968 ("DDHRSA"), N.J.S.A. 17:16C-95, *et seq.*, in violation of TCCWNA at N.J.S.A. 56:12-15, in addition to direct violations of TCCWNA at N.J.S.A. 56:12-16.  Based on these violations, Plaintiff seeks additional statutory damages under TCCWNA for herself and those similarly situated.

3. Plaintiff also brings individual claims against Defendant for unconscionable commercial practices in violation of the CFA in connection with Plaintiff's attempts to cancel her contract.

## PARTIES

4. Plaintiff Paulette Venditto resides in Roselle, New Jersey.

5. Defendant Vivint, Inc., formerly known as APX Alarm Security Solutions, Inc. ("Vivint"), is a for-profit corporation located in Provo, Utah.

## VENUE

6. Defendant has removed Plaintiff's action to this Court pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d) and 1453.

## FACTUAL ALLEGATIONS

7. On June 19, 2009, Defendant's door-to-door salesman came to Plaintiff's home to sell a home alarm system and monitoring services to Plaintiff.

8. At that time, Defendant was known as APX Alarm Security Solutions, Inc.

9. After discussing the features of the system and services, and the terms and conditions of the agreement, Plaintiff agreed to purchase the alarm system and monitoring services from Defendant for personal and household purposes.

10. Defendant installed the alarm system equipment and set up the monitoring service on June 19, 2009, the same day the door-to-door salesman first appeared at Plaintiff's residence. The Alarm System Purchase and Service Agreement (hereinafter the "Alarm Agreement"), with personal identifiers redacted, and the Schedule of Protection, denoting the cost of the installation and of the alarm equipment, with personal identifiers redacted, is attached as **Exhibit A.**

11. Defendant makes it a practice to install the alarm equipment immediately, upon consummating the sale, to deter consumers from exercising their three-day right to cancel without penalty under state and federal door-to-door sales laws.

12. The Alarm Agreement started on June 19, 2009, and was to run 39 months, ending on September 19, 2012.

13. In Section 2, titled **"PRICE, PAYMENT, FINANCIAL DISCLOSURES AND TERMS,"** the Alarm Agreement contains certain subsections which set forth the following:

    a. "**2.1 ACTIVATION FEE.** $198.00 (Non-Refundable)." [The $198.00 is crossed out, with "99" handwritten in its place];

    b. "**2.2 INSTALLATION & EQUIPMENT CHARGES. $ _0_  (See SOP)**

    c. "**2.3 SERVICES FEE.** FOR MONITORING YOU WILL PAY US AS FOLLOWS:
INITIAL TERM OF CONTRACT: 39 MONTHS    MONTHLY SERVICES FEE: $49.99 (plus any applicable taxes). [The $49.99 is crossed out, with "44.99" handwritten in its place.]
THE TOTAL MONTHLY SERVICES FEE IS PAYABLE MONTHLY IN ADVANCE. THE FIRST MONTHLY SERVICES FEE IS DUE WHEN THE SYSTEM IS INSTALLED AND OPERATIONAL. **THE TOTAL CASH PRICE YOU WILL PAY US FOR THE SERVICES PROVIDED IS $1,949.61, NOT INCLUDING APPLICABLE TAXES. THERE IS NO FINANCING CHARGE OR COST OF CREDIT (0% APR) ASSOCIATED WITH THIS AGREEMENT**;

    d. **2.4 TERM FOR SERVICES.** THE ORIGINAL TERM OF THIS AGREEMENT STARTS ON THE DAY THIS AGREEMENT IS SIGNED AND CONTINUES FOR THIRTY-NINE (39) MONTHS, AND WILL AUTOMATICALLY CONTINUE FROM YEAR TO YEAR THEREAFTER UNLESS CANCELLED BY EITHER OF US IN WRITING NO LATER THAN THIRTY (30) DAYS BEFORE THE END OF THE ORIGINAL TERM OR ANY RENEWAL TERM;

    e. **2.6 CREDIT CHECK; LATE FEES.** YOU AUTHORIZE US TO CONFIRM YOUR CREDIT RECORD AND TO REPORT YOUR PAYMENT PERFORMANCE UNDER THIS AGREEMENT TO CREDIT AGENCIES AND CREDIT REPORTING SERVICES. IF YOU FAIL TO MAKE ANY PAYMENT WHEN DUE, WE MAY, BY GIVING YOU WRITTEN NOTICE, DISCONTINUE INSTALLATION, MONITORING, REPAIR SERVICE, TERMINATE THIS AGREEMENT, AND RECOVER ALL DAMAGES TO WHICH WE ARE ENTITLED, INCLUDING THE VALUE OF THE WORK PERFORMED AND OUR LOSS OF PROFIT. ***IN ADDITION, WE MAY IMPOSE A LATE CHARGE ON ALL PAYMENTS MORE THAN TEN (10) DAYS PAST DUE IN THE MAXIMUM AMOUNT PERMITTED BY STATE LAW.*** [Emphasis added]

14. The $1,949.61 Total Cash Price set forth in subsection 2.3 consists of the total monthly service fee payments had the contract been executed at the preprinted monthly service fee of $49.99 (39 months x $49.99).

15. The preprinted $1,949.61 Total Cash Price in subsection 2.3 does not include the cost of the Activation Fee.

16. The preprinted $1,949.61 Total Cash Price understates and does not accurately set forth the cash price of the goods and services provided under the Alarm Agreement during the contract term.

17. Plaintiff gave to Defendant a down payment of $147.14, which consisted of the $99.00 Activation Fee, the $44.99 Monthly Services Fee for the first month, and $3.15 sales tax.

18. The Alarm Agreement does not set forth the down payment made by Plaintiff.

19. The Alarm Agreement does not contain any term or provision to record or reflect a down payment made by the consumer.

20. The Alarm Agreement fails to set forth the remaining unpaid cash balance (the difference between the cash price and the down payment).

21. Defendant obtained a void check from Plaintiff and began automatic withdrawals of the monthly service fees from Plaintiff's bank account via Electronic Funds Transfer the following month.

22. In Section 4, titled "**NOTICE TO CUSTOMER**," the Alarm Agreement states the following:

    1. DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT OR IF ANY OF THE SPACES INTENDED FOR THE AGREED TERMS TO THE EXTENT OF THEN AVAILABLE INFORMATION ARE LEFT BLANK.
    2. YOU ARE ENTITLED TO A COPY THIS AGREEMENT.
    3. YOU MAY PAY OFF THE FULL UNPAID BALANCE DUE UNDER THIS AGREEMENT AT ANY TIME, AND IN SO DOING YOU SHALL BE ENTITLED TO A FULL REBATE OF THE UNEARNED FINANCE AND INSURANCE CHARGES.
    4. YOU MAY CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.
    5. IT SHALL NOT BE LEGAL FOR THE SELLER TO ENTER YOUR PREMISES UNLAWFULLY OR COMMIT ANY BREACH OF THE PEACE TO REPOSSESS GOODS PURCHASED UNDER THIS AGREEMENT.
    ALL OF THE TERMS ON THE REVERSE SIDE OF THIS PAGE ARE PART OF THIS AGREEMENT. READ THEM BEFORE YOU SIGN BELOW.

23. At the bottom of the Alarm Agreement, there is a section titled **"NOTICE OF CANCELLATION."** The notice states:

DATE OF TRANSACTION *6-19, 2009* [Date handwritten]

YOU MAY CANCEL THIS TRANSACTION WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE (3) BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, AND PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN (10) DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED. IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER, AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK. IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY (20) DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN. THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT, TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE, OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM TO APX ALARM SECURITY SOLUTIONS, INC. 5132 NORTH 300 WEST, PROVO, UT 84604 NOT LATER THAN MIDNIGHT OF *6-24, 2009* [Date handwritten].

I HEREBY CANCEL THIS TRANSACTION. DATED: _____

24. The "Notice of Cancellation" fails to set forth a description of the goods sold or the amount of money paid by Plaintiff at the time the contract was entered into.

25. On the back of the Alarm Agreement, Section 12, titled "Suspension or Cancellation of this Agreement" states, in part:

If service is canceled or this agreement is terminated for any reason, you authorized [sic] us to remotely disconnect your communicator from the Center and/or enter your premises to disconnect your system from our monitoring equipment and remove our communications equipment and software and all of our signs and decals from your premises for our then prevailing disconnect fee.

26. The "communications equipment and software and all of our signs and decals" referenced in the preceding section includes some or all of the equipment identified on the SOP document.

27. Section 12 provides Defendant the right to repossess the communications equipment installed by Defendant during the term of the contract if Plaintiff and others similarly situated defaulted on the contract.

28. Section 12 does not limit Defendant's right to repossess the communications equipment installed by Defendant to the 3-day right of rescission period that began once Plaintiff and others similarly situated signed the Alarm Agreement.

29. Section 4.5 of the Notice to Customer provides Defendant the right to repossess the communications equipment installed by Defendant during the term of the contract if Plaintiff and others similarly situated defaulted on the contract so long as Defendant did not breach the peace.

30. Section 4.5 of the Notice to Customer does not limit Defendant's right to repossess the communications equipment installed by Defendant to the 3-day right of rescission period that began once Plaintiff and others similarly situated signed the Alarm Agreement.

31. On the back of the Alarm Agreement, Paragraph 5, titled "Repair Service" states, in relevant part:

> (C) … We are not liable for consequential or incidental damages...

> (D) *State Law:* Some states do not allow a limitation on the duration of implied warranties or the exclusion or the limitation of consequential or incidental damages, so the above limitations or exclusions may not apply to you.

32. On the back of the Alarm Agreement, Paragraph 18, titled "Entire Agreement" states, in part:

> The entire and only agreement between us is written in this agreement. It replaces any earlier oral or written understanding or agreements. ***It may only be changed by a written agreement signed by you (and if married, your spouse) and us. It may not be changed by any oral statements or representations made by our sales representative.*** [Emphasis added]

33. In connection with the Alarm Agreement, Defendant provided Plaintiff with a document titled "Schedule of Protection," a copy of which is attached as the last page of **Exhibit A**.

34. The Schedule of Protection ("SOP") is referenced in Section 2.2 of the Alarm Agreement with respect to the installation and equipment charges.

35. The SOP lists the retail prices for the alarm equipment and installation services. The items are identified as "Keypad & Siren" $399.00, "Door/Window" $99.00, "Door" $99.00, "Window" $99.00, "Motion" $195.00, "Key Fob" $99.00, "Lifetime" $199.00, "Installation" $199.00, and "Installation Charge" $198.00.

36. The SOP sets forth a handwritten "retail" Total Equipment & Installation Charge of $1,487 and a "Total Price" of $0.

37. The true price for the equipment was not $0.

38. The $0 disclosed "Total Price" for the equipment was a fictitious price used by Defendants for marketing purposes only.

39. In reality, the Defendants did not give away their equipment for free, but sold it in conjunction with monitoring services.

40. The monthly fee charged by the Defendant was not for monitoring services only, but was in reality payment in part for the installment purchase of equipment, and in part for the installment purchase of 39 months of monitoring services.

41. The alarm equipment sold under Defendant's agreement were "goods" subject to RISA, which applies to any "agreement to pay the retail purchase price of **goods _or_ services**, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time. N.J.S.A. 17:16C-1(b)(emphasis added).

42. The alarm monitoring services were likewise "services" subject to RISA, which applies to any "agreement to pay the retail purchase price of **goods _or_ services**, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time. N.J.S.A. 17:16C-1(b) (emphasis added).

43. At all times relevant to this action, Defendant used an Alarm Agreement with terms the same or similar to the above-quoted terms in transactions with at least 100 other New Jersey consumers.

44. At all times relevant to this action, Defendant used an Alarm Agreement that included a preprinted charge for an "Activation Fee" in transactions with at least 100 other New Jersey consumers.

45. At all times relevant to this action, Defendant entered into contracts for the sale of alarm equipment and monitoring services with at least 100 other New Jersey consumers at the consumer's residence or a location other than Defendants' place of business.

46. On or about March 5, 2012, Plaintiff received an unsolicited phone call from Defendant regarding renewal of the Alarm Agreement. Defendant told Plaintiff that Defendant would extend the term of the Alarm Agreement for 42 months and that Defendant would not increase the monthly services fee during that time period.

47. Defendant failed to send a new contract for Plaintiff to sign.

48. Plaintiff did not believe the telephone conversation by itself, without her signature on a new contract, bound her to the modifications of the Alarm Agreement.

49. Plaintiff never provided her written authorization for any modifications or extensions to the Alarm Agreement.

50. On or about August 1, 2012, Plaintiff called Defendant to cancel the Alarm Agreement at the end of the initial 39-month term, on September 19, 2012.

51. Defendant's representative obtained Plaintiff's account information and led Plaintiff to believe that Defendant was canceling the Alarm Agreement during the phone call.

52. Defendant's representative failed to tell Plaintiff that she was required to take any further action to cancel, or that the Alarm Agreement required Plaintiff to send a written cancellation request at least 30 days before September 19, 2012.

53. Had Defendant's representative told Plaintiff that Defendant required written notice to cancel the Alarm Agreement, Plaintiff would have mailed a written cancellation notice immediately.

54. Defendant's representative failed to tell Plaintiff that Defendant renewed the Alarm Agreement as of March 5, 2012, the date of Defendant called Plaintiff to renew.

55. Had Defendant's representative told Plaintiff that the Alarm Agreement had been renewed as of March 5, 2012, Plaintiff would have mailed a written dispute and cancellation notice immediately.

56. On or about September 5, 2012, Plaintiff called Defendant to see if the Alarm Agreement had been canceled. Plaintiff spoke to Defendant's representative, Parker, at extension 5020. Parker told Plaintiff that he would investigate her inquiry and call her back.

57. When Parker called Plaintiff back, he told her that the Alarm Agreement was extended 42 months, effective March 5, 2012.

58. Parker refused to cancel the contract, and instead told Plaintiff that the only way to get out of the contract was to pay for the balance of the contract or find someone to take over the contract.

59. Defendant continued to make automatic monthly withdrawals from Plaintiff's bank account via Electronic Funds Transfer up to and including February 18, 2014, when Plaintiff completed a bank form to stop the withdrawals.

60. Plaintiff called Defendant to cancel the Alarm Agreement on or about February 21, 2013, and again on May 6, 2013. Defendant refused to cancel the Alarm Agreement each time.

61. On February 20, 2014, Plaintiff sent Defendant a cancellation letter via certified mail, return receipt requested. The return postcard indicates that Defendant received the cancellation letter on February 24, 2014. Copies of the letter and return postcard are attached as **Exhibit B.**

62. Defendant sent Plaintiff a letter dated March 21, 2014 informing her that it was unable to withdraw the March 2014 monthly service fee from Plaintiff's checking account and assessed a $15 processing fee and a $3 late fee to her Vivint account.  A copy of Defendant's March 21, 2014 letter is attached as **Exhibit C**.

63. Defendant continued to refuse to cancel Plaintiff's contract, and instead sent Plaintiff an invoice dated April 15, 2014. The invoice covers the service period from April 15, 2014 to May 14, 2014 and includes a past due amount of $66.14. A copy of the April 15, 2014 invoice is attached as **Exhibit D.**

64. Plaintiff continued to receive monthly invoices from Defendant through June of 2014, the month that this action was filed in the Superior Court of New Jersey.

65. As a direct result of Defendant's conduct, Plaintiff has incurred an ascertainable loss, including:

   a.   The full amount of the "Activation Fee";

   b.   All monthly service fees paid following the expiration of the initial thirty-nine month contract term on September 19, 2012; and

   c.   All monthly service fees and other charges that Defendant has attempted to collect via Electronic Fund Transfer requests and invoices sent after receipt of Plaintiff's written cancellation letter.

## CLASS ACTION ALLEGATIONS

66. This action is brought and may properly proceed as a class action, pursuant to the provisions of Rule 4:32 of the New Jersey Court Rules.  Plaintiff brings this action on behalf of herself and all others similarly situated. Plaintiff seeks certification of a Class, initially defined as follows:

THE CLASS:

All persons who, at any time on or after June 6, 2008, entered into an Alarm System Purchase and Services Agreement ("Alarm Agreement") with Defendant for a residence in New Jersey with terms the same as or substantially similar to the Alarm Agreement signed by Plaintiff.

67. The Class for whose benefit this action is brought is so numerous that joinder of all members is impracticable.

68. Plaintiff's claims are typical of the claims of the members of the Class, since all such claims arise out of terms appearing on Defendant's standard form Alarm Agreement that violate New Jersey law.

69. Plaintiff does not have interests antagonistic to the interests of the Class.

70. The Class, of which Plaintiff is a member, is readily identifiable.

71. Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in the prosecution of consumer litigation.  Proposed Class Counsel has investigated and identified potential claims in the action; has a great deal of

experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

72. There are questions of law and fact common to the members of the Class. These common questions include:

    a. Whether Defendant charged Plaintiff and those similarly situated fees that are prohibited by RISA;

    b. Whether Defendant's violations of RISA constitute violations of the CFA;

    c. Whether Plaintiff and the members of the Class suffered an ascertainable loss as a result of Defendant's violation(s) of RISA and the CFA;

    d. Whether Defendant used a standard form Alarm Agreement that contains terms which violate the RISA, DDRISA, DDHRSA, the HIP Regulations, the CFA and/or TCCWNA;

    e. Whether Defendant's use of a standard form Alarm Agreement that contains terms which violate the RISA, DDRISA, DDHRSA, and the HIP Regulations constitutes a violation of TCCWNA; and

    f. Whether Plaintiff and the members of the Class are entitled to statutory damages of not less than $100 for each violation of TCCWNA.

73. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  While the economic damages suffered by the individual class members are significant, the amount is modest compared to the expense and burden of individual litigation.  A class action will cause an orderly and expeditious administration of the claims of the Class and will foster economies of time, effort and expense.

74. The questions of law and/or fact common to the members of the Class predominate over any questions affecting only individual members.

75. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendant in this action or the prosecution of separate actions by individual members of the Class would create the risk that adjudications with respect to individual members of the Class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.  Prosecution as a class action will eliminate the possibility of repetitious litigation.

76. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

77. Plaintiff does not anticipate any difficulty in the management of this litigation.

## CLASS CLAIMS

### FIRST COUNT
### Violations of the Consumer Fraud Act ("CFA")
### Based on Violations of the Retail Installment Sales Act ("RISA")

78. Plaintiff, on behalf of herself and those similarly situated, repeats and realleges all prior allegations as if set forth at length herein.

79. Defendant is a "retail seller" and/or a "sales finance company" within the meaning of the RISA at N.J.S.A. 17:16C-1.

80. The Alarm Agreement that Plaintiff signed is a "retail installment contract" as defined by RISA at N.J.S.A. 17:16C-1, because it is a contract entered into in New Jersey "evidencing an agreement to pay the retail purchase price of **goods _or_ services**, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time." (emphasis added).

81. The Alarm Agreement and attached SOP on their face encompass the combined time sale of goods and services; namely, the alarm equipment and installation services listed in the Schedule of Protection, and the monthly monitoring service fee described in Section 2.3 of the Agreement.

82. Plaintiff took possession of the alarm equipment listed in the Schedule of Protection at the time the Alarm Agreement commenced, but Defendant retained the right to repossess the alarm equipment during the contract term pursuant to Section 4.5 and Section 12 of the Agreement, therefore Plaintiff did not possess clear title to the alarm equipment during the term of the Agreement.

83. Plaintiff became or would have become the owner of all or some of the alarm equipment listed in the Schedule of Protection at the end of the contract term.

84. The Alarm Agreement is subject to RISA because it encompasses the sale of "services," specifically monthly monitoring services, "which are primarily for personal, family or household purposes … in two or more installments over a period of time" within the meaning of RISA at N.J.S.A. 17:16C-1.

85. RISA, at N.J.S.A. 17:16C-50, prohibits sales finance companies and retail sellers from charging, contracting for, collecting, or receiving any fees that are not specifically authorized by RISA.

86. The "Activation Fee" charged in the Alarm Agreement was not authorized by RISA at N.J.S.A. 17:16C-50.

87. Defendant violated RISA at N.J.S.A. 17:16C-50 by charging an "Activation Fee" on the Alarm Agreement, because that charge is not authorized by any provision of RISA.

88. The violation of another statute, particularly a statute providing protections for consumers such as RISA, constitutes and is evidence of an unconscionable commercial practice in violation of the CFA at *N.J.S.A.* 56:8-2.

89. Defendant's violations of RISA constitute unconscionable commercial practices, deception, fraud, false pretense, false promises, and/or misrepresentations in violation of the CFA at N.J.S.A. 56:8-2.

90. Plaintiff and those similarly situated suffered an ascertainable loss when they were charged the Activation Fee that was unauthorized under RISA, in violation of the CFA.

91. Plaintiff and those similarly situated suffered an ascertainable loss in the amount they were charged for the Activation Fee.

92. Plaintiff's ascertainable loss is $99.00.


**SECOND COUNT**
**Violations of the Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA")**

93. Plaintiff, on behalf of herself and those similarly situated, repeats and realleges all prior allegations as if set forth at length herein.

94. The Alarm Agreements that Plaintiff and those similarly situated entered into were consumer contracts and consumer notices subject to the Truth-in-Consumer Contract, Warranty and Notice Act at N.J.S.A. 56:12-15.

95. TCCWNA at N.J.S.A. 56:12-15 prohibits sellers, creditors and lenders from offering or entering into consumer contracts, or giving or displaying consumer notices that contain any provision that violates a clearly established legal right of a consumer as established New Jersey or Federal law.

96. TCCWNA at N.J.S.A. 56:12-15 prohibits sellers, creditors and lenders from offering or entering into consumer contracts, or giving or displaying consumer notices that violates any clearly established legal responsibility of a seller, creditor or lender as established by New Jersey or Federal law.

**Retail Installment Sales Act Violations**

97. For the reasons set forth in the First Count, the Alarm Agreements entered into by Plaintiff and those similarly situated were retail installment contracts within the meaning of RISA at N.J.S.A. 17:16C-1.

98. The "Activation Fee" charged in the Alarm Agreement was not authorized by RISA at N.J.S.A. 17:16C-50.

99. RISA at N.J.S.A. 17:16C-27(b) requires that all retail installment contracts set forth the down payment made by the retail buyer.

100.  RISA at N.J.S.A. 17:16C-27(i) requires that all retail installment contracts set forth the time sales price.

101.  The Alarm Agreements that Plaintiff and those similarly situated entered into included the following provisions that violated RISA, and therefore violated TCCWNA at N.J.S.A. 56:12-15:

   a.  The term charging an "Activation Fee," which violates RISA because the fee was not authorized by RISA at N.J.S.A. 17:16C-50; and,

   b.  The term setting forth a Total Cash Price that did not include or otherwise reflect the customer's down payment, which violates RISA at N.J.S.A. 17:16C-27(b).

   c.  The Alarm Agreements fail to provide the "time sales price", which violates RISA at N.J.S.A. 17:16C-27(i).

**Door-to-Door Retail Installment Sales Act Violations**

102.  For the reasons set forth in the First Count, the Alarm Agreements entered into by Plaintiff and those similarly situated were retail installment contracts within the meaning of RISA at N.J.S.A. 17:16C-1.

103.  The Door-to-Door Retail Installment Sales Act ("DDRISA") applies to retail installment contracts entered into at a place other than the retail seller's place of business, such as the home of the retail buyer.

104.  Defendant entered into Alarm Agreements with Plaintiff and those similarly situated at a place other than Defendant's place of business, therefore the Alarm Agreements are subject to the requirements of DDRISA at N.J.S.A. 17:16C-61.5.

105.  Pursuant to DDRISA at N.J.S.A. 17:16C-61.5(a)(1), Plaintiff and those similarly situated had a 3-day right to rescind the Alarm Agreement by:

   Furnish[ing] to the retail seller a notice of intent to rescind the retail installment sale or retail installment contract by certified mail, return receipt requested, postmarked not later than 5 p.m. of the third business day following the day on which the retail installment sale or retail installment contract is executed.

106.  Upon the retail buyer's rescission pursuant to DDRISA, Defendant is required to provide a refund within 10 business days of "all amounts of money paid by the retail buyer," pursuant to DDRISA at N.J.S.A. 17:16C-61.5(b)(2).

107.  The Alarm Agreements designate the Activation Fee as "Non-Refundable."

108.  By setting forth the Activation Fee as "Non-Refundable", Defendant misrepresented the 3-day right to rescind the contract and receive a full refund pursuant to DDRISA at N.J.S.A. 17:16C-61.5.

109. The "Notice of Cancellation" that Defendant provided to Plaintiff and those similarly situated does not include a description of the goods sold, and fails to set forth the amount of money paid by Plaintiff and those similarly situated at the time the contract was entered into.

110. The "Notice of Cancellation" that Defendant provided to Plaintiff and those similarly situated does not include a notice that failure to exercise the cancellation option does not interfere with any other remedies the retail buyer may have against the retail seller.

111. The Alarm Agreements that Plaintiff and those similarly situated entered into included the following provisions that violated DDRISA, and therefore violated TCCWNA at N.J.S.A. 56:12-15:

    a. The term setting forth the "Activation Fee" as "Non-Refundable," which violates DDRISA's 3-day right to cancel and receive a full refund at N.J.S.A. 17:16C-61.5;

    b. The "Notice of Cancellation," which violates DDRISA at N.J.S.A. 17:16C-61.6(a) because the notice does not include a description of the goods sold or the amount of money paid by Plaintiff and those similarly situated at the time the contract was entered into; and

    c. The "Notice of Cancellation," which DDRISA at N.J.S.A. 17:16C-61.6(b), because the notice does not state that failure to exercise the cancellation option does not interfere with any other remedies the retail buyer may have against the retail seller.

## Home Improvement Practices Regulations Violations

112. The Home Improvement Practices ("HIP") Regulations were promulgated by the Division of Consumer Affairs pursuant to the CFA at *N.J.S.A.* 56:8-4.

113. The HIP Regulations govern "home improvements" as defined by the Regulations, which include, *inter alia*, the "installation" of "security protection devices." N.J.A.C. 13:45A-16.1A.

114. Defendant installed security protection devices in the homes of Plaintiff and those similarly situated, including but not limited to the alarm equipment listed in the SOP.

115. As such, the Alarm Agreements entered into between Defendant and Plaintiff and those similarly situated are "home improvement contracts" within the meaning of the HIP Regulations at N.J.A.C. 13:45A-16.1A.

116. The HIP Regulations require that all home improvement contracts "shall clearly and accurately set forth in legible form and in understandable language all terms and conditions of the contract, including, but not limited to, the following: … (iii) The total price or other consideration to be paid by the buyer, including all finance charges." N.J.A.C. 13:45A-16.2(a)(12)(iii).

117.   The preprinted Total Cash Price listed on the Alarm Agreement does not include the cost of the Activation Fee.

118.   The Total Cash Price listed on the Alarm Agreement does not reflect Plaintiff's $147.14 down payment of the $99.00 Activation Fee and other charges. The Total Cash Price listed on the Alarm Agreement misrepresents that Plaintiff still owed the entire balance due on the contract, even though Plaintiff had already made a down payment of $147.14.

119.   The Alarm Agreements that Plaintiff and those similarly situated entered into included the following provisions that violated the HIP Regulations, and therefore violated TCCWNA at N.J.S.A. 56:12-15:

   a.   The term setting forth a Total Cash Price that does not accurately set forth the total price or other consideration to be paid by the buyer by omitting the "Activation Fee" and failing to set forth the buyer's down payment, which violates the HIP Regulations at N.J.A.C. 13:45A-16.2(a)(12)(iii).

**Door-to-Door Home Repair Sales Act Violations**

120.   The Door-to-Door Home Repair Sales Act ("DDHRSA") applies to home repair contracts with a purchase price in excess of $25.00 entered into at a place other than the place of business of the home repair contractor, such as the home of the retail buyer.

121.   The Alarm Agreements are "home repair contracts" within the meaning of DDHRSA at N.J.S.A. 17:16C-99.

122.   Defendant entered into Alarm Agreements with Plaintiff and those similarly situated at a place other than Defendant's place of business, therefore the Alarm Agreements are subject to the requirements of DDHRSA at N.J.S.A. 17:16C-99.

123.   Pursuant to DDHRSA at N.J.S.A. 17:16C-99(a)(1), Plaintiff and those similarly situated had a 3-day right to rescind the Alarm Agreement by:

   Furnish[ing] to the home repair contractor a notice of intent to rescind the home repair contract by certified mail, return receipt requested, postmarked not later than 5 p.m. of the third business day following the day on which the home repair contract is executed.

124.   Upon the retail buyer's rescission pursuant to DDHRSA, Defendant is required to provide a refund within 10 business days of "all amounts of money paid by the retail buyer," pursuant to DDHRSA at N.J.S.A. 17:16C-99(b)(2).

125.   The Alarm Agreements designate the Activation Fee as "Non-Refundable."

126.   By setting forth the Activation Fee as "Non-Refundable", Defendant misrepresented the 3-day right to rescind the contract and receive a full refund pursuant to DDHRSA at N.J.S.A. 17:16C-99.

127. The "Notice of Cancellation" that Defendant provided to Plaintiff and those similarly situated does not include a description of the goods sold, and fails to set forth the amount of money paid by Plaintiff and those similarly situated at the time the contract was entered into.

128. The "Notice of Cancellation" that Defendant provided to Plaintiff and those similarly situated does not include a notice that failure to exercise the cancellation option does not interfere with any other remedies the retail buyer may have against the home repair contractor.

129. The Alarm Agreements that Plaintiff and those similarly situated entered into included the following provisions that violated DDHRSA, and therefore violated TCCWNA at N.J.S.A. 56:12-15:

    a. The term setting forth the "Activation Fee" as "Non-Refundable," which violates DDHRSA's 3-day right to cancel and receive a full refund at N.J.S.A. 17:16C-99;

    b. The "Notice of Cancellation," which violates DDHRSA at N.J.S.A. 17:16C-100(a) because the notice does not include a description of the goods and services sold, or the amount of money paid by Plaintiff and those similarly situated at the time the home repair contract was entered into; and

    c. The "Notice of Cancellation," which DDHRSA at N.J.S.A. 17:16C-100(b), because the notice does not state that failure to exercise the cancellation option does not interfere with any other remedies the owner may have against the home repair contractor.

**Direct TCCWNA Violation**

130. TCCWNA at N.J.S.A. 56:12-16 prohibits the use of terms in consumer contracts which state that some provisions is or may be void, unenforceable or inapplicable in some jurisdictions without specifying which provisions are or are not void, unenforceable or inapplicable within the State of New Jersey.  This provision does not apply to warranties.

131. Section 5 of the Alarm Agreement is titled "Repair Service," which includes multiple contract terms and topics, reads as follows:

During the term of this agreement, we will repair or service any defective part of the System as follows: (A) *What is Covered:* For one hundred and twenty (120) days after we complete the installation, we will repair or replace any defective part of the system without charge to you.  After the initial one hundred and twenty (120) day period, we will, so long as we are providing monitoring pursuant to this agreement, provide a replacement for any defective part without charge, but you will pay a $35.00 visit charge for each service call, plus any applicable taxes.  All charges for repair service are due and payable upon completion of the service call, and you agree to pay the same.  We can use new or used parts of the same functionality, and keep all replaced parts. (B) *How to Get Service:* Call or write us at the address and

telephone number at the top of this agreement and tell us what is wrong with the system. We will provide service as soon as possible during our normal business hours, which are 9:00 a.m. to 6:00 p.m. Monday through Friday, excluding holidays we observe. A responsible adult must be at the premises at the time we visit. (C) *What is Not Included:* Repair of the system is our only duty. This warranty does not include batteries or alarm screens. We make no other express warranty including any warranty of merchantability of the system or its fitness for any special purpose. We do not warrant that they system will always detect, or help prevent, any burglary, fire, hold-up or other such event. We do not warrant that the system cannot be defeated or compromised or that it will always operate. This warranty does not cover repairs that are needed because of an accident, acts of God, your failure to properly use the system, or if someone other than us attempts to repair or change the system, or any other reason except a defect in the equipment or our installation. **We are not liable for consequential or incidental damages.** You agree that this is our only warranty and we have given you no other warranty for the system. (D) *State Law:* **Some states do not allow** a limitation on the duration of implied warranties or **the exclusion or the limitation of consequential or incidental damages, so the above limitations or exclusions may not apply to you**. The warranty gives you specific legal rights and you may also have other rights which may vary from state to state." (emphasis added).

132. Section 5(D) of the Alarm Agreement states that Defendant is not liable for consequential or incidental damages.

133. Section 5(D) states that some states do not allow an exclusion or limitation of consequential or incidental damages, but fails to set forth whether New Jersey is one of the states that does or does not allow this exclusion or limitation.

134. Section 5(D) of the Alarm Agreement violates TCCWNA at N.J.S.A. 56:12-16 because the provision notifies the consumer that the limitation on consequential and incidental damages may not apply in some States, but fails to set forth whether the limitation applies in New Jersey.

135. Plaintiff and those similarly situated are entitled to statutory damages of not less than $100 for each violation of TCCWNA, plus actual damages, attorneys' fees, and costs pursuant to N.J.S.A. 56:12-17.

## **INDIVIDUAL CLAIMS**

### **FIFTH COUNT**
### **Violations of the Consumer Fraud Act**

136. Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

137.    Plaintiff received an unsolicited phone call from Defendant's representative on or around March 5, 2012 proposing to extend the term of the Alarm Agreement for an additional 42 months.

138.    Plaintiff verbally agreed to a proposed extension of the Agreement term, but expected that Defendant would send her a new contract to sign.

139.    Defendant failed to send a new contract or any other writing for Plaintiff to sign.

140.    The Alarm Agreement at Section 18 clearly states that the contract may only be changed by a written agreement signed by both parties, and that the terms cannot be changed by oral statements or representations made by Defendant's sales representative.

141.    The extension of the Alarm Agreement's original 39-month term to a new 42-month term beginning in March, 2012 is a change to the Alarm Agreement that was required to be memorialized in writing.

142.    Subsequent to the March 5, 2012 phone call from Defendant's representative, Plaintiff made numerous attempts to cancel the Alarm Agreement, including telephone calls on August 1, 2012 and September 5, 2012 (prior to the expiration of the initial 39-month term), on or about February 21, 2013, and again on May 6, 2013, and then in writing on February 20, 2014.

143.    As set forth in Paragraphs 46-60 above, during Plaintiff's phone calls, Defendant variously misrepresented the status of Plaintiff's account, falsely stated that Plaintiff was not permitted to cancel the contract, gave Plaintiff the impression that her contract was cancelled, and informed Plaintiff that she would be required to complete the new 42-month term that began in March, 2012.

144.    Defendant breached Section 18 of the Alarm Agreement by attempting to verbally change the term of the Alarm Agreement, and then aggravated this breach by misrepresenting the Alarm Agreement's cancelation provisions and frustrating Plaintiff's attempts to cancel.

145.    Defendant engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises and/or misrepresentations in of the CFA at N.J.S.A. 56:8-2 including, but not limited to, the following:

    a.   Defendant's attempted verbal renewal of the Alarm Agreement for 42 additional months starting on March 5, 2012, when the Alarm Agreement required that all changes be in writing and signed by Plaintiff and specifically prohibited changes based on "oral statements or representations made by our sales representative";

    b.   The Alarm Agreement at Section 18 misrepresents the methods by which the Agreement may be changed because it clearly states that the contract may only be changed by a written agreement signed by both parties, and that the terms cannot be changed by oral statements or representations made by Defendant's sales representative;

    c.   Defendant's refusal to cancel Plaintiff's Alarm Agreement notwithstanding Plaintiff's telephone calls requesting cancellation on February 21, 2013 and May 6, 2013, and Plaintiff's February 20, 2014 cancellation letter;

    d.   Defendant's attempt to collect a $15 processing fee via Electronic Fund Transfer and invoices, which is not authorized by either the Alarm Agreement or RISA is an unconscionable commercial practice;

    e.   Defendant's misrepresentations concerning the status of Plaintiff's account and her right to cancel the Alarm Agreement; and

    f.   Defendant's misrepresentation that Plaintiff would be liable for the entire balance of the Alarm Agreement if she canceled the contract.

146.   As a direct result of Defendant's conduct, Plaintiff has incurred an ascertainable loss, including:

    a.   All monthly service fees paid following the expiration of the initial thirty-nine month contract term on September 19, 2012; and

    b.   All monthly service fees and other charges that Defendant has attempted to collect via Electronic Fund Transfer requests and invoices sent after receipt of Plaintiff's written cancellation letter.

147.   Plaintiff seeks treble damages in the form of three times her ascertainable loss, as well as a declaratory judgment that her contract with Defendant expired at the end of the initial thirty-nine month term and was not renewed.

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, demands judgment against the Defendant as follows:

    a.   For certification of this matter as a class action pursuant to Rule 4:32-1(b)(3);

    b.   For an order appointing the named Plaintiff, Paulette Venditto, as class representative and appointing the attorneys of The Wolf Law Firm, LLC, and David C. Ricci, Esq. of the Law Office of David C. Ricci, LLC as class counsel;

    c.   For injunctive relief prohibiting Defendant from future violations of the Consumer Fraud Act, the Retail Installment Sales Act, the Door-to-Door Retail Installment Sales Act, the Home Improvement Practices Regulations, the Door-to-Door Home Repair Sales Act, and the Truth-in-Consumer Contract, Warranty and Notice Act, as set forth herein;

    d.   For a declaratory judgment that the Defendant violated the CFA, RISA, DDRISA, the HIP Regulations, DDHRSA, and TCCWNA;

    e.   For a declaratory judgment that Plaintiff's contract with Defendant expired at the end of the initial thirty-nine month term and was not renewed;

f.  For injunctive relief requiring Defendant to provide an accounting to all Class members, including the fees charged for Activation Fees and Monthly Services Fees, and the amount of any such fees received or retained by Defendant;

g.  For actual damages;

h.  For treble damages, pursuant to the Consumer Fraud Act at N.J.S.A. 56:8-19;

i.  For maximum statutory damages under the Truth-in-Consumer Contract, Warranty and Notice Act, pursuant to N.J.S.A. 56:12-17;

j.  For reasonable attorneys' fees and costs of suit in connection with this action pursuant to N.J.S.A. 56:8-19, N.J.S.A. 56:12-17, and all other applicable statutes;

k.  For a refund of all moneys acquired by Defendant due to unlawful acts pursuant to N.J.S.A. 56:8-2.11;

l.  For pre-judgment and post-judgment interest; and

m.  For such other and further relief as Plaintiff and all others similarly situated may be entitled or as the Court deems equitable and just.

## <u>NOTICE TO ATTORNEY GENERAL OF ACTION</u>

A copy of the Complaint will be mailed to the Attorney General of the State of New Jersey within ten days after the filing with the Court, pursuant to N.J.S.A. 56:8-20.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues subject to trial.

## <u>CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify to the best of my knowledge that the matter in controversy is not the subject of any other action pending in any court or the subject of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated.

THE WOLF LAW FIRM, LLC

Dated: December 12, 2014                    s/Daniel I. Rubin
                                            Daniel I. Rubin
                                            *Attorneys for Plaintiff and the putative class*

EXHIBIT A

*Second Amended Class Action Complaint*
*Venditto vs. Vivint, Inc.*
Case No.:  2:14-cv-04357

UT License # ELG-102591-L5   NM License # 92695   1133 North 300 West, Provo, UT 84604
AL License # 1107   NV License # 0065209146   NY License # 12000273249   Phone: 800.216.5232
IA License # 04663-06   OH License # 53891547   Fax: 801.377.4116
LA License # F-1058   OR License # 173349   Email: support@apxalarm.com
ME License # MC 60019299   RI License # 6995   www.apxalarm.com
ME License # LM50017112   SC License # BAC 5569
MN License # TS01618   SC License # FAC 3437
MS License # 15010729   TN License # 1253
MT License # 216   TX License # B13684
NE License # 25514-SP-LV   TX License # ACR-2854
NC License # BPN 005143P3   VA DCJS I.D. # 11-4822
NE License # FA12465   WA License # APXALAS941CL   ☐ Residential   ☐ Commercial
NJ License # 34BF00000100   WY License # LV-A-16005

**APXALARM**
SECURITY SOLUTIONS

AR # 1259015

# ALARM SYSTEM PURCHASE AND SERVICES AGREEMENT

## CUSTOMER

THIS AGREEMENT is made and entered into this 19 day of June, 20 59 by and between APX Alarm Security Solutions, Inc. ("APX") and

Customer Name (First, MI, Last) Paulette Venditto   Soc. Sec. # ____ - ____ - ____   DOB ___ / ___ / ___   REDACTED
Homeowner ☑ Yes ☐ No

Customer Name (First, MI, Last) _____   Soc. Sec. # ____ - ____ - ____   DOB ___ / ___ / ___
Homeowner ☐ Yes ☐ No   REDACTED   REDACTED   REDACTED

INSTALLATION ADDRESS _____ REDACTED _____ CITY _____ COUNTY _____

STATE ____ ZIP ____ PHONE _____ EMAIL _____

BILLING ADDRESS (IF DIFFERENT) _____

## 1. INSTALLATION AND SERVICES

We will install the security system(s) (each a "System") described on the Schedule of Protection ("SOP"), which is part of the monitoring and installation information form, and provide repair service, and monitor the System at an independently owned and operated monitoring facility (the "Center") we select. We waive any right to file a mechanic's lien.

## 2. PRICE, PAYMENT, FINANCIAL DISCLOSURES AND TERMS

**2.1 ACTIVATION FEE** $198.00 (Non-Refundable)
☐ BILL OVER THREE (3) MONTHS   ☐ PAY IN FULL BY CHECK OR CREDIT CARD

**2.2 INSTALLATION & EQUIPMENT CHARGES.** $ _____ (See SOP)

**2.3 SERVICES FEE.** FOR MONITORING YOU WILL PAY US AS FOLLOWS:
INITIAL TERM OF CONTRACT: 39 MONTHS   MONTHLY SERVICES FEE: $49.99 (plus any applicable taxes)

THE TOTAL MONTHLY SERVICES FEE IS PAYABLE MONTHLY IN ADVANCE. THE FIRST MONTHLY SERVICES FEE IS DUE WHEN THE SYSTEM IS INSTALLED AND OPERATIONAL. **THE TOTAL CASH PRICE YOU WILL PAY US FOR THE SERVICES PROVIDED IS $1,949.61, NOT INCLUDING APPLICABLE TAXES. THERE IS NO FINANCING CHARGE OR COST OF CREDIT (0% APR) ASSOCIATED WITH THIS AGREEMENT.**

**2.4 TERM FOR SERVICES.** THE ORIGINAL TERM OF THIS AGREEMENT STARTS ON THE DAY THIS AGREEMENT IS SIGNED AND CONTINUES FOR THIRTY-NINE (39) MONTHS, AND IT WILL AUTOMATICALLY CONTINUE FROM YEAR TO YEAR THEREAFTER UNLESS CANCELLED BY EITHER OF US IN WRITING NO LATER THAN THIRTY (30) DAYS BEFORE THE END OF THE ORIGINAL TERM OR ANY RENEWAL TERM.

**2.5 INCREASE IN SERVICES FEE.** YOU ACKNOWLEDGE THAT WE SHALL HAVE THE RIGHT, AT ANY TIME, TO INCREASE THE SERVICES FEE TO REFLECT ANY TAXES, LICENSES, PERMITS, COSTS, FEES OR CHARGES WHICH MAY BE CHARGED TO US BY ANY UTILITY OR GOVERNMENTAL AGENCY RELATING TO THE INSTALLATION OF THE SYSTEM OR SERVICES AND YOU AGREE TO PAY THE SAME. IN ADDITION, WE CAN INCREASE THE SERVICES FEE FOR ANY RENEWAL TERM BY GIVING YOU SIXTY (60) DAYS PRIOR WRITTEN NOTICE.

**2.6 CREDIT CHECK; LATE FEES.** YOU AUTHORIZE US TO CONFIRM YOUR CREDIT RECORD, AND TO REPORT YOUR PAYMENT PERFORMANCE UNDER THIS AGREEMENT TO CREDIT AGENCIES AND CREDIT REPORTING SERVICES. IF YOU FAIL TO MAKE ANY PAYMENT WHEN DUE, WE MAY, BY GIVING YOU WRITTEN NOTICE, DISCONTINUE INSTALLATION, MONITORING, REPAIR SERVICE, TERMINATE THIS AGREEMENT, AND RECOVER ALL DAMAGES TO WHICH WE ARE ENTITLED, INCLUDING THE VALUE OF THE WORK PERFORMED AND OUR LOSS OF PROFIT. IN ADDITION, WE MAY IMPOSE A LATE CHARGE ON ALL PAYMENTS MORE THAN TEN (10) DAYS PAST DUE IN THE MAXIMUM AMOUNT PERMITTED BY STATE LAW.

CREDIT CARD: ☐ VISA ☐ MC ☐ DIS ☐ AMEX   AUTO-DEBIT: ☑ CHECKING ☐ SAVINGS
CARDHOLDER: _____   NAME (ON ACCOUNT): Paulette Venditto
ACCOUNT #: ____ ____ ____ ____   ACCOUNT #: _____ REDACTED
CID NUMBER: ____ EXPIRATION DATE: ___ / ___   ABA ROUTING NUMBER _____ REDACTED
DRIVER'S LICENSE #: _____ REDACTED

I AUTHORIZE APX OR ITS ASSIGNEE(S) TO MAKE ELECTRONIC FUND TRANSFERS FROM MY BANK ACCOUNT OR CHARGES TO MY CREDIT CARD ACCOUNT IN THE AMOUNT IDENTIFIED ABOVE AS MY TOTAL MONTHLY PAYMENT AND INCLUDING ALL PAST DUE AMOUNTS, TRIP FEES, SERVICE FEES OR AMOUNTS WHICH MAY ACCUMULATE IN ARREARS, ACCORDING TO THE TERMS ABOVE AND THE CONDITIONS OF THIS AGREEMENT.

## 3. OUR LIMITED LIABILITY

WHERE PERMITTED BY LAW, WE DISCLAIM ANY IMPLIED WARRANTIES PROVIDED BY LAW INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR PURPOSE. WE DO NOT WARRANT THAT THE SYSTEM WILL ALWAYS DETECT, OR HELP PREVENT, ANY BURGLARY, FIRE, HOLD-UP OR ANY OTHER SUCH EVENT. WE DO NOT WARRANT THAT THE SYSTEM CANNOT BE DEFEATED OR COMPROMISED OR THAT IT WILL ALWAYS OPERATE. SECTIONS 15 AND 16 ON THE REVERSE SIDE OF THIS AGREEMENT LIMIT OUR LIABILITY TO ONE THOUSAND DOLLARS ($1,000.00) OR TWELVE (12) TIMES THE MONTHLY SERVICES FEE, WHICHEVER IS LESS, IF YOU OR ANYONE ELSE SUFFERS ANY HARM (DAMAGE OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH) BECAUSE THE SYSTEM FAILED TO OPERATE PROPERLY OR WE WERE CARELESS OR ACTED IMPROPERLY. YOU HAVE HAD THE OPPORTUNITY TO TALK TO OUR SALES AGENT ABOUT THIS LIMITATION.

## 4. NOTICE TO CUSTOMER

1. **DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT OR IF ANY OF THE SPACES INTENDED FOR THE AGREED TERMS TO THE EXTENT OF THEN AVAILABLE INFORMATION ARE LEFT BLANK.**
2. **YOU ARE ENTITLED TO A COPY OF THIS AGREEMENT.**
3. **YOU MAY PAY OFF THE FULL UNPAID BALANCE DUE UNDER THIS AGREEMENT AT ANY TIME, AND IN SO DOING YOU SHALL BE ENTITLED TO A FULL REBATE OF THE UNEARNED FINANCE AND INSURANCE CHARGES.**
4. **YOU MAY CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**
5. **IT SHALL NOT BE LEGAL FOR THE SELLER TO ENTER YOUR PREMISES UNLAWFULLY OR COMMIT ANY BREACH OF THE PEACE TO REPOSSESS GOODS PURCHASED UNDER THIS AGREEMENT.**
**ALL OF THE TERMS ON THE REVERSE SIDE OF THIS PAGE ARE PART OF THIS AGREEMENT. READ THEM BEFORE YOU SIGN BELOW.**

APX ALARM SECURITY SOLUTIONS, INC.   CUSTOMER(S) SIGNATURE(S)

By: _____   By: Paulette Venditto
Signature

By: _____ Stevenson   Print Name: Paulette Venditto
Printed Name

Agent Type: _____   By: _____

Please Check One ☐ Sales ☐ Technician   Print Name: _____

_____ 6-19, 2059
Date of Transaction

**Supervisor Approval** _____ (OFFICE USE ONLY)   Type of Commercial Entity: ☐ Corporation ☐ LLC ☐ Partnership ☐ Sole Owner

**THIS AGREEMENT WILL NOT BE BINDING UPON APX UNTIL EITHER (1) SIGNED BY AN APX SUPERVISOR OR (2) WE START THE INSTALLATION OR MONITORING SERVICE. CUSTOMER ACKNOWLEDGES AND AGREES THAT CUSTOMER MAY NOT RECEIVE A COPY OF THIS AGREEMENT SIGNED BY OUR SUPERVISOR, AND SUCH LACK OF RECEIPT SHALL NOT, IN ANY WAY, INVALIDATE OR OTHERWISE AFFECT THIS AGREEMENT.**

PSA Rev. 03/09 Generic 39

## NOTICE OF CANCELLATION

BILLING ADDRESS (IF DIFFERENT) _____ PHONE ___ - ___ - ____

## 1. INSTALLATION AND SERVICES

We will install the security system(s) (each a "System") described on the Schedule of Protection ("SOP"), which is part of the monitoring and installation information form, and provide repair service, and monitor the System at an independently owned and operated monitoring facility (the "Center") we select.
We waive any right to file a mechanic's lien.

## 2. PRICE, PAYMENT, FINANCIAL DISCLOSURES AND TERMS

**2.1 ACTIVATION FEE. $198.00** (Non-Refundable)
☐ BILL OVER THREE (3) MONTHS      ☐ PAY IN FULL BY CHECK OR CREDIT CARD

**2.2 INSTALLATION & EQUIPMENT CHARGES. $** _____ (See SOP)

**2.3 SERVICES FEE.** FOR MONITORING YOU WILL PAY US AS FOLLOWS:
INITIAL TERM OF CONTRACT: __39__ MONTHS                    MONTHLY SERVICES FEE: $49.99 (plus any applicable taxes)
THE TOTAL MONTHLY SERVICES FEE IS PAYABLE MONTHLY IN ADVANCE. THE FIRST MONTHLY SERVICES FEE IS DUE WHEN THE SYSTEM IS INSTALLED AND OPERATIONAL. THE TOTAL CASH PRICE YOU WILL PAY US FOR THE SERVICES PROVIDED IS $1,949.61, NOT INCLUDING APPLICABLE TAXES. THERE IS NO FINANCING CHARGE OR COST OF CREDIT (0% APR) ASSOCIATED WITH THIS AGREEMENT.

**2.4 TERM FOR SERVICES.** THE ORIGINAL TERM OF THIS AGREEMENT STARTS ON THE DAY THIS AGREEMENT IS SIGNED AND CONTINUES FOR THIRTY-NINE (39) MONTHS, AND WILL AUTOMATICALLY CONTINUE FROM YEAR TO YEAR THEREAFTER UNLESS CANCELLED BY EITHER OF US IN WRITING NO LATER THAN THIRTY (30) DAYS BEFORE THE END OF THE ORIGINAL TERM OR ANY RENEWAL TERM.

**2.5 INCREASE IN SERVICES FEE.** YOU ACKNOWLEDGE THAT WE SHALL HAVE THE RIGHT, AT ANY TIME, TO INCREASE THE SERVICES FEE TO REFLECT ANY TAXES, LICENSES, PERMITS, COSTS, FEES OR CHARGES WHICH MAY BE CHARGED TO US BY ANY UTILITY OR GOVERNMENTAL AGENCY RELATING TO THE INSTALLATION OF THE SYSTEM OR SERVICES AND YOU AGREE TO PAY THE SAME. IN ADDITION, WE CAN INCREASE THE SERVICES FEE FOR ANY RENEWAL TERM BY GIVING YOU SIXTY (60) DAYS PRIOR WRITTEN NOTICE.

**2.6 CREDIT CHECK; LATE FEES.** YOU AUTHORIZE US TO CONFIRM YOUR CREDIT RECORD, AND TO REPORT YOUR PAYMENT PERFORMANCE UNDER THIS AGREEMENT TO CREDIT AGENCIES AND CREDIT REPORTING SERVICES. IF YOU FAIL TO MAKE ANY PAYMENT WHEN DUE, WE MAY, BY GIVING YOU WRITTEN NOTICE, DISCONTINUE INSTALLATION, MONITORING, REPAIR SERVICE, TERMINATE THIS AGREEMENT, AND RECOVER ALL DAMAGES TO WHICH WE ARE ENTITLED, INCLUDING THE VALUE OF THE WORK PERFORMED AND OUR LOSS OF PROFIT. IN ADDITION, WE MAY IMPOSE A LATE CHARGE ON ALL PAYMENTS MORE THAN TEN (10) DAYS PAST DUE IN THE MAXIMUM AMOUNT PERMITTED BY STATE LAW.

CREDIT CARD: ☐ VISA  ☐ MC  ☐ DIS  ☐ AMEX          AUTO-DEBIT: ☒ CHECKING  ☐ SAVINGS
CARDHOLDER: _____          NAME (ON ACCOUNT): _Paulette Venditta_
                                                                          REDACTED
ACCOUNT #: _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _          ACCOUNT #: __REDACTED__
CID NUMBER: ____  EXPIRATION DATE: __ / __          ABA ROUTING NUMBER: __REDACTED__
                                                                          DRIVER'S LICENSE #: __REDACTED__

I AUTHORIZE APX OR ITS ASSIGNEE(S) TO MAKE ELECTRONIC FUND TRANSFERS FROM MY BANK ACCOUNT OR CHARGES TO MY CREDIT CARD ACCOUNT IN THE ACCOUNT IDENTIFIED ABOVE AS MY TOTAL MONTHLY PAYMENT AND INCLUDING ALL PAST DUE AMOUNTS, TRIP FEES, SERVICE FEES OR AMOUNTS WHICH MAY ACCUMULATE IN ARREARS, ACCORDING TO THE TERMS ABOVE AND THE CONDITIONS OF THIS AGREEMENT.

## 3. OUR LIMITED LIABILITY

WHERE PERMITTED BY LAW, WE DISCLAIM ANY IMPLIED WARRANTIES PROVIDED BY LAW INCLUDING THE IMPLIED WARRANTIES OF MER-CHANTABILITY OR FITNESS FOR PURPOSE. WE DO NOT WARRANT THAT THE SYSTEM WILL ALWAYS DETECT OR HELP PREVENT, ANY BURGLARY, FIRE, HOLD-UP OR ANY OTHER SUCH EVENT. WE DO NOT WARRANT THAT THE SYSTEM CANNOT BE DEFEATED OR COMPROMISED OR THAT IT WILL ALWAYS OPERATE. SECTIONS 15 AND 16 ON THE REVERSE SIDE OF THIS AGREEMENT LIMIT OUR LIABILITY TO ONE THOUSAND DOLLARS ($1,000.00) OR TWELVE (12) TIMES THE MONTHLY SERVICES FEE, WHICHEVER IS LESS, IF YOU OR ANYONE ELSE SUFFERS ANY HARM (DAMAGE OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH) BECAUSE THE SYSTEM FAILED TO OPERATE PROPERLY OR WE WERE CARELESS OR ACTED IMPROPERLY. YOU HAVE HAD THE OPPORTUNITY TO TALK TO OUR SALES AGENT ABOUT THIS LIMITATION.

## 4. NOTICE TO CUSTOMER

1. DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT OR IF ANY OF THE SPACES INTENDED FOR THE AGREED TERMS TO THE EXTENT OF THEN AVAILABLE INFORMATION ARE LEFT BLANK.
2. YOU ARE ENTITLED TO A COPY OF THIS AGREEMENT.
3. YOU MAY PAY OFF THE FULL UNPAID BALANCE DUE UNDER THIS AGREEMENT AT ANY TIME, AND IN SO DOING YOU SHALL BE ENTITLED TO A FULL REBATE OF THE UNEARNED FINANCE AND INSURANCE CHARGES.
4. YOU MAY CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.
5. IT SHALL NOT BE LEGAL FOR THE SELLER TO ENTER YOUR PREMISES UNLAWFULLY OR COMMIT ANY BREACH OF THE PEACE TO REPOSSESS GOODS PURCHASED UNDER THIS AGREEMENT.
ALL OF THE TERMS ON THE REVERSE SIDE OF THIS PAGE ARE PART OF THIS AGREEMENT. READ THEM BEFORE YOU SIGN BELOW.

APX ALARM SECURITY SOLUTIONS, INC.                    CUSTOMER(S) SIGNATURE(S)

By: _____                          By: _Paulette Venditta_
       Signature                                     Print Name: _Paulette Venditta_
By: ___Stevenson___                                  By: _____
       Printed Name                                  Print Name: _____
Agent Reg. #: _____                                        _6-19_, 20_09_
Please Check One  ☐ Sales  ☐ Technician                              Date of Transaction
                                                     Type of Commercial Entity: ☐ Corporation  ☐ LLC  ☐ Partnership ☐ Sole Owner
Supervisor Approval ____ (OFFICE USE ONLY)
THIS AGREEMENT WILL NOT BE BINDING UPON APX UNTIL EITHER (1) SIGNED BY AN APX SUPERVISOR OR (2) WE START THE INSTALLATION OR MONITORING SERVICE. CUSTOMER ACKNOWLEDGES AND AGREES THAT CUSTOMER MAY NOT RECEIVE A COPY OF THIS AGREEMENT SIGNED BY OUR SUPERVISOR, AND SUCH LACK OF RECEIPT SHALL NOT, IN ANY WAY, INVALIDATE OR OTHERWISE AFFECT THIS AGREEMENT.

PSA Rev. 03/09 Generic 39

## NOTICE OF CANCELLATION

DATE OF TRANSACTION _6-19_, 20_09_.

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE (3) BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, AND PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN (10) DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTER-EST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED. IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER, AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUC-TIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK. IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY (20) DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PER-FORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT. TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE, OR ANY OTHER WRITTEN NOTICE, OR SEND A TELE-GRAM TO APX ALARM SECURITY SOLUTIONS, INC. 5132 NORTH 300 WEST, PROVO, UT 84604 NOT LATER THAN MID-NIGHT OF _6-24_, 20_09_.
                                    Date

I HEREBY CANCEL THIS TRANSACTION. DATED: _____

AR # _1259015_                    **BUYER'S SIGNATURE**                    PSA Rev. 03/09 Generic 39

5. **Repair Service.** During the term of this agreement, and at your request, we may perform repair service as follows: (A) *What is Covered.* For one hundred and twenty (120) days after we complete the installation, we will repair or replace any defective part of the system without charge to you. After the initial one hundred and twenty (120) day period, we will, so long as we are providing monitoring pursuant to this agreement, provide a replacement for any defective part without charge, but you will pay a $35.00 visit charge for each service call, plus any applicable taxes. All charges for repair service are due and payable upon completion of the service call, and you agree to pay the same. We can use new or used parts of the same functionality, and keep all replaced parts. (B) *How to Get Service:* Call or write us at the address and telephone number at the top of this agreement and tell us what is wrong with the system. We will provide service as soon as possible during our normal business hours, which are 8:00 a.m. to 6:00 p.m. Monday through Friday, excluding holidays we observe. A responsible adult must be at the premises at the time we visit. (C) *What is Not Included:* Repair of the system is our only duty. This warranty does not include batteries or alarm screens. We make no other express warranty including any warranty of merchantability of the system or its fitness for any special purpose. We do not warrant that the system will always detect, or help prevent, any burglary, fire, hold-up or other such event. We do not warrant that the system cannot be defeated or compromised or that it will always operate. This warranty does not cover repairs that are needed because of an accident, acts of God, your failure to properly use the system, or if someone other than us attempts to repair or change the system, or any other reason except a defect in the equipment or our installation. We are not liable for consequential or incidental damages. You agree that this is our only warranty and we have given you no other warranty for the system. (D) *State Law:* Some states do not allow a limitation on the duration of implied warranties or the exclusion or the limitation of consequential or incidental damages, so the above limitations or exclusions may not apply to you. The warranty gives you specific legal rights and you may also have other rights which may vary from state to state.

6. **Installation of the System.** You will permit us to install the system during our normal business hours and you will give us uninterrupted access to your premises. You have approved the locations where the control panel, audible devices and all protective devices will be installed. If the system includes an exterior audible bell, horn or siren, it is designed to shut-off after sounding for not more than five (5) minutes. You will provide a 110 volt electrical service, including non-switched electrical outlets for the System's transformers and other electrical needs, and will make repairs to the premises (such as fixing loose doors or broken windows) that we deem reasonably necessary to facilitate the installation and operation of the System. We are not responsible if the installation is delayed because of weather, labor disputes, acts of God or other reasons beyond our control. You have an affirmative duty to inform us, prior to us beginning installation, of every location at the premises where we should not (because of concealed obstructions or hazards such as pipes, wires or asbestos) enter or drill holes. We will take reasonable precautions to avoid concealed obstructions, but have no means of determining with certainty if they exist. Any costs incurred to repair pipes, wires or other obstructions, and any resulting damaged walls, ceiling, floors or furnishings shall be your sole expense and responsibility. If asbestos or other hazardous material is encountered during installation, we will cease work until you have, at your sole expense, obtained clearance from a licensed asbestos abatement or hazardous material contractor that continuation of work will not pose any danger to our personnel. In no case shall we be liable for discovery or exposure of hidden asbestos or other hazardous material. Unless so notified, we will determine where to drill and place equipment. If telephone utility service or outlets are necessary for the installation and operation of the System, you will provide them at your expense. After we complete the System, you and our installer will inspect it. The city or county in which your home or business is located may require that you obtain a permit for the use and monitoring of the System. Local authorities may not respond to alarm notifications until all permits or licenses for use of the System have been obtained, and therefore we may not begin monitoring until you have obtained at your expense all necessary permits or licenses, and provided us with the license or permit information.

7. **Monitoring Service.** We shall connect your System to the Center. To reduce false alarms, we use enhanced call verification (2 call verification). When your System sends a burglar alarm signal, the Center will try to telephone your premise to verify whether an emergency condition exists, and if there is no answer or a person indicates that an emergency exists, the Center will attempt to notify the police department and will also attempt to contact someone on your emergency call list to advise them that the police have been notified. When your System sends a fire alarm signal, the Center will attempt to call your premise and, if there is no answer or a person indicates that an emergency exists, the Center will attempt to notify the fire department or other emergency personnel. When your System sends a hold-up alarm or duress alarm signal, the Center will attempt to notify the police department. When your System sends a non-emergency signal, the Center will attempt to contact your premises and all available contacts, but will not notify emergency personnel. You acknowledge and agree that we are not liable if emergency personnel fail to respond to our request for emergency assistance. Although the Center will always attempt to respond to alarm signals in accordance with the procedures described above, if it has reason to believe that an emergency condition does not exist. You and we are obligated to comply with all notification and response requirements imposed by governmental agencies having jurisdiction over your System. We may discontinue or change any particular response service due to governmental or insurance requirements. You consent to the tape recording of all telephonic communications between your premises and our office or the Center. You authorize us to act as your agent to direct the Center to make changes to the information provided on your SOP, and otherwise communicate with the Center regarding your System.

8. **Response to Alarm Activations.** Customer understands, acknowledges and agrees that the emergency response agencies (police department, fire department, paramedics, etc. and herein referred to as the "jurisdiction") that would be notified in the event of an alarm under Section 7, may have instituted or may subsequent to the date of this agreement, institute either: (i) a no response policy to alarm system activations, or (ii) require an on site physical verification of the existence of an emergency condition before responding to a notification of an alarm signal from the Center. You may subscribe to private guard response through a separate contract with us to provide alternative response to alarm signals received by the Center (herein referred to as "private response"). Customer acknowledges and agrees that we are obligated to comply with the response and notification requirements imposed by the jurisdiction. If the jurisdiction has adopted a no-response policy, or a physical verification requirement, upon receipt of an alarm signal, we will not notify the jurisdiction, and shall only notify your designated representative and the private response if you subscribed to it. If your designated representative or the private response verify by physical on-site inspection and report such condition to APX, then APX shall attempt to notify the jurisdiction.

9. **Transmission Lines.** The System includes a communicator that sends signals to the Center over your regular telephone service. You will pay for all telephone charges including any installation fee for a special jack to connect the System to your telephone service. We, at our option, may install an RJ31 X or equivalent telephone jack to give the System priority over other telephones in your premises. When the System is activated, you will be unable to use your telephone to make other calls (such as 911 emergency calls) and, therefore, you may wish to have the System connected to a dedicated telephone line. If your telephone is out of order, placed on vacation status or otherwise not working, signals cannot be transmitted and the Center will not know of the service problem. We, at our option, may utilize a cellular communications system for transmitting alarm signals from your premises to the Center as a primary or secondary communications system. The use of cellular systems are controlled by state utility regulatory agencies and Federal Communications Commission and changes in rules, regulations and policies may necessitate our discontinuing such transmission facilities at our option. Cellular transmissions may be changed (or interrupted) by atmospheric conditions, including electrical storms, power failures, network outages or other conditions and events beyond our control. You agree to reimburse us for any costs we may incur to reprogram the communications device in your System because of area code changes or other dialing pattern changes. The use of DSL, VoIP or other broadband signals interferes with the telephone line seizure feature of the System. DSL service should be installed on a telephone number that is not used for alarm signal transmission. You agree to notify us immediately if you have installed or intend to install DSL, VoIP or other broadband service. Immediately after the installation of DSL, VoIP or other broadband service you must test your System's signal transmission with the Center.

10. **False Alarms.** You agree that you and others using the System, will use it carefully so as to avoid causing false alarms. False alarms can be caused by weather or other forces beyond our control. If we receive too many false alarms, that will constitute a breach of contract by you, and we may cancel monitoring and repair service and seek to recover damages. If a false alarm fine or penalty is charged to us, the Center, or you by any governmental agency, you will pay for the charge. You authorize us to enter your premises to turn off the audible device if we are requested or ordered to do so by governmental authorities, neighbors or anyone else, and you will pay our standard service call charge for each such visit.

11. **Customer Duties.** You will instruct all other persons who may use the System on its proper use. You will test the protective devices and send test signals to the Center in accordance with our instructions at least monthly. If the System includes space or interior protection (e.g. passive infrared motion detectors or other such detectors) you will turn off, control or remove all things such as air conditioning and heating systems, and pets that might interfere with such devices when they are turned on. If a problem in the System occurs you will notify us. You will obtain and keep in effect all permits or licenses that may be required for the installation and operation of the System. You will complete and give us the monitoring and installation information form, which will include the name, telephone number and relationship of each person we may call in the event we believe there is an emergency at your premises, and other information we may require. You will notify us in writing of any changes in the persons or telephone numbers on the monitoring and installation information form. You agree that we may disclose such information to any governmental agency having jurisdiction over the use and operation of the System. If the System includes any wireless devices, you will replace the batteries as needed and at least once each year. If you fail to replace the batteries, the System may not send a notification of an alarm.

12. **Suspension or Cancellation of this Agreement.** You understand that we may stop or suspend monitoring and repair service if: (A) strikes, weather, earthquakes or other such events beyond our control affect the operation of the Center or so severely damage your premises that continuing service would be impractical; (B) there is an

(C) you do not pay the service charge due to us, after we have given you ten days notice that we are cancelling service because of non-payment; (D) we are unable to provide monitoring service because of some action or ruling by any governmental authority; or (E) you become a debtor in a bankruptcy proceeding. If service is canceled or this agreement is terminated for any reason, you authorized us to remotely disconnect your communicator from the Center and/or enter your premises to disconnect your System from our monitoring equipment and remove our communications equipment and software and all of our signs and decals from your premises for our then prevailing discount fee. If service is suspended because you failed to pay the services fees set forth herein, and you ask us to reactivate the System, you will pay, in advance, our then prevailing reconnection fee. You understand that the System may not work with equipment used by other alarm companies or monitoring centers. You agree that you will grant us access to your premises to allow us to repossess or disable the equipment. You agree that we are not required to reactivate or repair your premises. We do not waive our right to any other legal remedy, including our right to charge you interest at the highest legal rate on the unpaid amount, by stopping the alarm monitoring and repair services or repossessing or disabling the equipment.

13. **Assignees and Subcontractors.** You may transfer or assign this agreement to any other alarm company, or as collateral to a financial institution. You may not transfer this agreement to someone else (including someone who purchases or rents your premises) unless we approve the transfer in writing. We may use subcontractors (including the Center) to provide installation, repair or monitoring services, and this agreement, and particularly Sections 15 and 16 shall apply to them and the work or services they provide, and protect them in the same manner as it applies to and protects us.

14. **Changes to the System.** If you or any governmental agency or insurance interest wants us to change the System described herein, or change it after it is installed, you agree to pay our standard parts and labor charges for such changes. You agree that you have chosen this System and you understand that additional or different protection is available for a higher price.

15. **APX is not an insurer; Limitation of Liability.** You understand that: (A) we are not an insurer of your premises, property or the personal safety of persons in your premises; (B) you are solely responsible for providing any life, health or disability insurance for yourself and persons who use the System, and insurance on your premises and its contents; (C) the amount you pay to us is based only on the value of the service we provide and not on the value of your premises or its contents; (D) alarm systems and monitoring service may not always operate properly for various reasons; (E) it is difficult to determine in advance the value of the property that might be lost, stolen or destroyed if the System or our services fail to operate properly; (F) it is difficult to determine in advance how fast the police or fire department or others would respond to an alarm signal; (G) an alarm system may not detect or prevent an unauthorized intrusion onto the premises or unauthorized activities (including criminal conduct) by persons on or about the premises; and (H) it is difficult to determine in advance what portion, if any, of any property loss, personal injury or death would be proximately caused by our failure to perform, our negligence, or a failure of the System or service.

Therefore you agree:
Even if a court decides that our breach of this agreement, or a failure of the System, or our negligence, or a failure of the installation, monitoring or repair service caused or allowed any harm or damage (whether property damage, personal injury or death) to you or anyone in your premises, you agree that our liability shall be limited to the lesser of $1000.00 or twelve (12) times the monthly service fee, and this shall be your sole and exclusive remedy regardless of what legal theory (including without limitation, negligence, breach of contract, breach of warranty or product liability) is used to determine that we were liable for the injury or loss.

You may obtain higher limitation of liability. You may obtain from APX a higher limitation of liability for an additional charge. If you elect this option, we will attach a rider to this agreement that will set forth the amount of the higher limitation of liability and the amount of the additional charge. Agreeing to the higher limitation of liability does not mean that APX is an insurer.

16. **Third Party Indemnification and Subrogation.** If anyone other than you asks us to pay for any harm or damages (including property damage, personal injury or death) connected with or resulting from (i) our breach of this agreement, (ii) a failure of the System or service, (iii) our negligence, (iv) any other improper or careless activity of ours in providing the System or services, or (v) a claim for indemnification or contribution, you will pay us (A) any amount which a court orders us to pay or which we reasonably agree to pay and (B) the amount of our reasonable attorney's fees and any other losses or costs that we may pay in connection with the harm or damages. Your obligation to pay us for such harm or damages shall not apply if the harm or damages happens while one of our employees or subcontractors is in or about your premises, and such harm or damages is solely caused by that employee or subcontractor. Unless prohibited by your property insurance policy, you agree to release us from any claims of any parties suing through your authority or in your name, such as your insurance company, and you agree to defend us against any such claim. You will notify your insurance company of this release.

17. **Limitation on Lawsuit; Waiver of Jury Trial.** Both parties agree that no lawsuit or any other legal proceeding connected with this agreement shall be brought or filed more than one (1) year after the incident giving rise to the claim occurred. **IN ADDITION, ANY LEGAL PROCEEDING SHALL NOT BE HEARD BEFORE A JURY. EACH PARTY WAIVES ANY RIGHT TO A JURY TRIAL.**

18. **Entire Agreement.** The entire and only agreement between us is written in this agreement. It replaces any earlier oral or written understanding or agreements. It may only be changed by a written agreement signed by you (and if married, your spouse) and us. It may not be changed by any oral statements or representations made by our sales representative. If you have given or ever give us a purchase order for the System or service which provides for different terms than this agreement, this agreement will govern and be controlling. If any provision of this agreement is found to be invalid or illegal by a court, the balance of the agreement shall remain in force. You agree that we may save and store all contracts and other documents executed by you in an electronic media, and all such contracts and other documents shall be given the same force and effect as the paper/form originals.

19. **Information; Privacy Contact.** You understand and agree that in conjunction with employee training, quality control and the provision of services, we may monitor and/or electronically record video and audio related to monitored activity at your location, as well as conversations with you, emergency services providers, and law enforcement personnel. Further, you understand that privacy cannot be guaranteed on telephone, cable and computer systems, and we shall not be liable to you for any claims, loss, damages or costs which may result from a lack of privacy experienced. You consent to us (i) using information about you and your location (collectively, "information") to administer services, offer you new products or services, enforce the terms of this agreement, prevent fraud and respond to regulatory and legal requirements; (ii) provide information, including information contained on your emergency information to law enforcement or fire service personnel for the purpose of providing services hereunder or in response to a subpoena or other such legal process; and (iii) using and sharing aggregate customer information and statistics that do not include information that identifies you personally. You agree that we may contact you by telephone, facsimile, email or other internet facilities, with respect to the system and services we provide under this agreement, and other offerings of systems or services we may make available in the future.

20. **Licenses.** ALARM COMPANY OPERATORS AND CONTRACTORS MAY BE LICENSED AND REGULATED BY THE STATE IN WHICH YOUR SYSTEM IS LOCATED. We, and our subcontractors (including the Center), maintain the licenses required by applicable law and, when required, list the applicable license number(s) and the name and address of the state licensing authority as follows: AL: Electronic Security Board of Licensure, 7956 Vaughn Road, PMB 392, Montgomery, AL 36116 (334) 264-9388. AK: Dept. of Commerce, Community and Economic Development, Div. of Occupational Licensing, 550 West 7th Ave., Suite 1500, Anchorage, AK 99501 (907) 269-8160. AZ: Arizona State Board of Technical Registration, 1110 W. Washington St., Suite 240, Phoenix, AZ 85007 (602) 364-4930. AR: Arkansas Board of Private Investigators and Private Security Agencies, #1 State Police Plaza Drive, Little Rock, AR 72209 (501) 618-8600. CA: Bureau of Security and Investigative Services, Dept. of Consumer Affairs, P.O. Box 989002, West Sacramento, CA 95798-9002 (916) 322-4000. DE: Division of Revenue, Business Licensing, 820 North French Street, Wilmington, DE 19801 (302) 577-8200. IA: Division of Labor Services, 1000 East Grand Avenue, Des Moines, IA 50319 (515) 242-5871. LA: LA State Fire Marshal's Office, 8181 Independence Blvd., Baton Rouge, LA 70806 (800) 256-5452. MN: Minnesota Dept. of Labor and Industry, 443 Lafayette Road North, St. Paul, MN 55155-4342 (651) 284-5064. MS: Mississippi Insurance Department, 1001 Woolfolk State Office Building, 501 North West St., Jackson, MS 39201 (601) 359-1061. NC: NC Board of Examiners of Electrical Contractors, 3101 Industrial Drive, Suite 206, Raleigh, NC 27609 (919) 733-9042. NC: NC Alarm Systems Licensing Board, 1631 Midtown Place, Suite 104, Raleigh, NC 27609 (919) 875-3611. NE: NE State Electrical Board, 800 South 13th, Suite 109, PO Box 95066, Lincoln, NE 68509 (402) 471-3550. NJ: New Jersey Office of the Attorney General, Division of Consumer Affairs, Board of Examiners of Electrical Contractors, Fire Alarm, Burglar Alarm, and Locksmith Advisory Committee, 124 Halsey Street, 6th Floor, Newark, NJ 07101 973-504-6245. NM: NM Regulation and Licensing Department, 2550 Cerrillos Road, Santa Fe, NM 87504 (505) 476-4500. NV: NV State Contractors Board, 9670 Gateway Drive, Suite 100, Reno, NV 89521 (775) 688-1141. NY: Licensed by the N.Y.S. Dept. of State, Division of Licensing Services, 41 State Street, Albany, NY 12231 (518) 474-4687. OH: OH Dept. of Commerce, Division of State Fire Marshal, 8895 E. Main Street, Reynoldsburg OH 43068 (614) 752-7126. RI: RI Dept. of Business Regulation, Division of Commercial Licensing, 233 Richmond Street, Suite 230, Providence, RI 02903 (401) 222-2416. SC: DEPT OF LABOR, LICENSING AND REGULATION, Contractors Licensing Board, P.O. Box 11329, Columbia, SC 29211 (803) 896-4696. TN: ALARM SYSTEMS CONTRACTORS BOARD, 500 James Robertson Parkway, Davy Crockett Tower, Nashville, TN 37243-1166 (615) 741-9771. TX: Complaints may be directed to the Texas Department of Public Safety, Private Security Bureau, P. O. Box 4087, Austin, Texas 78773, (512) 424-7710. TX: TX Dept of Insurance, State Fire Marshal, 333 Guadalupe, Austin, TX 78701 (512) 305-7935. VA: VA Dept of Criminal Justice Services, Private Security Section Board, 202 North Ninth Street, 10th Floor, Richmond, VA 23219 (804) 786-4700. WA: WA Dept of Labor and Industries, Contractor Registration Section, PO Box 44460, Olympia, WA 98504 (360) 902-5269. WY: Department of Fire Prevention & Electrical Safety, Herschler Building 1 West Cheyenne, WY 82002, 307-777-7288. OR: Construction Contractors Board, PO Box 14140, Salem, OR 97309-5052, 503-378-4621. OR: Department of Consumer & Business Services, Building Codes Division, P.O. Box 14470, Salem, OR 97309, 503-378-4133. CT: Department of Consumer Protection, 165 Capitol Avenue, Hartford, CT 06106, (860) 713-6050.

including non-switched electrical outlets for the System's hardware, internet and other electrical needs, and will make repairs in the premises (such as fixing loose doors or broken windows) that we deem reasonably necessary to facilitate the installation, service and use of the System. You acknowledge that installation is a physical process of weather, labor disputes, acts of God or other reasons beyond our control. You have an affirmative duty to inform us, prior to us beginning installation, of every location at the premises where we should not (because of concealed obstructions or hazards such as pipes, wires or asbestos) enter or drill holes. We will take reasonable precautions to avoid concealed obstructions, but have no means of determining with certainty if they exist. Any costs incurred to repair pipes, wires or other obstructions, and any resulting damaged walls, ceiling, floors or furnishings shall be your sole expense and responsibility. If asbestos or other hazardous material is encountered during installation, we will cease work until you have, at your sole expense, obtained clearance from a licensed asbestos abatement or hazardous material contractor that continuation of work will not pose any danger to our personnel. In no case shall we be liable for discovery or exposure of hidden asbestos or other hazardous material. Unless so notified, we will determine where to drill and place equipment. If telephone utility services or cables are necessary for the installation and operation of the System, you will provide them at your expense. After we complete the System, you and our installer will inspect it. The City or county in which your home or business is located may require that you obtain a permit for the use and monitoring of the System. Local authorities may not respond to alarm notifications until all permits or licenses for use of the System have been obtained, and therefore we may not begin monitoring until you have obtained at your expense all necessary permits or licenses, and provided us with the license or permit information.

**7. Monitoring Service.** We shall connect your System to the Center. To reduce false alarms, we use enhanced call verification (2 call verification). When your System sends a burglar alarm signal, the Center will try to telephone your premise to verify whether an emergency condition exists, and if there is no answer or a person indicates that an emergency exists, the Center will attempt to notify the police department and will also attempt to contact someone on your emergency call list to advise them that the police have been notified. When your System sends a fire alarm signal, the Center will attempt to call your premise and, if there is no answer or a person indicates that an emergency exists, the Center will attempt to notify the fire department or other emergency personnel. When your System sends a hold-up alarm or duress alarm signal, the Center will attempt to notify the police department. When your System sends a non-emergency signal, the Center will attempt to contact your premises and all available contacts, but will not notify emergency authorities. The Center may choose not to notify emergency personnel if it has reason to believe that an emergency condition does not exist. You and we are obligated to comply with all notification and response requirements imposed by governmental agencies having jurisdiction over your premises. We may discontinue or change any particular response service due to governmental or insurance requirements. You consent to the tape recording of all telephonic communications between your premises and our office or the Center. You authorize us to act as your agent to direct the Center to make changes to the information provided on your SOP, and otherwise communicate with the Center regarding your System.

**8. Response to Alarm Activations.** Customer understands, acknowledges and agrees that the emergency response agencies (police department, fire department, paramedics, etc. and herein referred to as the "jurisdiction") that would be notified in the event of an alarm under Section 7, may have instituted or may subsequent to the date of this agreement, institute either : (i) a no response policy to alarm system activations, or (ii) require an on-site physical verification of the existence of an emergency condition before responding to a notification of an alarm signal from the Center. You may subscribe to private guard response pursuant to a separate contract with us to provide alternative response to alarm signals received by the Center (herein referred to as "private response"). Customer acknowledges and agrees that we are obligated to comply with the response and notification requirements imposed by the jurisdiction. If the jurisdiction has adopted a no-response policy, or a physical verification requirement, upon receipt of an alarm signal, we will not notify the jurisdiction, and shall only notify your designated representative or the private response you designated. If you subscribed to it. If your designated representative or the private response verify by physical on-site inspection and report such condition to APX, then APX shall attempt to notify the jurisdiction.

**9. Transmission Lines.** The System includes a communicator that sends signals to the Center over your regular telephone service. You will pay for all telephone charges including any installation fee for a special jack to connect the System to your telephone service. We, at our option, may install an RJ31 X or equivalent telephone jack to give the System priority over other telephones in your premises. When the System is activated, you will be unable to use your telephone to make other calls (such as 911 emergency calls) and, therefore, you may wish to have the System connected to a secondary telephone line. If your telephone is out of order, placed on vacation status or otherwise not working, signals cannot be transmitted and the Center will not know of the telephone service problem. We, at our option, may utilize a cellular communications system for transmitting alarm signals from your premises to the Center as a primary or secondary communications system. The use of cellular systems are controlled by state utility regulatory agencies and Federal Communications Commission and changes in rules, regulations and policies may necessitate our discontinuing such transmission facilities at our option. Cellular transmissions may be impaired or interrupted by atmospheric conditions, including electrical storms, power failures, network outages or other conditions and events beyond our control. You agree to reimburse us for any costs we may incur to reprogram the communications device in your System because of area code changes or other dialing pattern changes. The use of DSL, VoIP or other broadband signals interferes with the telephone line seizure feature of the System. DSL service should be installed on a telephone number that is not used for alarm signal transmission. You agree to notify us immediately if you have installed or intend to install DSL, VoIP or other broadband service. Immediately after the installation of DSL, VoIP, or other broadband service you must test your System's signal transmission with the Center.

**10. False Alarms.** You agree that you and others using the System, will use it carefully so as to avoid causing false alarms. False alarms can be caused by weather or other forces beyond our control. If we receive too many false alarms, that will constitute a breach of contract by you, and we may cancel monitoring and repair service and seek to recover damages. If a false alarm fine or penalty is charged to us, the Center, or you by any governmental agency, you will pay for the charge. You authorize us to enter your premises to turn off the audible device if we are requested or ordered to do so by governmental authorities, neighbors or anyone else, and you will pay our standard service call charge for each such visit.

**11. Customer Duties.** You will instruct all other persons who may use the System as to its proper use. You will test the System's protective devices and send test signals to the Center in accordance with our instructions at least monthly. If the System includes space or interior protection (e.g. passive infrared motion detectors or other such detectors) you will turn off, control or remove all things such as air conditioning and heating systems, and pets that might interfere with such devices when they are turned on. If a problem in the System occurs you will notify us. You will obtain and keep in effect all permits or licenses that may be required for the installation and operation of the System. You will complete and give us the monitoring and installation information form, which will include the name, telephone number and relationship of each person we may call in the event we believe there is an emergency at your premises, and other information we may require. You will notify us in writing of any changes in the persons or telephone numbers on the monitoring and installation information form. You agree that we may disclose such information to any governmental agency having jurisdiction over the use and operation of the System. If the System includes any wireless devices, you will replace the batteries as needed and at least once each year. If you fail to replace the batteries, the System may not send a notification of an alarm.

**12. Suspension or Cancellation of This Agreement.** You understand that we may stop or suspend monitoring and repair service if: (A) strikes, weather, earthquakes or other such events beyond our control affect the operation of the Center or so severely damage your premises that continuing service would be impractical; (B) there is an

PSA Rev. 03/09 Generic 39

**15. APX Is not an Insurer; Limitation of Liability.** You understand that: (A) we are not an insurer of your premises, property or the personal safety of persons in your premises; (B) you are solely responsible for providing any life, health or medical service for persons in your premises; (C) we do not represent your premises and contents ... the installation, monitoring and service we provide ... the systems ... will ... avert or ... the amount you pay bears ... to the ... to the possible loss, damage or injury you may suffer; ... the amount ... value of your premises or its contents; (D) alarm systems and monitoring service may not always operate properly for various reasons; (E) it is difficult to determine in advance the value of the property that might be lost, stolen or destroyed if the System or our services fail to operate properly; (F) it is difficult to determine in advance how fast the police or fire department or others would respond to an alarm signal; (G) an alarm system may not detect or prevent an unauthorized intrusion onto the premises or unauthorized activities (including criminal conduct) by persons on or about the premises; and (H) it is difficult to determine in advance what portion, if any, of any property loss, personal injury or death would be proximately caused by our failure to perform, our negligence, or a failure of the System or service.

Therefore you agree:
Even if a court decides that our breach of this agreement, or a failure of the System, or our negligence, or a failure of the installation, monitoring or repair service caused or allowed any harm or damage (whether property damage, personal injury or death) to you or anyone in your premises, you agree that our liability shall be limited to the lesser of $1000.00 or twelve (12) times the monthly service fee, and this shall be your sole and exclusive remedy regardless of what legal theory (including without limitation, negligence, breach of contract, breach of warranty or product liability) is used to determine that we were liable for the injury or loss.

You may obtain higher limitation of liability. You may obtain from APX a higher limitation of liability for an additional charge. If you elect this option, we will attach a rider to this agreement that we will set forth the amount of the higher limitation of liability and the amount of the additional charge. Agreeing to the higher limitation of liability does not mean that APX is an insurer.

**16. Third Party Indemnification and Subrogation.** If anyone other than you asks us to pay for any harm or damages (including property damage, personal injury or death) connected with or resulting from (i) our breach of this agreement, (ii) a failure of the System or service, (iii) our negligence, (iv) any other improper or careless activity of ours in providing the System or services, or (v) a claim for indemnification or contribution, you will pay us (X) any amount which a court orders us to pay or which we reasonably agree to pay and (Y) the amount of our reasonable attorney's fees and any other losses or costs that we may pay in connection with the harm or damages. Your obligation to pay us for such harm or damages shall not apply if the harm or damages happens while one of our employees or subcontractors is in or about your premises, and such harm or damages is solely caused by that employee or subcontractor. Unless prohibited by your property insurance policy, you agree to release us from any claims of any parties suing through your authority or in your name, such as your insurance company, and you agree to defend us against any such claims. You hereby notify your insurance company of this release.

**17. Limitation on Lawsuit; Waiver of Jury Trial.** Both parties agree that no lawsuit or any other legal proceeding connected with this agreement shall be brought or filed more than one (1) year after the incident giving rise to the claim occurred. **IN ADDITION, ANY LEGAL PROCEEDING SHALL NOT BE HEARD BEFORE A JURY. EACH PARTY WAIVES ANY RIGHT TO A JURY TRIAL.**

**18. Entire Agreement.** The entire and only agreement between us is written in this agreement. It replaces any earlier oral or written understanding or agreements. It may only be changed by a written agreement signed by you (and if married, your spouse) and us. It may not be changed by any oral statements or representations made by our sales representative. If you have given or ever give us a purchase order for the System or service which provides for different terms than this agreement, this agreement will govern and be controlling. If any provision of this agreement is found to be invalid or illegal by a court, the balance of the agreement shall remain in force. You agree that we may save and store all contracts and other documents executed by you in an electronic media, and all such contracts and other documents shall be given the same force and effect as the paper/form originals.

**19. Information; Privacy Contact.** You understand and agree that in conjunction with employee training, quality control and the provision of services, we may monitor and/or electronically record video and audio related to monitored activity at your location, as well as conversations with you, emergency service providers, and law enforcement personnel. Further, you understand that privacy cannot be guaranteed on telephone, cable and computer systems, and we shall not be liable to you for any claims, loss, damages or costs which may result from a lack of privacy experienced. You consent to us (i) using information about you and your location (collectively, "information") to administer services, offer you new products or services, enforce the terms of this agreement, prevent fraud and respond to regulatory and legal requirements, (ii) provide information, including information contained on your emergency information to law enforcement or fire service personnel for the purpose of providing services hereunder or in response to a subpoena or other such legal process, and (iii) using and sharing aggregate customer information and statistics that do not include information that identifies you personally. You agree that we may contact you by telephone, facsimile, email or other internet facilities, with respect to the system and services we provide under this agreement, and new offerings of systems or services we may make available in the future.

**20. Licenses. ALARM COMPANY OPERATORS AND CONTRACTORS MAY BE LICENSED AND REGULATED BY THE STATE IN WHICH YOUR SYSTEM IS LOCATED.** NM: The Construction Industries Licensing Act does not protect consumers if the contractor defaults. DE: Delaware State Police, dpsc.webmaster@state.de.us (302) 736-5901. DE: Division of Revenue, Business Licensing, 820 North French Street, Wilmington, DE 19801 (302) 577-8200. IA: Division of Labor Services, 1000 East Grand Avenue, Des Moines, IA 50319 (515) 242-5871. LA: LA State Fire Marshal's Office, 8181 Independence Blvd., Baton Rouge, LA 70806 800-256-5452. MN: Minnesota Dept of Labor and Industry, 443 Lafayette Road North, St. Paul, MN 55155-4342 (651) 284-5064. MS: Mississippi Insurance Department, 1001 Woolfolk State Office Building, 501 North West St., Jackson, MS 39201 (601) 359-1061. NC: NC Board of Examiners of Electrical Contractors, 3101 Industrial Drive, Suite 206, Raleigh NC 27609 (919) 733-9042. NC: NC Alarm System Licensing Board, 1631 Midtown Place, Suite 104, Raleigh NC 27609 (919) 875-3611. NE: NE State Electrical Board, 800 South 13th, Suite 109, PO Box 95066, Lincoln, NE 68509 (402) 471-3550. NJ: New Jersey Office of the Attorney General, Division of Consumer Affairs, Board of Examiners of Electrical Contractors, Fire Alarm, Burglar Alarm, and Locksmith Advisory Committee, 124 Halsey Street, 6th Floor, Newark, NJ 07101, 973-504-6245. NM: NM Regulation and Licensing Department, 2550 Cerrillos Road, Santa Fe, NM 87504 (505) 476-4500. NY: NY State Contractors Board, 5670 Gateway Drive, Suite 100, Reno, NV 89521 (775) 688-1141. NY: Licensed by the N.Y.S. Dept of State, Division of Licensing Services, 41 State Street, Albany, NY 12231 (518) 474-4597. OH: OH Dept of Commerce, Division of State Fire Marshal, 8895 E. Main Street, Reynoldsburg, OH 43068 (614) 752-7126. RI: RI Dept of Business Regulation, Division of Commercial Licensing, 233 Richmond Street, Suite 230, Providence, RI 02903 (401) 222-2416. SC: DEPT OF LABOR, LICENSING AND REGULATION, Contractors Licensing Board, P. O. Box 11329, Columbia, SC 29211 (803) 896-4686. TN: ALARM SYSTEMS CONTRACTORS BOARD, 500 James Robertson Parkway, Davy Crockett Tower, Nashville, TN 37243-1158 (615) 741-9771. TX: Complaints may be directed to the Texas Department of Public Safety, Private Security Bureau, P. O. Box 4087, Austin, Texas 78773, (512) 424-7710. TX: TX Dept of Insurance, State Fire Marshal, 333 Guadalupe, Austin, TX 78701 (512) 305-7935. VA: VA Dept of Criminal Justice Services, Private Security Services Section, 202 North Ninth Street, 10th Floor, Richmond, VA 23219 (804) 786-4700. WA: WA Dept of Labor and Industries, Contractor's Registration Section, PO Box 44400, Olympia, WA 98504 (360) 902-5269. WY: Department of Fire Prevention & Electrical Safety, Herschler Building 1 West Cheyenne, WY 82002, 307-777-7288. OR: Construction Contractors Board, PO Box 14140, Salem, OR 97309-5052, 503-378-4621. OR: Department of Consumer & Business Services, Building Codes Division, P.O. Box 14470, Salem, OR 97309, 503-378-4133. CT: Department of Consumer Protection, 165 Capitol Avenue, Hartford, CT 06106, (860) 713-6050.

**NAME:** _[handwritten]_
**ADDRESS:** REDACTED
**CITY** REDACTED   **STATE:** UT **ZIP** REDACTED
**PREMISES PHONE #:** REDACTED
**RECVR LINE #:** (866) 856-0112
**CSID#:** ASUO1788
**AR#:** 1259015
**OFFICE:** Jessey Smith
**SALES REP:** Wes Swenson

# APXALARM
SECURITY SOLUTIONS
5132 North 300 West
Provo, UT 84604
P: 800.216.5232
F: 801.377.4116
Email: support@apxalarm.com
www.apxalarm.com

## SCHEDULE OF PROTECTION

### EMERGENCY CALL LIST
### (AUTHORIZED INDIVIDUALS TO BE NOTIFIED)

| | NAME | RELATIONSHIP TO CUSTOMER | TELEPHONE # | ALT. TELEPHONE # | KEY HOLDER? |
|---|---|---|---|---|---|
| 1. | Paulene Vendito | Self | REDACTED | ( ) - | Y☒ N☐ |
| 2. | Anthony Vendito | Brother | | ( ) - | Y☒ N☐ |
| 3. | | | ( ) - | ( ) - | Y☐ N☐ |
| 4. | | | ( ) - | ( ) - | Y☐ N☐ |

**PASSWORD INFORMATION:**   **PASSWORD:** Peaches   (No profanity or common emergency terms)

### SYSTEM INFORMATION

**Pre-Install Summary**

☑New ☐Exist   ☒APX 32 ☐V-15   ☐Cell Prim ☐Cell Back   Tot. Pts. 7   ☐ Call Waiting ☐ DSL ☐ VOIP

**Install Summary**

☒APX 32 ☐V-15   ☒2 Way Conf. # 50929247   ☐Cell Prim ☐Cell Back

☐Wally ☐7845 GSM Reg ☐DSL ☒Seizure   Tot. Pts. __ Existing Zones __ | MAC # __ | CRC# __

### Pre-Installation EQUIPMENT (Rep)

| Item | Qty | Retail Price | Retail Total | Taxes | Total Price |
|---|---|---|---|---|---|
| Keypad & Siren | 1 | $399.00 | 399 | | ☐ |
| Door/Window | 3 | $ 99.00 | 297 | | |
| Door | 2 | 99 | 198 | | |
| Window | 1 | 99 | 99 | | |
| Motion | 1 | 195 | 195 | | |
| Key Fob | 2 | 99 | 198 | | |
| Lifetime | 1 | 199 | 199 | | |
| Installation | 1 | 199 | 199 | | |
| | | | | | |
| Installation Charge | | $198.00 | | | |
| Total Equipment & Installation Charges | | | 1,487 | ☐ | |

### Post-Installation EQUIPMENT (Installer)

| Item | Qty | Price | Taxes | Total Price |
|---|---|---|---|---|
| Keypad & Siren | 1 | | | |
| Door/Window | 3 | | | |
| Motion | 1 | | | |
| Keyfobs | 2 | | | |
| | | | | |
| Installation Charge | | | | |
| Total Equipment & Installation Charges | | | ☐ | ☐ |

**Installation Notes:** Program panic Button

### ZONE INFORMATION

| Existing | Hardwire | Zone # | Zone Type | Location |
|---|---|---|---|---|
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

| Existing | Hardwire | Zone # | Zone Type | Location |
|---|---|---|---|---|
| ☐ | ☐ | 02 | 01 | FD |
| ☐ | ☐ | 03 | 01 | FD |
| ☐ | ☐ | 04 | 03 | Win. |
| ☐ | ☐ | 05 | 10 | Mot/LR |
| ☐ | ☐ | | | |
| ☐ | ☐ | 29 | 08 | Keyfobs |
| ☐ | ☐ | 33 | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | 25 | | |
| ☐ | ☐ | 92 | | Duress |
| ☐ | ☐ | 95 | 09 | Fire |
| ☐ | ☐ | 96 | 08 | Medical |
| ☐ | ☐ | 99 | 07 | Police |

## APX ALARM SECURITY SOLUTIONS, INC.

**By:** Dallas Jeffs
Installer Signature

**By:** Dallas Jeffs
Installer Printed Name

**Agent Reg. #:** ____

## CUSTOMER(S) SIGNATURE(S)

**By:** _[signature]_

**Print Name:** Paulette Vendito

**By:** ____

**Print Name:** ____

06-19-2009 , 20 __
Date of Transaction

SOP Rev. 3/09

# EXHIBIT B

*Second Amended Class Action Complaint*
*Venditto vs. Vivint, Inc.*
Case No.:  2:14-cv-04357

PAULETTE VENDITTO
REDACTED


ACCOUNT #1259015


FEBRUARY 20, 2014


VIVINT
4931 NORTH 300 WEST
PROVO, UT  84604

DEAR ACCOUNT MANGER:

PLEASE BE ADVISED THAT I'M WRITING TO YOU TO CANCEL THE SERVICE
CONTRACT I HAVE WITH YOUR COMPANY IMMEDIATLY.  AS OF THIS
NOTICE, PLEASE STOP ALL MONTHLY WITHDRAWALS FROM MY BANK
ACCOUNT.



SINCERELY,

*Paulette Venditto*

PAULETTE VENDITTO



**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

VIVINT
ATTN: ACCT. MGR.
4931 NORTH 300 WEST
PROVO, UT 84604

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _J T Taufer_  ☑ Agent ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
Janet Taufer   FEB 24 2014

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☒ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

2. Article Number
(Transfer from service label)   7009 0820 0002 0988 6661

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

7009 0820 0002 0988 6661

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

| | | |
|---|---|---|
| Postage | $ | $2.70 |
| Certified Fee | | $3.30 |
| Return Receipt Fee (Endorsement Required) | | $6.49 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $4.49 |

Sent To VIVINT - ATTN: ACCT MGR
Street, Apt No.; 4931 NORTH 300 WEST
or PO Box No. Provo, UT 84604

PS Form 3800, August 2006   See Reverse for Instructions

7009 0820 0002 0988 6661

---

Return Rcpt (Green Card)
00 Certified   $3.30
USPS Certified Mail #:
70090820002098861

Issue PVI:   $6.49

(Forever)   1   $4.90   $4.90
Four Flags
PSA Bklt/10
(Forever)   1   $9.80   $9.80
Vintage
Seed
Packets PSA
Dbl-Sd
Bklt/20
(Forever)   1   $9.80   $9.80
Winter
Flowers PSA
Bklt/20

Total:   $30.99

Paid by:
Debit Card   $30.99
Account #:   XXXXXXXXXX3277
Approval #:   973040
Transaction #:   704

EXHIBIT C

*Second Amended Class Action Complaint*
*Venditto vs. Vivint, Inc.*
Case No.:  2:14-cv-04357



vivint.com
info@vivint.com
800.216.5232

United States
4931 North 300 West
Provo, UT  84604
801.705.2900

March 21, 2014

Page 1 of 1 - A

Paulette Venditto
REDACTED

Regarding: Automatic payment rejected - stop payment

Account Number: 1259015

Dear Paulette,

We are writing to inform you that the automatic debit on your account, submitted on 3/19/2014 has been rejected.  We were unable to process your payment because you requested a stop payment.  As a result, a processing fee of $15 and late fee of $3 have been charged to your account.

Collecting additional fees:

The additional fees will be collected during your next scheduled automatic debit and will be itemized on your bank statement.  You do not need to send us a separate payment.  If you have already done so, that amount will be applied toward any existing or future outstanding invoices.

We appreciate your assistance in resolving this issue.  If you have any questions, please feel free to contact us.

Sincerely,

**Vivint Accounting Representative**

Vivint. Accounting
800.216.5232 • support@vivint.com

NEW JERSEY #34BX00000100

LICENSING // AB: 318268 / AK: 36012 / AK: 952694 / AK: 10-052 / AL: 980 / AL: 932-717 / AR: E 07-009 / AZ: ROC272138 / AZ: ROC218272 / BC: 84978 / CA: ACO6286 / CA: LCO 5368 / CA: 874794 CT: ELC.0192591-L5 / CT: ELC.0189925-E1 / DC: 71101930 / DC: ECS901552 / DE: 06-116 / DE: 2006209146 / DE: CSRSL-0039 / FL: EG13000290 / GA: LVU406189 / HI: CT-31374 / IA: AC-0011 IA: C004643 / IA: 321248 / ID: 011630 / ID: 006720 / IL: 127001290 / MA: 1471 C / MA: SS CO 001351 / MB: 32065 / MD: 107-1302 / ME: LMS0017112 / MI: 3601206218 / MN: TS01618 / MS: 15010729 MT: 216 / NB: 81467 / NB: 134892749000 / NC: 1811-CSA / NC: 25514-SP-LV / ND: TM-00327 / NE: 12465 / NJ: 34BF00000100 / NL: 320 / NL: 11-10-VI016-1 / NM: 93695 / NS: 101411230 / NT: 11-019 NV: 0062684 / NY: 12000301658 / OH: 53-89-1547 / OK: 1026 / OR: 173349 / OR: CLE216 / PA: PA017248 / PE: 13002 / RI: 34456 / RI: 6995 / SC: BAC #5569 / SC: FAC #3437 / SK: 322095 / TN: 1524 TN: 1253 / TN: 711 / TX: B13684 / TX: ACR-2854 / TX: TACLB00043940R / UT: 6093322-6501 / VA: 11-4822 / VA: 2705 138422 / WA: VIVIN*894BZ / WV: WV040401 / WY: LV-G-16005

EXHIBIT D

*Second Amended Class Action Complaint*
*Venditto vs. Vivint, Inc.*
Case No.:  2:14-cv-04357

# vivint.

Account #:  1259015
Invoice Date #:  April 15, 2014
Invoice #:  INV01435530
Due Date #:  May 10, 2014
Page:  1 of 1

## Monthly Service Charges

| | | |
|---|---|---|
| Home Security & Automation | | **$44.99** |
| Home Security Monitoring | Apr 15 - May 14 | $44.99 |
| **Total Monthly Service Charges** | | **$44.99** |

## Taxes & Fees

| | |
|---|---|
| STATE SALES TAX | $3.15 |
| **Total Taxes & Fees** | **$3.15** |
| **Subtotal After Tax** | **$48.14** |
| **Past Amount Due:** | **$66.14** |
| **Total Amount Due:** | **$114.28** |

### HOW TO CONTACT US
1-800-216-5232
Email: support@vivint.com

### UPGRADE TO AUTOMATIC BILLING
Save time
Save paper
Save money on stamps
Call 888.346.9202 or sign up at
account.vivint.com

### VIVINT ACCOUNT CENTER
Update your profile
View your bill and pay online
Set up system notifications and alerts
Find user guides and product manuals
Login at account.vivint.com

### NEW MOBILE APPS
Check current system status
Arm and disarm your system
Watch live and saved video clips
View recent system and sensor activity
Get the latest app for iPhone, iPad,
Blackberry and Android at
vivint.com/mobile

### REFER A FRIEND AND SAVE
They get $30 off activation
You get a check for $30
There's no limit on the number of
rewards you can receive
Call 888.304.6802

---

Thank you for your business. Detach and return this portion with your payment. Keep upper portion for your records.

# vivint.

| | |
|---|---|
| Statement Date: | April 15, 2014 |
| Account #: | 1259015 |
| Due Date: | May 10, 2014 |
| Amount Due: | $114.28 |
| Amount Enclosed: | |

☐ Please check box if your address has changed and
provide your new address on the back.

Paulette Venditto
REDACTED

Vivint, Inc.
62992 Collection Drive
Chicago, IL 60693-0629

001259015 01435530 0000011428 9



**service and support: call 800.216.5232**
Vivint is your single source to call for all your support needs. Simply call the number shown above for:
• Equipment repair    • Updates of emergency contact information
• Equipment operation assistance    • Billing questions
• Monitoring service questions    • Moving your alarm system
• Changes of address, phone numbers, permit numbers
• Security system upgrades

**moving or changes to your address**
If you have moved or are planning to move in the future, Vivint can help you with important matters concerning your alarm system and safety. Please call Customer Service at 800.216.5232 (24 hours a day, 7 days a week) to find out more about the variety of options we can provide you. Options may include:
• Moving your current alarm system to your new home or property
• Installing a new alarm system in your new home or property
• Continuing 24-hour monitoring service for the buyer or new resident of your property

**tips to prevent false alarms**
• Become familiar with how to operate your system and how to use its features.
• Read and retain the operator's manual for your security system.
• Be sure those who have a key to your home or business know how to operate the security system.
• If your system does not seem to be working properly, call Vivint immediately.
• Call Vivint if you change your phone number or other emergency contact information.
• Test your system monthly. Call 800.216.5232 for instructions.

**electronic payment authorization form**
Vivint's Electronic Payment Plan can save you the time and expense of mailing monthly payments for your monitoring account by automatically debiting your checking/savings/credit card for the monthly fee. Please include a voided check/savings account statement if necessary. Sign and mail to the address below to authorize your Electronic Payment Plan.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂

Name
_____

City
_____    State _____

Type of account (check one):    Checking ☐    Savings ☐

Name of financial institution
_____

Checking/Savings account number
_____

Type of credit card (check one):    Visa ☐    MasterCard ☐

Name on account
_____

Address
_____

Zip code _____    Home phone _____

(Remember to include a voided check/savings account statement)

City _____    State _____

ABA routing number (first 9 digits in lower left corner of check)
_____

Discover ☐    American Express ☐

Expiration date _____    Card number _____

I authorize Vivint to initiate, by electronic means, debit entries to my checking/savings/credit card and the financial institution shown to debit the same such account.

Signature _____    Date _____

Detach and mail the Electronic Payment Plan authorization form to: Vivint c/o EPP Dept., 4931 North 300 West, Provo, UT 84604

Thank you for your business. Detach and return this portion with your payment. Keep upper portion for your records.



Name _____    Social security number _____

Mailing address _____

City _____    State _____    Zip code _____

Home phone _____    Business phone _____

**terms and conditions**
All payments should be made to Vivint at the address shown on the front of your statement. Please allow 5–7 days for your payment to reach us. Payments received after the invoice date will be included on your next statement. If your payment is not received in a timely manner, a late charge will apply and will be assessed on your next statement. Please call 800.216.5232 if you have any questions relating to your statement or alarm services. All written correspondence should be mailed to Vivint Customer Service, 4931 North 300 West, Provo, UT 84604