# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PAULETTE VENDITTO, on behalf of herself and all others similarly situated, | : | <u>**Document Electronically Filed**</u> |
| Plaintiff, | : | |
| v. | : | **CIVIL ACTION NO.**<br>**2:14-cv-04357-JLL-JAD** |
| VIVINT, INC. f/k/a APX Alarm Security Solutions, Inc., | : | |
| Defendant. | : | |

---

## VIVINT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE  SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND PURSUANT TO FED.R.CIV.P. 12 (b)(6)

---

LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, New Jersey 07068
Attorneys for Defendant Vivint, Inc.

On the Brief:

    Gavin J. Rooney, Esq.
    Jewel M. Watson, Esq.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF THE CASE..........................................................................3

ARGUMENT......................................................................................................7

I.     AS THE AGREEMENT DOES NOT VIOLATE RISA, THE COMPLAINT PLEADS NO UNCONSCIONABLE COMMERCIAL PRACTICE NOR DOES IT PLEAD ANY ASCERTAINABLE LOSS; ACCORDINGLY, THE CFA CLAIM OF THE FIRST COUNT SHOULD BE DISMISSED.........................................7

     A.     Only "Retail Installment Contracts," which are contracts that charge customers interest or a premium for the privilege of paying for goods or services via installment payments, are subject to N.J.S.A. 17:16C-50 and N.J.S.A. 17:16C-27.........................................................................7

     B.     The Agreement is Not a "Retail Installment Contract" under RISA. ......................9

          1.     Providing Equipment at No Cost is Not an Installment Sale.......................9

          2.     Providing an Ongoing Service, Billed Monthly, Is Not an Installment Sale of that Service. .................................................11

     C.     Alternatively, Plaintiff's Second Amended Complaint Fails to State an Ascertainable Loss Arising from the Alleged RISA Violation. ...........................12

II.     THE SECOND AMENDED COMPLAINT FAILS TO STATE A TCCWNA CLAIM BECAUSE THE AGREEMENT DOES NOT VIOLATE RISA, DDRISA, THE HIP REGULATIONS OR DDHRSA; NOR DOES THE AGREEMENT OTHERWISE VIOLATE TCCWNA. ..........................................13

     A.     To Violate a "Clearly Established" Right of a Consumer, the Conduct Must be Such That No Reasonable Vendor Could Fail to Know that it was Prohibited.......................................................................14

     B.     The Agreement Does Not Clearly Violate RISA or DDRISA. ...........................15

     C.     The Agreement Does Not Clearly Violate the Home Improvement Practices Regulations. ..........................................................16

     D.     The Agreement Does Not Clearly Violate the Door-to-Door Home Repair Sales Act. .............................................................17

E.   The Agreement's Warranty Provision Does Not Violate N.J.S.A. 56:12-16 of TCCWNA. ......................................................................................................18

III.  THE FINAL COUNT SHOULD BE DISMISSED BECAUSE IT DOES NOT ALLEGE FACTS TO PLAUSIBLY SET FORTH A CFA CLAIM. ...............................20

CONCLUSION ........................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Ashcroft v. Iqbal,
    556 U.S. 662, 127 S. Ct. 1937 (2009).................................................6

Assoc. Gen. Contractors of Cal., Inc. v. Carpenters,
    459 U.S. 519, 528 n. 17 (1983)...........................................................6

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)...........................................................................6

Cox v. Sears Roebuck & Co.,
    138 N.J. 2 (1994) ............................................................................21

D'Ercole Sales v. Fruehauf Corp.,
206 N.J. Super. 11, 25 (App.Div. 1985) ............................................21

Dobron v. New Jersey,
    No. 13-CV-02353, 2014 U.S. Dist. LEXIS 35705 (D.N.J. Mar. 18, 2014)...........23

Fowler v. UPMC Shadyside,
    578 F.3d 210 (3d Cir. 2009)...............................................................6

Girard Acceptance Corp. v. Wallace,
    76 N.J. 434 (1978) ............................................................................8

Luppino v. Mercedes-Benz USA, LLC,
    2010 U.S. Dist. LEXIS 83584 (D.N.J. Aug. 13, 2010).........................6

McGarvey v. Penske Automotive Group, Inc.,
    639 F.Supp.2d 450 (2009) ................................................................22

McGarvey v. Penske Automotive Group, Inc.,
    No. 08-5610, 2011 WL 1325210 (D.N.J. March 31, 2011).........14, 15, 17

New Jersey Citizen Action v. Schering-Plough Corp.,
    367 N.J. Super. 8 (App. Div. 2003) ...................................................20

Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,
    998 F.2d 1192 (3d Cir. 1993)..............................................................6

Perez v. Rent-A-Center, Inc.,
    186 N.J. 188 (2006) ...............................................................7, 8, 9, 10

Phila. Indem. Ins. Co. v. Healy,
    156 Fed. Appx. 472 (3d Cir. 2005) ................................................20

Phillips v. County of Allegheny,
    515 F.3d 224 (3d Cir. 2008) ................................................6

Rait v. Sears Roebuck and Co.,
    No.08-2461, 2009 WL 250309 (D.N.J. Feb 3, 2009) ................................21

Ramon v. Budget Rent-A-Car Sys., Inc.,
    No. 06-1905-WJM, 2007 WL 604795 (D.N.J. Feb. 20, 2007) ................10

Rolo v. City Investing Co. Liquidating Trust,
    No155 F.3d 644, 659 (3d Cir. 1998) ................................................7

Suber v. Chrysler Corp.,
    104 F.3d 578 (3d. Cir. 1997) ................................................21

Swiss v. Williams,
    184 N.J. Super. 243 (Cty. Ct. 1982) ................................................17

Turner v. Aldens, Inc.,
    179 N.J. Super. 596 (App. Div. 1981) ................................................10

Warburton v. Foxtons, Inc.,
    No. 04-2474-FLW, 2005 WL 1398512 (D.N.J. June 13, 2005) ................10

**STATUTES**

N.J.S.A. 12A:12-1, et seq. ................................................1, 21

N.J.S.A. 17:16C-1 et seq. ................................................2

N.J.S.A. 17:16C-1(b) ................................................8, 10,11

N.J.S.A. 17:16C-21 to 25 ................................................8

N.J.S.A. 17:16C-27 ................................................7, 8

N.J.S.A. 17:16C-35 to 39 ................................................8

N.J.S.A. 17:16C-50 ................................................7, 13

N.J.S.A. 17:16C–61.1 et seq. ................................................2, 18

N.J.S.A. 17:16C-61.5(a) ................................................15

N.J.S.A. 17:16C-61.5(b) ................................................15

N.J.S.A. 17:16C-61.6 .................................................................................15

N.J.S.A. 17:16C-62(d) .............................................................................18

N.J.S.A. 17-16C-95 et seq. ........................................................................2

N.J.S.A. 17:16C-99(a) ..............................................................................17

N.J.S.A. 56:8-1 et seq. ...............................................................................1

N.J.S.A. 56:8-8 .........................................................................................12

N.J.S.A. 56:12-14 to 18 ..............................................................................2

N.J.S.A. 56:12-14 .......................................................................................2

N.J.S.A. 56:12-15 ......................................................................................13

N.J.S.A. 56:12-16 ................................................................................18, 19

15 U.S.C. § 2302 ......................................................................................14

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ..........................................1, 23

Federal Rule of Civil Procedure 12(9)(b) ................................................22

**Other Authorities**

N.J.A.C. 13:45A-16.1et seq. ........................................................................2

N.J.A.C. 13:45A-16.1A .......................................................................16, 17

Defendant Vivint, Inc. ("Vivint") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Second Amended Class Action Complaint and Jury Demand ("Second Amended Complaint") filed by Plaintiff Paulette Venditto.

## PRELIMINARY STATEMENT

The Complaint is plaintiff's *third* attempt to state a claim for relief. Yet, like Plaintiff's two previous attempts, the Second Amended Complaint again fails to state a claim for relief.

This lawsuit arises out of a contract for the provision of ongoing security services to Plaintiff's home. To provide such services, Vivint installed certain equipment in Plaintiff's home (e.g., a keypad and sensors), which were then connected to Vivint's monitoring stations to enable continuous monitoring of Plaintiff's home for the duration of the parties' relationship. Vivint provided Plaintiff with the equipment and installation thereof at no cost in consideration for Plaintiff's agreement to the terms of the Alarm System Purchase and Services Agreement ("Agreement"), including specifically, Plaintiff's agreement to pay an initial activation fee for the service followed by a monthly service fee for the ongoing service. The Agreement had an initial term of 39 months with the option for a renewal.

The actual dispute between the parties relates to the enforceability of Plaintiff's oral agreement to extend the Agreement for a further 42-month term in exchange for a fixed monthly rate. But not content to litigate that dispute in small claims court, Plaintiff curiously attempts to morph her contract dispute into a massive class action by claiming that the Agreement she signed in June 2009 violates a laundry list of consumer protection statutes and regulations -- including

- the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 et seq.;
- the Retail Installment Sales Act of 1960 ("RISA"), N.J.S.A. 17:16C-1 et seq.;

- the Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA"), N.J.S.A. 56:12-14 to -18;

- the Door-to-Door Retail Installment Sales Act of 1968 ("DDRISA"), N.J.S.A. 17:16C-61.1, et seq.;

- the New Jersey Home Improvement Practices Regulations (the "HIP Regulations"), N.J.A.C. 13:45A-16.1 to -16.2; and

- the Door-to-Door Home Repair Sales Act ("DDHRSA"), N.J.S.A. 17-16C-95, et seq.

At the heart of Plaintiff's class claims in the Second Amended Complaint is Plaintiff's patent attempt to blur, confuse and conflate the distinction between a *retail installment contract* and a *contract for an ongoing service*. The statutes Plaintiff relies on in the Second Amended Complaint apply to contracts for the timed sale of goods or services on credit. However, contracts such as the present one, where a customer pays *on a monthly basis for an ongoing service*, are not such financing transactions. Contrary to Plaintiff's conclusory allegations, the fact that Plaintiff was not charged for the equipment and also agreed to pay a monthly fee for the service does not transform Plaintiff's Agreement into an "installment" contract for the financed sale of the equipment or service. To hold otherwise, of course, would sweep many service agreements into the scope of the RISA and DDRISA and, therefore, of the CFA and TCCWNA -- including contracts for telecommunications, cellular, cable, Internet access, natural gas, electricity, construction, professional services – even legal services. Plaintiff "owned" nothing at the end of the initial term of the Agreement that she did not own at the outset, which demonstrates that this was not a financing transaction for the sale of goods or services.

As discussed below, the remaining claims in the Second Amended Complaint are similarly without merit. Given Plaintiff's repeated attempts to plead her claims, the Second Amended Complaint should be dismissed with prejudice.

## STATEMENT OF THE CASE

The following information is derived from Plaintiff's allegations in the Second Amended Complaint and exhibits attached thereto. The allegations are accepted as true only for purposes of this Rule 12(b)(6) motion to dismiss.

On June 19, 2009, Plaintiff entered into an Alarm System Purchase and Services Agreement (the "Agreement") with Vivint. The Agreement is attached as Exhibit A to the Second Amended Complaint. See 2d Am. Compl. ¶¶ 4-11 and Ex. A. The "initial term" of the Agreement ran for a total of 39 months, which term expired on September 19, 2012. Id., Ex. A at § 2.3. The Agreement sets forth the terms pursuant to which Vivint was to provide Plaintiff with certain security services, including monitoring services. Plaintiff received the benefit of Vivint's security services during the initial term without any apparent issues.

The preprinted form of the Agreement provided for the customer's payment of certain fees -- specifically, a $198.00 non-refundable fee to "activat[e]" the monitoring service in Section 2.1 and a monthly service fee of $49.99 "for monitoring" in Section 2.3. See id. Additionally, Section 2.3 also stated that the "total cash price you will pay us for the *services* is $1,949.61," which represented the $49.99 monthly service fee times the 39 months of the initial contract term. Id. (emphasis added). However, the marked-up Agreement that Plaintiff actually signed reflected agreed-upon discounts off of these amounts, so that Plaintiff only paid an initial activation fee of $99 and a monthly service fee of $44.99. The preprinted form setting forth the total cost of the services, however, was not changed to reflect these agreed upon reductions.

The Agreement incorporates by reference a document titled "Schedule of Protection." In the Schedule of Protection, Plaintiff and Vivint set forth the equipment that Vivint was providing to Plaintiff under the Agreement that was necessary for the monitoring services. Specifically, Vivint provided Plaintiff with a keypad, siren, sensors, and a keyfob. Both the Agreement and the Schedule of Protection show that Plaintiff was not charged ("$0") for any of the equipment or the installation thereof. See 2d Am. Compl. Ex. A at § 2.2 and the Schedule of Protection. The Agreement does not limit or qualify Vivint's transfer of ownership

of the equipment to Plaintiff.[1]  Vivint retained no right under the Agreement to retrieve this equipment for any reason, although Section 12 advised Plaintiff that after the Agreement's termination Vivint would disconnect the communication equipment from Vivint's system and that the equipment may not be compatible with another security company's system.

On March 5, 2012, Plaintiff received a call from a Vivint representative to discuss renewal of the Agreement.  See 2d Am. Compl. at ¶ 46.  The Vivint representative offered to maintain the same monthly service fee ($44.99) after the expiration of the Agreement's initial term in September, provided that Plaintiff agreed to extend the contract term for another 42 months.  While not precisely clear from the Second Amended Complaint, it appears that Plaintiff admits that she provided her oral consent to this offer (which consent was documented through a recording of the conversation).  See id. In the Second Amended Complaint, Plaintiff alleges that this extension is not binding on her because she never signed a document agreeing to the extension, which she contends the Agreement required.  Id. at ¶ 46-49.[2]  Plaintiff further alleges in the Second Amended Complaint that she contacted Vivint in August and September 2012 to cancel the Agreement -- and that she also sent Vivint a written notice of cancellation in February 2014.  See id. at ¶¶ 56, 61.

In June 2014, Plaintiff filed her initial Complaint in the Superior Court of New Jersey.  After removing the action to this Court under the Class Action Fairness Act of 2004, and pursuant to Rule 12(b)(6), Vivint filed a motion to dismiss in lieu of an answer.  Plaintiff responded to Vivint's motion by filing the First Amended Class Action Complaint and Jury

---

[1]  Under the Agreement's three-day right of rescission, Plaintiff had the right to cancel the contract and receive a refund of all monies paid. That provision also required that the customer return the equipment to Vivint if the parties were to be returned to the status quo ante. Plaintiff did not exercise this right and, therefore, the Agreement vested her with ownership of the equipment.

[2]  Plaintiff contends that Section 18 of the Agreement required her signature on a written extension of its term. But Section 18 addresses "change[s]" to the Agreement, not an extension of the term, and therefore it does not preclude enforcement of Plaintiff's oral consent to extend the term. In any event, the Uniform Electronic Transactions Act, N.J.S.A. 12A:12-1, et seq., provides that Plaintiff's recorded oral consent is sufficient to bind her to the extension.

Demand ("Amended Complaint") on September 2, 2014.  Because the Amended Complaint failed to cure the deficiencies in the initial Complaint, Vivint again moved the Court to dismiss Plaintiff's Amended Complaint.  On November 5, 2014, the Court issued an Order and Opinion dismissing Plaintiff's Amended Complaint, but permitting Plaintiff an opportunity to try to amend her pleading to see if she could cure the deficiencies.  On December 12, 2014, the deadline set by the Court for filing any amended pleading, Plaintiff filed her Second Amended Complaint and Jury Demand, which is the subject of the present motion.

Plaintiff divides her claims in her Second Amended Complaint into two counts: those advanced on behalf of herself and the putative class (defined as all New Jersey residents who signed alarm monitoring agreements with Vivint), and a single count advanced on her individual behalf only.  Among the class claims, the First Count alleges a claim under the CFA -- specifically, that the Agreement is a retail installment sale contract within the meaning of RISA, that the $99 "activation fee" required by Section 2.1 violates RISA because it was not included within the $1,949.61 total price for the 39 monthly payments disclosed in Section 2.3, and that this supposed RISA violation constitutes an unconscionable commercial practice actionable under the CFA.  The Second Count alleges that Vivint owes a $100 penalty under TCCWNA for each of the Agreement's supposed violations of RISA, DDRISA, the HIP Regulations, and the DDHRSA.  In addition, Plaintiff alleges in the Second Count that the Agreement's warranty provision (Section 5) violates TCCWNA because it did not advise whether certain limitations were or were not enforceable in New Jersey.

For the claims Plaintiff brings in her individual capacity only, and not as to the class, Plaintiff alleges a cause of action under the CFA arising from Vivint's "attempted renewal" of the Agreement through a telephone call, Vivint's alleged refusal to cancel the Agreement, Vivint's assessment of a "$15 processing fee," and Vivint's alleged "misrepresentations" regarding the status of her account.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 127 S. Ct. 1937, 1949 (2009) quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). See also Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("stating … a claim requires a complaint with enough factual matter (taken as true) to suggest the required element" (internal quotations omitted)). To decide a motion to dismiss, a court may consider the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

Under the well-known standard articulated in Twombly, courts should engage in a two-step analysis to determine whether the factual allegations nudge the claim "across the line from conceivable to plausible." Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009) quoting Twombly, 550 U.S. at 570. First, the court should identify any conclusory allegations that, as a matter of law, are not entitled to a presumption of truth; such allegations should be discarded. Id. Second, the court should look to the remaining well-plead and non-conclusory factual allegations to determine whether there is a "reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. A district court "retain[s] the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." Twombly, 550 U.S. at 558 (quoting Assoc. Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528 n. 17 (1983)). See also Fowler v. UPMC Shadyside, 578 F.3d 210, 11 (3d Cir. 2009).

The fact that the Complaint pleads claims on behalf of a putative class adds nothing to the Rule 12(b)(6) analysis; instead, the Second Amended Complaint must allege facts relevant to the named plaintiff's experience that are sufficient to survive a motion to dismiss. Luppino v. Mercedes-Benz USA, LLC, 2010 U.S. Dist. LEXIS 83584, *14 (D.N.J. Aug. 13,

2010) ("Plaintiffs' allegations regarding the experience of members of the putative class, in general, cannot fulfill the requirement of pleading with adequate specificity") citing Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 659 (3d Cir. 1998) (stating that "[u]ntil the putative class is certified, the action is one between the [ named plaintiff] ... and the defendants. Accordingly, the ... Complaint must be evaluated as to these particular plaintiffs.").

**ARGUMENT**

I.  **AS THE AGREEMENT DOES NOT VIOLATE RISA, THE COMPLAINT PLEADS NO UNCONSCIONABLE COMMERCIAL PRACTICE NOR DOES IT PLEAD ANY ASCERTAINABLE LOSS; ACCORDINGLY, THE CFA CLAIM OF THE FIRST COUNT SHOULD BE DISMISSED.**

RISA does not set forth a private right of action allowing a plaintiff to bring suit, and for that reason the Complaint pleads the RISA violation as a supposed "unconscionable commercial practice" actionable under the CFA.  Accordingly, the CFA claim hinges on the applicability of RISA here.  But the Complaint does not allege facts sufficient to show either a RISA violation or an ascertainable loss under the CFA.  The Agreement is not a retail installment contract subject to RISA; it is a service contract.  Moreover, the Agreement's required payment of the $99 activation fee does not create an ascertainable loss under the CFA.  Accordingly, the First Count should be dismissed, with prejudice.

A.  **Only "Retail Installment Contracts," which are contracts that charge customers interest or a premium for the privilege of paying for goods or services via installment payments, are subject to N.J.S.A. 17:16C-50 and N.J.S.A. 17:16C-27.**

In Perez v. Rent-A-Center, Inc., 186 N.J. 188, 210 (2006), the New Jersey Supreme Court explained that the New Jersey Legislature enacted RISA in 1961 to remedy an imbalance in the usury laws, which historically applied to cash loans, but not to the sale of goods on credit.  Recognizing that retailers could prey upon consumers by offering immediate possession of goods or services in return for an agreement to pay an outrageous interest rate for the privilege of paying the purchase price over time, the Legislature enacted RISA to govern the

sales of goods on credit. 186 N.J. at 203-04.  The New Jersey also adopted RISA to set interest rate limits on credit sales transactions. Id. at 204 (citations omitted).

RISA was "part of a package of laws designed to protect consumers from overreaching by others ... and also to promote the availability of financing to purchase various goods and services." Girard Acceptance Corp. v. Wallace, 76 N.J. 434, 439 (1978). "Among other things, [RISA] prescribed the general form that retail installment contracts should take, N.J.S.A. 17:16C-21 to 25; required certain financial disclosures, N.J.S.A. 17:16C-27; and detailed prohibited practices, N.J.S.A. 17:16C-35 to 39." Perez, 186 N.J. at 205.

As the Court held in Perez, RISA was enacted to "regulat[e] charges associated with the timed sale of goods." Id. at 209.  By its terms, the statute only applies to "retail installment contracts," which are defined as:

> [A]ny contract ... entered into in this State between a retail seller and a retail buyer evidencing an agreement to pay the retail purchase price of goods or services, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time.  This term includes a security agreement, chattel mortgage, conditional sales contract, or other similar instrument ...

N.J.S.A. 17:16C-1(b). Such retail installment contracts must disclose their key terms in order to help the consumer better understand the financing portion of the transaction -- including the "down payment," "unpaid cash balance," "principal balance," "time price differential," "time balance," and "time sales price."  Accordingly, RISA applies to financing transactions whereby the consumer pays for goods or services on credit over time and, at the end of the payment term, becomes (or has the option of becoming) the owner of the goods or services. Perez, 186 N.J. at 210 ("A sale is conditional when possession of the goods is transferred to the buyer who will receive title at some future time upon payment of the full price or upon the happening of some other condition or contingency.").

In Perez, the New Jersey Supreme Court examined the definition of a "retail installment contract" in the context of a "rent-to-own" contract that required the plaintiff to pay

$18,613.32 over 22 months to assume immediate possession of household furnishings that had a retail value of $9,301.72 -- which, in effect, imposed upon the plaintiff an annual percentage interest rate of 80%. 186 N.J. at 196-97. Defendant Rent-A-Center sought to escape RISA's reach by arguing that the agreement was not a retail "installment contract" because it allowed the customer to stop making payments at any time by returning the furnishings, and did not require the customer to take ownership of the furnishings at the end of the period of payments. Id. at 207-8. While recognizing that the agreement lay near the boundaries of the statutory definition, the Perez court concluded that the rent-to-own contract was nevertheless a "retail installment contract" under RISA because it required the customer "to pay the retail purchase price of goods in installments." Id. at 209-10. Key to the court's determination was that "while '[a] portion of each of [plaintiff's] payments was assigned to defray the cost of the goods ... [the] remainder of each payment was interest for the privilege of paying for the goods in installments." Id. at 209.

**B.   The Agreement is Not a "Retail Installment Contract" under RISA.**

    **1.   Providing Equipment at No Cost is Not an Installment Sale.**

In her Second Amended Complaint, Plaintiff alleges that the Agreement qualifies as a "retail installment contract" because it provided the keypad, sensors, and keyfob to plaintiff for "free." 2d Am. Compl., ¶¶ 38-40. Evidently conceding that the provision of equipment to a customer for free could not possibly represent an installment sale, the Complaint makes the wholly conclusory allegation that the "$0" purchase price listed in the Agreement was a "fictitious price" and that the monthly service fee must therefore represent "in part [] the installment purchase of equipment." Id. The patent fallacy in Plaintiff's tortured attempt to concoct a RISA claim is that the Agreement does not require that Plaintiff pay the monthly services fee in order to eventually own the equipment. Absent that fact, Plaintiff's RISA claim fails as a matter of law.

As explained above, the key criterion in determining whether a transaction is an installment sale is whether the Plaintiff comes to own anything as a result of making the periodic

payments that she did not own at the beginning of the contractual term. That is what defines an "installment" sale of goods. In <u>Perez</u>, for example, the contract provided that the plaintiff would come to own the furniture outright only after making *all* of the periodic payments. Unlike the plaintiff in <u>Perez</u>, Plaintiff had full ownership of the equipment free of charge at the outset of the Agreement regardless of the payment of the monthly services fee. Indeed, where equipment is provided at *no* charge, there can be no "down payment," "unpaid cash balance," "principal balance," "time price differential," "time balance," or "time sale price," as required by <u>N.J.S.A.</u> 17:16C-1(b). To dispel any doubt on this point, and in sharp contrast to the facts of <u>Perez</u>, Section 2.3 of the Agreement states that "there is no financing charge or cost of credit (0% APR) associated with this agreement." A contract that does not charge interest or a premium for the privilege of paying monthly installments of the purchase price does not fall within the statutory scope of RISA. <u>See</u> <u>Turner v. Aldens, Inc.</u>, 179 N.J. Super. 596, 602 (App. Div. 1981) ("We have no doubt that the evil sought to be remedied by [RISA] is the charging of excessive interest to New Jersey consumers.").

More bluntly stated, had Plaintiff canceled the Agreement after a single month she would have still owned the equipment installed in her home. The Second Amended Complaint attempts to avoid this unwelcome fact by advancing a strawman allegation flatly at odds with the plain language of the Agreement; specifically, that Plaintiff "became or would become the owner of all or some of the alarm equipment listed in the Schedule of Protection *at the end of the contract term*." 2d Am. Compl., ¶ 83 (emphasis added). It is well-established law that a complaint cannot manufacture a claim by misstating or misquoting the provisions of a contract attached to the complaint. In such a situation, the terms of the contract, and not the mischaracterizations of the complaint, control the court's decision. <u>See</u> <u>Ramon v. Budget Rent-A-Car Sys., Inc.</u>, No. 06-1905-WJM, 2007 WL 604795, at *2 (D.N.J. Feb. 20, 2007) ("[T]o the extent that Plaintiff's allegations are contradicted by such documents upon which Plaintiff's claims are based, the Court need not accept such allegations as true."); <u>Warburton v. Foxtons, Inc.</u>, No. 04-2474-FLW, 2005 WL 1398512, at *4 (D.N.J. June 13, 2005) (same).

Finally, in the Second Amended Complaint Plaintiff attempts to create a retail installment claim by citing to Vivint's "repossession" rights in Section 12 of the Agreement. This attempt fails as well.  Section 12 of the Agreement does *not* give Vivint any right to repossess any of the equipment that, per the Schedule of Protection, had been given to or owned by Plaintiff.  Instead, it merely recognizes that at the end of the service term, *Vivint could retrieve any materials that remained the property of Vivint*:

> [I]f the service is canceled or this agreement is terminated for any reason, you authorize us to ... *remove our communication equipment and software and all of our signs and decals from your premises for our then prevailing disconnecting fee.* . . .

(emphasis added).  By its plain terms, therefore, this language only relates to removal of <u>Vivint's</u> communication equipment and signs – and not what Section 12 specifically refers to as "your system," the equipment listed in the Agreement as having been given to plaintiff for "$0."

### 2. Providing an Ongoing Service, Billed Monthly, Is Not an Installment Sale of that Service.

The Complaint also alleges that because the Agreement required plaintiff to pay for the monitoring service on a monthly basis, it was therefore an "installment purchase of 39 months of monitoring services."  2d Am. Compl., ¶¶ 40, 42.  But there is a key distinction between *(1)* a contract of installment payments to purchase goods or services, which charges interest for the privilege of paying the purchase price over time, and *(2)* what the Agreement here represents, which is a contract for the provision of a continuous and ongoing service, and for which the customer pays on a monthly basis.  As explained above, <u>N.J.S.A.</u> 17:16C-1(b)'s reference to the "installment" sales of "goods or services" requires a financing arrangement -- <u>i.e.</u>, where the consumer receives the goods or service and then later pays for what he or she already received through periodic payments made over time (and which includes the payment of interest or a premium for the privilege of doing so).

The Agreement at issue here contemplates the provision of ongoing security services twenty-four hours a day, seven days a week, with that continuous service billed to

Plaintiff on a monthly basis.  In that regard, the Agreement is indistinguishable from other arrangements for the provision of ongoing services billed through periodic invoices, such as service contracts for electricity, natural gas, cable television, high-speed internet access, or even ongoing professional services such as legal services.  Specifically, Section 2.3 of the Agreement provides for "service fees" billed on a monthly basis "for monitoring" of the security alarm system.  Section 9 obligates Plaintiff to keep her telephone lines in constant working order, so that Vivint can maintain continuous communication with the monitoring equipment installed on the customer's premises.  Section 7 specifies the monitoring services to be provided; in the event of an alarm notification Vivint would (a) contact Plaintiff, to determine if it is a false alarm, and (b) if Plaintiff cannot be contacted, or if the alarm is a <u>bona fide</u> one, notify the applicable police or private security authorities of the alarm.  This ongoing service is what the Agreement required Plaintiff to pay for on a monthly basis.

Ongoing and continuous service, invoiced monthly to the consumer, is not an "installment" contract for the payment of a service with the meaning of RISA.  Because the service is an ongoing one, and billed accordingly, it is not a financing transaction.  To hold otherwise, of course, would sweep many ongoing service contracts common in our economy today into RISA's scope, and that result is far afield from the legislative intent underlying RISA. Accordingly, the CFA claim of the First Count should be dismissed.

### C.   Alternatively, Plaintiff's Second Amended Complaint Fails to State an Ascertainable Loss Arising from the Alleged RISA Violation.

Even if Plaintiff could establish that the Agreement was a retail installment contract within the purview of RISA, Plaintiff would still need to allege that she suffered an ascertainable loss under the CFA arising from the alleged RISA violation.  <u>N.J.S.A.</u> 56:8-8. Technical violations of the statute that do not injure a plaintiff are insufficient to give rise to a CFA cause of action.

Plaintiff does not plead any viable theory of ascertainable loss in her Second Amended Complaint.  The First Count includes the allegation that the $99 "activation fee" of

Section 2.1 was "not authorized by RISA at <u>N.J.S.A.</u> 17:16C-50," and on that basis Plaintiff contends that this $99 constituted her loss. <u>See</u> 2d Am. Compl., ¶¶ 86, 88. But <u>N.J.S.A.</u> 17:16C-50 does not prohibit the assessment of an activation fee to commence a service contract. Nor does it prohibit down payments, even if the Court were to accept Plaintiff's mischaracterization of the activation fee as a down payment. What RISA does limit is the assessment of fees or costs upon the consumer's default or delinquency -- which is not at issue here. In fact, <u>N.J.S.A.</u> 17:16C-50 does not address fees associated with the actual goods or services being contacted for; instead, it regulates fees assessed beyond the purchase price:

> No retail seller, sales finance company, or holder shall charge, contract for, collect or receive from any retail buyer, directly or indirectly, any further or other amount *for costs, charges, insurance premiums, examination, appraisal service, brokerage, commission, expense, interest, discount, fees, fines, penalties or other things of value in connection* with retail installment contracts or retail charge accounts other than the charges permitted by this act, except court costs, attorney fees and the expenses of retaking and storing repossessed goods which are authorized by law.

<u>N.J.S.A.</u> 17:16C-50 (emphasis added). Therefore, even accepting Plaintiff's own reasoning, her RISA claims in the Second Amended Complaint still fail due to the lack of any ascertainable loss.

## II.   THE SECOND AMENDED COMPLAINT FAILS TO STATE A TCCWNA CLAIM BECAUSE THE AGREEMENT DOES NOT VIOLATE RISA, DDRISA, THE HIP REGULATIONS OR DDHRSA; NOR DOES THE AGREEMENT OTHERWISE VIOLATE TCCWNA.

The Second Count asserts claims under TCCWNA, which allows a consumer to recover a $100 penalty upon showing that a seller required a consumer to enter into a contract containing a provision "that violates any clearly established legal right of a consumer or responsibility of a seller . . . as established by State or Federal law. . . ." <u>N.J.S.A.</u> 56:12-15. Plaintiff alleges in the Second Amended Complaint underlying infractions of RISA, DDRISA, the HIP Regulations, and DDHRSA as the violations of Plaintiff's "clearly established legal

right[s]," each of which supposedly then render Vivint liable for a $100 per-violation penalty under TCCWNA. Further, in paragraph 134 Plaintiff alleges a "direct TCCWNA violation" -- specifically, that the limited warranty (Section 5) of the Agreement fails to state whether certain of its provisions are, or are not, enforceable in New Jersey. As demonstrated below, these claims also fail.

> **A.   To Violate a "Clearly Established" Right of a Consumer, the Conduct Must be Such That No Reasonable Vendor Could Fail to Know that it was Prohibited.**

By adopting the "clearly established" standard, the New Jersey Legislature intended to set a high bar for the establishment of a TCCWNA violation. An exacting standard is particularly appropriate, since the $100 penalty of TCCWNA applies even in the absence of any injury whatsoever to the plaintiff or any ill intent on the part of the vendor.

In McGarvey v. Penske Automotive Group, Inc., No. 08-5610, 2011 WL 1325210 (D.N.J. March 31, 2011), Chief Judge Simandle addressed what it means for a contractual provision to violate a "clearly established" legal right of a consumer under TCCWNA. In McGarvey, a plaintiff sought to amend its class action complaint to assert a TCCWNA claim arguing that a warranty violated a prohibition on tying arrangements contained in the Magnuson Moss Warranty Act, 15 U.S.C. § 2302. Judge Simandle agreed that "the New Jersey legislature intended to impose [TCCWNA] liability *only* upon those vendors whose violation of a consumer statute was so clear that no reasonable vendor could fail to know that its conduct was prohibited." Id. at *4 (emphasis added). Applying that standard to the case at hand, Judge Simandle denied leave to amend on futility grounds because:

> At the time the warranties were made, there was no unambiguous statutory text, helpful legislative history, relevant precedent, or determinative regulatory interpretations [prohibiting the provision]. . . . In other words, there was no established standard putting Defendant on notice that its conduct was prohibited. . . . [and,] therefore[,] Plaintiffs cannot state a claim under the [TCCWNA] for the violation of this right.

Id. at *5.  Accordingly, the alleged violation of a consumer right must be clear and unmistakable to any reasonable vendor to justify TCCWNA's $100 penalty.

**B.      The Agreement Does Not Clearly Violate RISA or DDRISA.**

The TCCWNA claims in the Second Amended Complaint based on the Agreement's supposed RISA and DDRISA violations suffer from the same deficiency that dooms the First Count and should be similarly dismissed.  As explained above, RISA only applies to retail installment contracts.  Like RISA, DDRISA is specifically limited to "retail installment sales" or "retail installment contracts."  See N.J.S.A. 17:16C-61.5(a) ("Any retail installment sale of goods or retail installment contract for sale of goods . . . which is entered into at a place other than the place of business of the retail seller may be rescinded by the retail buyer. . . ."); N.J.S.A. 17:16C-61.5(b) ("Within 10 business days after receipt of such notice of intent to rescind the retail installment sale or retail installment contract, a retail seller shall. . . .); N.J.S.A. 17:16C-61.6 ("At the time of executing every installment sale or retail installment contract subject to the provisions of Section 5 of this act, the retail seller shall deliver to the retail buyer two copies of a receipt. . . .").  The Agreement is patently *not* a retail installment contract; consequently, the Second Count's RISA and DDRISA claim fail and should be dismissed.

At a minimum, the Second Amended Complaint contains no allegations of facts to show that it is "clearly established" that the Agreement qualifies as a retail installment contract under RISA and DDRISA such that no reasonable vendor could miss that point.  There is no case law in New Jersey addressing the boundary between a service contract outside the reach of RISA and DDRISA and a retail installment contract associated with the sale of a service.  The lack of any such "unambiguous statutory text, helpful legislative history, relevant precedent, or determinative regulatory interpretations," McGarvey, 2011 WL 1325210 at *5, demonstrates that the Agreement could not have violated a legal right of plaintiff clearly established by RISA or DDRISA.

**C.     The Agreement Does Not Clearly Violate the Home Improvement Practices Regulations.**

The Agreement does not violate any "clearly established" right established by the HIP regulations. Those regulations do not apply to the provision of an ongoing and continuous service; they govern "home improvements," which are defined as:

> the remodeling, altering, painting, repairing, renovating, restoring, moving, demolishing, or modernizing of residential or noncommercial property or the making of additions thereto, and includes, but is not limited to, the ***installation . . . of . . . security protection devices*** . . .

N.J.A.C. 13:45A-16.1A (emphasis added).  Nothing in these regulations brings the provision of an ongoing service within their reach, such as ongoing security monitoring services.

Plaintiff contends that the Agreement falls within the HIP Regulations because it involved the provision of the keypad, sensors, and keyfob to Plaintiff free of charge.  But Plaintiff does not allege any conduct violative of the HIP Regulations with regard to that equipment.  Instead, to plead the supposed violation, Plaintiff switches gears to speaking about the assessment of fees for the ongoing security monitoring service.  Specifically, Plaintiff alleges in the Second Amended Complaint that the Agreement violates the HIP Regulations because the "total cash price you will pay us for the service" set forth in Section 2.3 (i.e., the monthly payment of $44.99 times 39 months = $1,949.61) did not include the activation fee required by Section 2.1.  2d Am. Compl., ¶¶ 117-119 (emphasis added).  Because service contracts lay outside the scope of the HIP Regulations, this TCCWNA theory fails. There is no provision of the HIP Regulations that prohibits a service provider from charging an activation fee to commence an ongoing service followed by monthly invoices for the cost of that service over time.  In any event, the $1,949.61 "total cash price" did not overstate the total 39 monthly payments plus the activation fee.  Because the $1,949.61 figure did not factor in the discounts, the total of those fees was in fact $1,853.61.  In that sense, therefore, Section 2.3's "total cash price" included the $99 activation fee.  Certainly, the $1,949.61 figure deceived no one.

-16-

Vivint acknowledges that the Court observed in its prior Order and Opinion that "Plaintiff ... allege[d] facts *suggesting* that (a) the Alarm Agreement provided for, among other things, the installation of a security protection device, which *is arguably* covered by N.J.A.C. 13:45A-16.1A, and (b) that she was charged an Activation Fee which was not included in the 'Total Cash Prices' set forth in the Alarm Agreement." [Motion to Dismiss Opinion at p. 13] (emphasis added). To say that an issue is "arguable" in dicta, however, does not show that the legal right is "clearly established," as required by TCCWNA. This point is crucial to affording TCCWNA its proper scope. As Judge Simandle inarguably held, "the New Jersey legislature intended to impose [TCCWNA] liability only upon those vendors whose violation of a consumer statute was so clear that no reasonable vendor could fail to know that its conduct was prohibited." McGarvey, 2011 WL 1325210, *4. That is not the case here.

As such, Plaintiff's HIP Regulation claim fails and should be dismissed.

**D.     The Agreement Does Not Clearly Violate the Door-to-Door Home Repair Sales Act.**

Plaintiff further alleges the violation of a "clearly established" legal right in the Agreement's activation fee and "Notice of Cancellation," which she claims run afoul of DDHRSA. But security monitoring service is not a home repair and, therefore, the Agreement falls outside the scope of that statute.

As its name suggests, DDHRSA applies to "home repair contract[s]" with a value in excess of $25. N.J.S.A. 17:16C-99(a). The statute does not define a "home repair," but the dictionary definition of "repair" is "to restore by replacing a part or putting together what is torn or broken." See http://www.merriam-webster.com/dictionary/repair (last visited Jan. 16, 2015). Nothing was repaired here. Plaintiff's home was not damaged nor did Vivint offer to "repair" any part of it. As discussed in detail above, the Agreement was a service contract and did not involve any repair of Plaintiff's home.

To supply a definition of "home repair contract," an older trial-court opinion referenced the definitions contained in DDRISA. See Swiss v. Williams, 184 N.J. Super. 243,

249 (Cty. Ct. 1982) ("The phrase[s] 'home repair contract[,]' ... 'home repair contractor[,]' ['goods,' and 'services'] are not defined in the act itself, but are given content and meaning by the definitions contained in companion legislation regulating door-to-door retail installment sales adopted at the same time, N.J.S.A. 17:16C–61.1 et seq.").   DDRISA defines a "home repair contract" as an agreement between a home repair contractor "and an owner to pay the time sales price of goods or services in installments over a period of time greater than 90 days"; and the "goods" that might be sold by a home repair contractor comprise chattels "furnished or used in the modernization, repair, alteration or improvement of real property," except for "appliances furnished for use in a home and designed to be removable without material injury to the structure. . . ." N.J.S.A. 17:16C-62(d).

Again, the Agreement fails these definitions on all counts.  As discussed above, the Agreement did not involve an agreement to pay the purchase price in installments.  The ongoing monitoring service did not involve the modernization, repair, alteration or improvement of real property, and the equipment installed (keypad and sensors) plainly fall within the statutory exemption for appliances that can be removable without "material injury to the structure." N.J.S.A. 17:16C-62(d).  Accordingly, Plaintiff fails to allege facts in the Second Amended Complaint to show that DDHRSA applies to the Agreement and this TCCWNA claim fails.

**E.    The Agreement's Warranty Provision Does Not Violate N.J.S.A. 56:12-16 of TCCWNA.**

Finally, Plaintiff alleges in the Second Amended Complaint that Section 5 of the Agreement violates TCCWNA because it does not indicate whether its limitation on consequential or incidental damages is enforceable in New Jersey.  N.J.S.A. 56:12-16 of TCCWNA provides that:

> No consumer contract, notice or sign shall state that any of its provisions is or may be void, unenforceable or inapplicable in some jurisdictions without specifying which provisions are or are

-18-

not void, unenforceable or inapplicable within the State of New Jersey; provided, however, that *this shall not apply to warranties*.

N.J.S.A. 56:12-16 (emphasis added).

As its heading indicates, Section 5 of the Agreement addresses "Repair Service" for the security-monitoring system. It describes what repairs are and are not covered, makes clear that "repair of the system is our *only warranty*," and then sets forth the various limitations to the warranty of the system provided by Vivint. (Emphasis added). The exclusion for consequential and incidental damages challenged by the Complaint appears in the warranty provision:

> (C) *What is not included:* This *warranty* does not include batteries or alarm screens. We make no other express *warranty* including any *warranty* of merchantability of the system or its fitness for any special purpose. We do not *warrant* that the system will always detect, or help prevent any burglary, fire, hold-up or other such event. We do not *warrant* that the system cannot be defeated or compromised or that it will always operate. This *warranty* does not cover repairs that are needed because of an accident, acts of God, your failure to properly use the system, or if someone other than us attempts to repair or change the system, or any other reason except a defect in the equipment or our installation. *We are not liable for consequential or incidental damages.* You agree that this is our only *warranty* and we have given you no other *warranty* for the system. (D) *State Law:* Some states do not allow a limitation on the duration of implied *warranties* or the exclusion or the limitation of consequential or incidental damages, so the above limitations or exclusions may not apply to you. The *warranty* gives you specific legal rights and you may also have other rights which may vary from state to state.

Agreement, Section 5 (emphasis added). As the context of Section 5 makes clear, the subject of the entire section is the warranty provided by Vivint, and the exclusion of consequential or incidental damages necessarily relates to an alleged breach of that warranty. Indeed, given the limited nature of the Agreement, it is difficult to conceive of a situation where Vivint might be sued for consequential or incidental damages on a theory separate from breach of warranty.

Plaintiff evidently suggests that the challenged language in Section 5 would have been clearer if it read: "we are not liable for consequential or incidental damages *for alleged*

*breach of this warranty*," even though Sections 5(C) and (D) used the word "warranty" ten times aside from that. But the violation of a "clearly established" right required by TCCWNA cannot arise from an ambiguity in a contract provision. This supposed ambiguity is a red herring readily resolved by a narrow reading of the exclusion limiting it to warranty claims. Phila. Indem. Ins. Co. v. Healy, 156 Fed. Appx. 472, 475 (3d Cir. 2005) (ambiguities in "contracts of adhesion . . . are construed against the drafting party."). Vivint respectfully requests that the Court reconsider its prior conclusion otherwise: Section 5, and its exclusion of consequential and incidental damages, plainly deals with warranties and is therefore exempt from the reach of the TCCWNA.

Accordingly, this TCCWNA claim should be dismissed now.

## III.   THE FINAL COUNT SHOULD BE DISMISSED BECAUSE IT DOES NOT ALLEGE FACTS TO PLAUSIBLY SET FORTH A CFA CLAIM.

The final count[3] in the Second Amended Complaint is a CFA claim against Vivint arising from Plaintiff's particular interactions with Vivint.  Specifically, Plaintiff alleges that the following conduct ran afoul of the CFA:  Vivint's attempted renewal of the Agreement through a telephone call; the Agreement's alleged misrepresentation of how the Agreement could be changed; Vivint's alleged refusal to cancel the Agreement; the $15 reprocessing fee charged to Plaintiff's account; as well as alleged misrepresentations about the status of her account, her right to cancel, and the amount she would be liable for under the contract if she canceled.  2d Am. Compl. ¶ 145. But as explained below, none of these factual allegations plausibly state a CFA violation.

"To state a claim under the CFA, a plaintiff must allege each of three elements: *(1)* unlawful conduct by the defendants; *(2)* an ascertainable loss on the part of the plaintiff; and *(3)* a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." New Jersey Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 12-13 (App. Div. 2003) (internal citations omitted).  A plaintiff cannot plead a CFA violation by

---

[3] While this is the Second Amended Complaint's third count, it is incorrectly styled as the "Fifth Count."

simply alleging that the defendant violated the contract; "a breach of warranty or contract alone is not per se unlawful." Cox v. Sears Roebuck & Co., 138 N.J. 2, 18 (1994). Instead, a CFA claim requires that a plaintiff allege "substantial aggravating circumstances" in the contract violation. Suber v. Chrysler Corp., 104 F.3d 578, 587 (3d. Cir. 1997). Moreover, the alleged misrepresentations supporting the CFA claim must be plead with particularity as they are subject to the heightened pleading standards of Rule 9(b). Rait v. Sears Roebuck and Co., No.08-2461, 2009 WL 250309, at *4 (D.N.J. Feb 3, 2009).

   *The oral contract renewal.*   Vivint's renewal of the Agreement's term by a recorded telephone call is not an unlawful act prohibited by the CFA. The Complaint does not allege any misrepresentation, material omission, or unconscionable commercial practice in connection with that renewal. The fact that Plaintiff disputes the enforceability of her recorded oral extension of the Agreement's term does not mean that the renewal itself violated the CFA. Vivint also did not violate the CFA by seeking to enforce the contract extension. Further, the Uniform Electronic Transactions Act, N.J.S.A. 12A:12-1 et seq., allows for a recording to serve as an electronic signature in the place of a physical signature. Here, Plaintiff's recorded oral consent is sufficient to bind her to the extension.

   More importantly, however, plaintiff's claims are merely garden-variety contract claims without any aggravating circumstances -- and she has three times declined to assert a breach of contract claim. Contract disputes such as this are not the stuff of CFA claims. See Cox v. Sears Roebuck & Co., 138 N.J. 2, 18 (1994) ("Because any breach of warranty or contract is unfair to the non-breaching party, the law permits that party to recoup remedial damages in an action on the contract; however, by providing that a court should treble those damages and should award attorneys' fees and costs, the Legislature must have intended that substantial aggravating circumstances be present in addition to the breach.") (citing D'Ercole Sales v. Fruehauf Corp., 206 N.J. Super. 11, 25 (App.Div. 1985) ("But a breach of warranty, or any breach of contract, is not per se unfair or unconscionable, and a breach of warranty alone does not violate a consumer protection statute.")).

*The "misrepresentation" as to how the Agreement could be extended.* Further, the Second Amended Complaint fails to state with specificity how exactly Section 18 of the Agreement supposedly "misrepresents" how the Agreement can be changed. Indeed, contractual provisions are not in themselves misrepresentations of fact, even when the parties dispute their meaning or legal effect. Section 18 states that the Agreement "may only be changed by a written agreement signed by [Plaintiff and Vivint]. It may not be changed by any oral statements or representations made *by sales representatives*." 2d Am. Compl, Ex. A § 18 (emphasis added). Section 18 addresses "changes" to the Agreement, not an extension beyond its initial 39-month term, and therefore does not preclude enforcement of plaintiff's oral consent to extend the term. Plaintiff entirely fails to allege any facts to explain how this portion of the Agreement is a misrepresentation actionable under the CFA.

*The $15 fee.* Plaintiff alleges that Vivint violated the CFA by charging her a $15 reprocessing fee. This allegation hardly rises to the level of an unconscionable commercial practice prohibited by the CFA. "The New Jersey Supreme Court has explained that '[t]he standard of conduct that the term 'unconscionable' implies is lack of good faith, honesty in fact and observance of fair dealing.'" McGarvey v. Penske Automotive Group, Inc., 639 F.Supp.2d 450, 464 (2009) (citing Cox v. Sears Roebuck & Co., supra, 138 N.J. 2, 18 (finding that the "Legislature must have intended that substantial aggravating circumstances be present in addition to the breach" to substantiate a finding of unconscionability)). Moreover, "courts in this District have recognized that CFA claims targeting allegedly unconscionable commercial conduct 'are subject to Rule 9(b)'s heightened pleading standards.'" McGarvey, 639 F.Supp. 2d at 464-65 (internal citations omitted) (such acts must rise to the level of "bad faith or were otherwise dishonest [necessary] … to satisfy the CFA's unconscionable commercial practice requirement."). The scant allegations in the Second Amended Complaint fail to demonstrate how the assessment of a single $15 fee establishes "dishonest" acts in "bad faith."

*The status of Plaintiff's account.* Finally, Plaintiff's claim that Vivint's unspecified misrepresentations regarding the status of her account and the liability Plaintiff

would face if she canceled are insufficient to substantiate a CFA claim.  Plaintiff fails to allege any specificity with regards to these purported misrepresentations; there are no allegations as to what was said, when these misrepresentations were made, and by whom, and there are no allegations in the Second Amended Complaint that Vivint had knowledge of the falsity of any statement it allegedly made to Plaintiff concerning the status of her account and the amount she would owe if she were to cancel.

Accordingly, the Complaint's individual CFA count should be dismissed.

## CONCLUSION

For the reasons explained above, the Court should grant Vivint's Rule 12(b)(6) motion and dismiss the Second Amended Complaint for failure to state a claim.  Moreover, since Plaintiff has already made *three* attempts to file a viable complaint, and already has the benefit of the Court's opinion on the last motion to dismiss, the Court should dismiss the Complaint with prejudice.  Dobron v. New Jersey, No. 13-CV-02353, 2014 U.S. Dist. LEXIS 35705, *18-19 (D.N.J. Mar. 18, 2014) (dismissing amended complaint with prejudice after several opportunities to amend); see also Wright & Miller, Federal Practice & Procedure § 1487 (2013) ("[I]f the court determines that plaintiff has had multiple opportunities to state a claim but has failed to do so, leave to amend may be denied.").

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

Attorneys for Defendant Vivint, Inc.

By: /s/ Gavin J. Rooney

Gavin J. Rooney, Esq.

Dated:  January 23, 2015

-23-