# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

---

PAULETTE VENDITTO, on behalf of itself and others similarly situated,

                  Plaintiff,

    v.

VIVINT, INC., f/k/a APX Alarm Security Solutions, Inc.,

                  Defendant.

---

Civil Action No. 2:14-cv-04357 (JLL)(JAD)

Return Date: March 2, 2015

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT VIVINT INC.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Daniel I. Rubin
Henry P. Wolfe
THE WOLF LAW FIRM, LLC
1520 U.S. Highway 130 - Suite 101
North Brunswick, NJ 08902
Tel. 732-545-7900; Fax 732-545-1030

David C. Ricci
Law Office of David C. Ricci, LLC
51 JFK Parkway, First Floor West
Short Hills, New Jersey 07078
Tel. 973-218-2627; Fax 973- 206-6955
*Attorneys for Plaintiff and the putative class*

On the brief:
Daniel I. Rubin

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iii

PRELIMINARY STATEMENT ................................................................................... 1

PLAINTIFF'S FACTUAL ALLEGATIONS AND LEGAL CLAIMS ........................ 3

LEGAL ARGUMENT.................................................................................................. 7

   I.   STANDARD GOVERNING MOTIONS TO DISMISS UNDER RULE 12(B)(6). ......... 7

   II.  PLAINTIFF'S SECOND AMENDED COMPLAINT PROPERLY SETS FORTH CLAIMS FOR RELIEF UNDER THE CONSUMER FRAUD ACT ON BEHALF OF PLAINTIFF AND THE PUTATIVE CLASS BASED ON VIOLATIONS OF THE RETAIL INSTALLMENT SALES ACT ........................................................................................ 8

      A.   RISA Applies to the Alarm Agreement .................................................... 9

      B.   Defendant Violated RISA, Giving Rise to CFA Claims .......................... 16

   III. PLAINTIFF'S SECOND AMENDED COMPLAINT PROPERLY SETS FORTH CLAIMS FOR RELIEF UNDER THE TRUTH-IN-CONSUMER CONTRACT, WARRANTY AND NOTICE ACT ........................................................................... 20

      A.   The Alarm Agreement Violates the Retail Installment Sales Act by Charging an Impermissible Fee, Omitting Plaintiff's Down Payment, and Misstating the Time Sales Price ................................................................................................ 21

      B.   The Alarm Agreement Violates the Door-to-Door Retail Installment Sales Act by Providing an Improper Notice of Cancellation ...................................... 22

      C.   The Alarm Agreement Violates the Home Improvement Practices Regulations by Failing to Include the Activation Fee in the Disclosed Total Cash Price, and Therefore Violates TCCWNA.................................................................... 23

      D.   The Alarm Agreement Violates the Door-to-Door Home Repair Sales Act by Misrepresenting Plaintiff's Cancellation Rights, and Therefore Violates TCCWNA. 26

      E.   The Alarm Agreement Improperly Fails to Specify Whether the Limitation of Consequential and Incidental Damages Applies in New Jersey, in Direct Violation of TCCWNA at *N.J.S.A.* 56:12-16. ............................................................... 28

   IV. THE AMENDED COMPLAINT PROPERLY SETS FORTH PLAINTIFF'S INDIVIDUAL CFA CLAIM BASED ON DEFENDANT'S UNLAWFUL CONDUCT IN CONNECTION WITH THE RENEWAL OF PLAINTIFF'S CONTRACT........................... 30

CONCLUSION.......................................................................................................... 40

# **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ................................ 7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) .......... 6

*Cox v. Sears Roebuck & Co.*, 138 N.J. 2 (N.J. 1994) ......................................................... 19, 24

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) .................................... 36

*Korrow v. Aaron's, Inc.*, No. 10-6317, 2011 U.S. Dist. LEXIS 95306, 2011 WL 3794231 (D.N.J.
    Aug. 25, 2011) ......................................................................................................... 16, 19

*Kugler v. Romain*, 58 N.J. 522 (N.J. 1971) ............................................................................ 31

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir.2004) ............................................................. 16

*McGarvey v. Penske Automotive Group, Inc.*, No. 08-5610, 2011 U.S. Dist. LEXIS 35408, 2011
    WL 1325210 (D.N.J. March 31, 2011) ............................................................................ 20, 24

*Merin v. Maglaki*, 126 N.J. 430 (N.J. 1992) .......................................................................... 8

*Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464 (N.J. 1988) ............................................. 31

*New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8 (N.J. Super. Ct. App.
    Div. 2003) ....................................................................................................................... 19

*Perez v. Rent-A-Center, Inc.,* 186 N.J. 188 (B.J. 2006) ....................................................... 10, 11

*Phila. Indem. Ins. Co. v. Healy*, 156 Fed. Appx. 472 (3d Cir. 2005) .................................... 30, 37

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ................................................ 14

*Rait v. Sears, Roebuck and Co.,* No. 08–2461, 2009 U.S. Dist. LEXIS 7540, 2009 WL 250309
    (D.N.J. Feb.3, 2009) ........................................................................................................ 32

*Shelton v. Restaurant.com,* 214 N.J. 419 (N.J. 2013) ............................................................ 20

*Suber v. Chrysler Corp.,* 104 F.3d 578 (3d Cir.1997) ............................................................. 31

*Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 N.J. 392 (N.J. 1995) ..................... 32

**Statutes**

15 *U.S.C.* §1602 ............................................................................................................... 12

Door-to-Door Home Repair Sales Act of 1968, N.J.S.A. 17:16C-95 ......................... 5, 20, 26, 27

Door-to-Door Retail Installment Sales Act of 1968, *N.J.S.A.* 17:16C-61.1 ........................... passim

Federal Truth in Lending Act, 15 *U.S.C.* §1601 ..................................................................... 12

*N.J.A.C.* 13:45A-16 ................................................................................................. 5, 23, 24, 25

*N.J.S.A.* 12A:12-2 ................................................................................................... 36

*N.J.S.A.* 12A:12-5(b) .............................................................................................. 37

*N.J.S.A.* 17:16C-1 and -27 ............................................................................. 11,17, 21

*N.J.S.A.* 17:16C-30 and -33 ............................................................................ 11, 17

*N.J.S.A.* 17:16C-42 ...................................................................................... 11, 17

*N.J.S.A.* 17:16C-50 ................................................................................. 11, 17, 18

*N.J.S.A.* 17:16C-61.1 ......................................................................................... 5

*N.J.S.A.* 17:16C-61.5 ....................................................................................... 22

*N.J.S.A.* 17:16C-61.6 .................................................................................. 22, 23

*N.J.S.A.* 17:16C-62 .......................................................................................... 26

*N.J.S.A.* 17:16C-96 .......................................................................................... 27

*N.J.S.A.* 17:16C-99 ..................................................................................... 26, 27

*N.J.A.A.* 17:16C-100(a) - (b) ............................................................................. 27

*N.J.S.A.* 56:8-19 .............................................................................................. 6

*N.J.S.A.* 56:8-2 .......................................................................... 16, 25, 31, 32

*N.J.S.A.* 56:8-2.13 ........................................................................................... 16

New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8-1 *et seq.*........................................ passim

New Jersey Uniform Electronic Transactions Act, *N.J.S.A.* 12A:12-1 *et seq.* ............... 35, 36, 37

Retail Installment Sales Act of 1960, *N.J.S.A.* 17:16C-1, *et seq.* ............................... passim

Truth-in-Consumer Contract, Warranty and Notice Act, *N.J.S.A.* 56:12-14 to -18 ................ passim

**Other Authorities**

Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory

    Construction (7th ed. 2009) .......................................................................... 10

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................................... 6

Fed. R. Civ. P. 8(a)(2)........................................................................................... 7

## PRELIMINARY STATEMENT

Plaintiff Paulette Venditto brings class action claims against Defendant Vivint, Inc., formerly known as APX Alarm Security Solutions, Inc. (hereinafter "Defendant") alleging that Defendant contracted for and charged unlawful fees in its alarm equipment sales and monitoring service contracts, in violation of the Retail Installment Sales Act of 1960 ("RISA"), *N.J.S.A.* 17:16C-1, *et seq.,* the New Jersey Consumer Fraud Act ("CFA"), *N.J.S.A.* 56:8-1 *et seq.*, and the Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA"), *N.J.S.A.* 56:12-14 to -18. Plaintiff further alleges that Defendant's standard form Alarm System Purchase and Services Agreement contains terms which on their face violate numerous New Jersey consumer protection laws.

In its motion to dismiss Plaintiff's Second Amended Complaint, Defendant's principal argument is that RISA and the door-to-door statutes enacted in connection with RISA do not apply to Defendant's contracts, because the contracts provide "ongoing security services." This argument is contrary to the plain text of RISA, which states that the statute applies to contracts for the installment sale of "goods *or* services." Defendant's position also fails to account for the mixed sale of alarm equipment and monitoring services embodied in its contracts. In asserting that the consumer laws identified by Plaintiff do not apply to its Alarm Agreements, Defendant continually attempts to interpose additional requirements and restrictions

1

that are inconsistent with the text of the statutes and regulations, and which would undermine the broad consumer protection purposes identified by the Legislature as the reason why these laws were enacted.

In her individual count, Plaintiff alleges that Defendant violated the CFA by soliciting a verbal extension of her contract term, which is not permitted under Defendant's own contract, and then refusing to accept Plaintiff's subsequent attempts to cancel notwithstanding the absence of any written agreement modifying the initial contract. Defendant's motion to dismiss Plaintiff's individual claim is largely grounded on references to an alleged audio recording of Plaintiff that has not been provided to counsel or the Court, and is improperly raised on a motion to dismiss. Even accepting Defendant's representations as to the content of the recording as true, Defendant cannot be permitted to flaunt the provisions of its own contract and lock in Plaintiff to an extended contract term without obtaining Plaintiff's written consent to the extension.

Plaintiff has addressed and responded to the pleading deficiencies and other concerns previously identified in the Court's decision on Defendant's prior motion to dismiss, and the remaining arguments raised by Defendant do not provide grounds for the dismissal of Plaintiff's claims. Accordingly, Defendant's motion should be denied.

## PLAINTIFF'S FACTUAL ALLEGATIONS AND LEGAL CLAIMS

Plaintiff's Second Amended Complaint includes the following factual allegations. On June 19, 2009, a salesperson came to Plaintiff Paulette Venditto's residence to offer the sale of a home alarm system and monitoring services on behalf of Defendant's predecessor APX Alarm Security Solutions, Inc.  Doc. 19, Second Amended Complaint (hereinafter "Compl.") ¶¶7-8. Ms. Venditto agreed to purchase the alarm system and monitoring services, and the alarm equipment was installed that same day. *Id.* at ¶¶9-10. In connection with the transaction, Defendant's predecessor prepared and directed Ms. Venditto to sign an Alarm System Purchase and Service Agreement (the "Alarm Agreement"). *Id.* at ¶10, Ex. A.

The Alarm Agreement states that Plaintiff would be charged a $99.00 "Activation Fee" (marked down from the pre-printed price of $198.00), which was designated as "Non-Refundable." *Id.* at ¶13(a), Ex. A. The initial term of the contract was thirty-nine months, and Plaintiff would be charged a $44.99 monthly services fee (marked down from the pre-printed price of $49.99) plus taxes. *Id.* at ¶13(c), Ex. A. The Alarm Agreement identifies the "total cash price" as $1,949.61. *Ibid.*

The Alarm Agreement lists the price for installation and equipment charges as "$  0  (See SOP)." *Id.* at ¶13(b). The "SOP" refers to the "Schedule of Protection," a separate document that was attached to the Alarm Agreement. *Id.* at ¶33, Ex. A. Notwithstanding the absence of a listed price for installation and equipment on the face of the Alarm Agreement, the Schedule of Protection does set forth specific

3

prices for both the alarm equipment and the cost of the installation, including the following: "Keypad & Siren" $399.00, "Door/Window" $99.00, "Door" $99.00, "Window" $99.00, "Motion" $195.00, "Key Fob" $99.00, "Lifetime" $199.00, "Installation" $199.00, and "Installation Charge" $198.00. *Id.* at ¶35, Ex. A.

Plaintiff contends that Defendant sold the equipment in conjunction with monitoring services, and that monthly services fee was in reality payment in part for the installment purchase of equipment, and in part for the installment purchase of 39 months of monitoring services. *Id.* at ¶¶39-40.

The Alarm Agreement states that Defendant may retake possession of some or all of the alarm equipment listed in the Schedule of Protection if the customer failed to make payments under the contract. Specifically, Section 12 provides that:

> [i]f service is canceled or this agreement is terminated for any reason, you authorized [sic] us to…enter your premises to disconnect your system from our monitoring equipment and remove our communications equipment and software and all of our signs and decals from your premises for our then prevailing disconnect fee…

Compl. ¶25, Ex. A. Defendant's right to retake the alarm equipment upon default is reiterated in Section 4, Subpart 5 of the Alarm Agreement. Compl. ¶22, Ex. A.

Based upon Section 12 and Section 4.5 of the Alarm Agreement, Plaintiff alleges that Defendant retained an ownership interest in some or all of the equipment identified on the Schedule of Protection. Compl. ¶¶26-27. The Second Amended Complaint asserts that Defendant's right to repossess the communications equipment is not limited to the 3-day right of rescission period that began once Plaintiff and

others similarly situated signed the Alarm Agreement, and that Defendant may repossess the equipment at any time during the term of the contract in the event of a default in monthly payments. *Id.* at ¶¶27-30

Plaintiff made a down payment of $147.14, consisting of the $99.00 activation fee, the first month's $44.99 monthly services fee, and $3.15 in sales tax. *Id.* at ¶17. Plaintiff's down payment was not reflected anywhere on the Alarm Agreement, nor does the Alarm Agreement set forth the remaining unpaid cash balance or time sales price. *Id.* at ¶¶18-20.

The Amended Complaint alleges that Defendant charged an "Activation Fee" that was not permitted under the RISA, and that the charging of this fee in violation of RISA constitutes an unconscionable commercial practice in violation of the CFA. *Id.* at ¶¶86-89. Plaintiff alleges an ascertainable loss for this violation of the CFA in the amount of $99.00, the "Activation Fee" that she paid. *Id.* at ¶92.

Plaintiff also contends that the Alarm Agreement contains numerous terms both on the face of the contract and buried in fine print on the reverse side of the document which violate several New Jersey consumer protection statutes and regulations, including RISA, the Door-to-Door Retail Installment Sales Act of 1968 ("DDRISA"), *N.J.S.A.* 17:16C-61.1, *et seq.,* the New Jersey Home Improvement Practices Regulations promulgated under the CFA, *N.J.A.C.* 13:45A-16.1 to -16.2 ("HIP Regulations"), and the Door-to-Door Home Repair Sales Act of 1968 ("DDHRSA"), N.J.S.A. 17:16C-95, *et seq.* By including terms which violate

5

clearly-established New Jersey statutes and regulations, the Alarm Agreement violates the Truth-in-Consumer Contract, Warranty and Notice Act at *N.J.S.A.* 56:12-15. The Second Amended Complaint further alleges that the Alarm Agreement improperly states that one of its provisions may not apply to all consumers, yet fails to set forth whether the provision applies or does not apply in New Jersey, in direct violation of TCCWNA at *N.J.S.A.* 56:12-16.

Based upon the charging of the "Activation Fee" and the inclusion of unlawful terms in the Alarm Agreement, Plaintiff seeks relief for herself and all other New Jersey consumers who entered into an Alarm Agreement with Defendant or its predecessor during the applicable limitations period as follows: three times the amount of the "Activation Fee" charged in violation of RISA and the CFA, pursuant to the CFA at *N.J.S.A.* 56:8-19; and a statutory penalty for the Alarm Agreement's inclusion of terms contrary to clearly-established New Jersey law in violation of TCCWNA, pursuant to *N.J.S.A.* 56:12-17.

Plaintiff also seeks additional damages under the CFA arising out of her attempts to cancel the Alarm Agreement. The factual basis for Plaintiff's individual claims is set forth in section IV, *infra*.

## <u>LEGAL ARGUMENT</u>

**I.   STANDARD GOVERNING MOTIONS TO DISMISS UNDER RULE 12(B)(6).**

A motion to dismiss under FED. R. CIV. P. 12(b)(6) should be granted only if the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Id.* at 555 (alteration in original). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ibid*. (alteration in original); *see also* FED. R. CIV. P. 8(a)(2). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The primary inquiry in a motion to dismiss under Rule 12(b)(6) is whether the facts pleaded, if proven, would entitle Plaintiff to the relief requested. Plaintiff's Second Amended Complaint addresses and resolves the pleading deficiencies identified in the Court's November 5, 2014 Opinion, Doc. 17, and

now sets forth sufficient facts to state claims for relief under multiple New Jersey consumer protection statutes.

## II. PLAINTIFF'S SECOND AMENDED COMPLAINT PROPERLY SETS FORTH CLAIMS FOR RELIEF UNDER THE CONSUMER FRAUD ACT ON BEHALF OF PLAINTIFF AND THE PUTATIVE CLASS BASED ON VIOLATIONS OF THE RETAIL INSTALLMENT SALES ACT

In response to the question raised by the Court in its November 5, 2014 Opinion, Plaintiff has endeavored to clarify that she seeks relief under the Consumer Fraud Act for herself and the putative class members based upon Defendant's alleged violations of the Retail Installment Sales Act. *See* Compl. First Count; *Korrow v. Aaron's, Inc.*, No. 10-6317, 2011 U.S. Dist. LEXIS 95306, 2011 WL 3794231, at *2 (D.N.J. Aug. 25, 2011) (allowing CFA claim to proceed based upon violations of RISA).

The Second Amended Complaint sets forth two separate but related grounds as to why the provisions of the Alarm Agreement are governed by the requirements of RISA and its related door-to-door sales statutes. First, the alarm equipment sold in connection with the Alarm Agreement was "goods" paid for in two or more installments over a period of time. Compl. ¶41. Second, the alarm monitoring services sold by Defendant were "services" paid for in monthly installments, which are also expressly covered by the provisions of RISA.

8

## A. **RISA Applies to the Alarm Agreement**

"Construction of any statute necessarily begins with consideration of its plain language. Such language should be given its ordinary meaning, absent a legislative intent to the contrary." *Merin v. Maglaki*, 126 N.J. 430, 434-435 (N.J. 1992) (citations omitted). RISA's plain language leaves no doubt that the statute applies to Defendant's Alarm Agreement. RISA applies to "retail installment contracts" "evidencing an agreement to pay the retail purchase price of **goods or services,** which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time." *N.J.S.A.* 17:16C-1(b)(emphasis added).

Defendant's Alarm Agreement obligates the buyer to pay for thirty-nine months' worth of services as indicated in preprinted text on the form contract, and lists a total cash price for those services of $1,949.61, to be paid in monthly installments of $49.99[1].  Compl. Ex A. Thus, the Alarm Agreement is a contract under which Plaintiff agreed to pay the retail purchase price of goods or services for use at her residence in two or more installments over a period of time, bringing it squarely within the definition of a "retail installment contract" subject to RISA.

---

[1] In Ms. Venditto's contract, the pre-printed "$49.99" is stricken with $44.99 handwritten above it.

### 1. RISA Applies to Installment Contracts that Do Not Impose a Finance Charge.

In its brief, Defendant again argues that the Alarm Agreement is not subject to RISA because it does not expressly impose a finance charge. However, the definition of "retail installment contract" does not include any reference to interest or finance charges, or any requirement that such charges must be imposed in order for a contract otherwise meeting the definition to fall within the purview of RISA. The statute defines "retail installment contract" as:

> [A]ny contract, other than a retail charge account or an instrument reflecting a sale pursuant thereto, entered into in this State between a retail seller and a retail buyer evidencing an agreement to pay the retail purchase price of goods or services, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time. This term includes a security agreement, chattel mortgage, conditional sales contract, or other similar instrument and any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation a sum substantially equivalent to or in excess of the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.

*N.J.S.A.* 17:16C-1(b)

Defendant seeks to impose restrictions on the applicability of RISA that are outside of the text of the statutory definition. This sort of constriction of the statute is contrary to the New Jersey Supreme Court's directive in *Perez v. Rent-A-Center, Inc.*, 186 N.J. 188 (N.J. 2006), to construe RISA liberally and inclusively, and requiring "questions regarding the applicability of the statute to be resolved in

favor of consumers for whose protection RISA was enacted." *Id.* at 209; *see also* Norman J. Singer & J.D. Shambie Singer, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION (7th ed. 2009) § 60:2 ("A liberal construction is ordinarily one which makes the statutory rule or principle apply to more things or in more situations than would be the case under a strict construction.").

Defendant's argument that RISA only covers installment contracts that impose interest or finance charges is based on the false premise that RISA's sole purpose is to regulate interest and finance charges. On the contrary, RISA prohibits *any* fees or charges other than those expressly authorized by the statute (*see N.J.S.A.* 17:16C-50), and includes various provisions regulating fees *other* than interest or finance charges. *See, e.g.*, *N.J.S.A.* 17:16C-42(a)-(c) (regulating late fees); *N.J.S.A.* 17:16C-42 and -50 (regulating attorney's fees, court costs and other expenses incurred in collections); *N.J.S.A.* 17:16C-30 and -33 (regulating certain types of insurance premiums); *N.J.S.A.* 17:16C-1 and -27 (regulating official fees, such as lien recording fees or motor vehicle license and transfer fees); and *N.J.S.A.* 17:16C-42(e) regulating return check fees.[2] Indeed, the Court in *Perez* recognized that RISA was concerned with "regulation of the charges associated with the time sale of goods [and services]" generally, and not just interest or finance charges. *Perez*, 186 N.J. at 209.

---

[2] As discussed further below, Defendant's "Activation Fee" is not a fee authorized by RISA, and is therefore prohibited by RISA at *N.J.S.A.* 17:16C-50.

That the New Jersey Legislature did not intend for RISA to be limited to contracts that impose interest or a finance charge is also evident from the fact that the statute defines "retail installment contract" to expressly include certain contracts that do not charge interest or finance charges. In addition to traditional installment sale contracts, RISA further defines "retail installment contract" to include "any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation **a sum substantially equivalent to** or in excess of **the value of the goods**...." *N.J.S.A.* 17:16C-1 (emphasis added). By including contracts that only require the customer to pay "a sum substantially equivalent to...the value of the goods", the Legislature clearly signaled its intention that RISA was to cover installment sales contracts for goods and services regardless of whether they impose interest or finance charges.[3]

### 2. RISA Applies Not Just to Installment Sales of Goods, but Also Expressly Applies to the Installment Sale of Services.

Defendant also argues that RISA cannot apply to the Alarm Agreement because the contract is limited to the sale of a monthly monitoring service. As discussed in the next section of this brief, *infra*, Defendant's claim is factually incorrect, as the Alarm Agreement in reality involves the sale of both goods and

---

[3] There is notable precedent for consumer credit legislation to apply even where no interest is imposed. The federal Truth in Lending Act, 15 *U.S.C.* §1601 *et seq.* ("TILA") covers any credit transaction "which is payable by agreement in more than four installments **or** for which the payment of a finance charge is or may be required." 15 *U.S.C.* §1602(g).

services. However, even if the Alarm Agreement was limited to the sale of services, it would nonetheless be covered by RISA. As noted above, the definition of "retail installment contract" includes agreements providing for the installment sale of "goods **or** services." *N.J.S.A.* 17:16C-1 (emphasis added). The use of the disjunctive "or" in the definition makes clear that installment contracts for services alone can be "retail installment contracts" provided they meet the other conditions in the definition.

Defendant's comparison of its standard thirty-nine month Alarm Agreement to utility, telephone, and other services, Def. Brief at p. 12, is factually inapt. For example, utilities providing electric and natural gas service are strictly regulated, and rates must be filed with the Board of Public Utilities. There is no such public filing requirement for alarm equipment and monitoring service providers such as Defendant. Consumers are billed for electric and natural gas service on a monthly basis based upon usage. These accounts can be cancelled at any time, and the consumer is only charged for the services actually used up to the point of cancellation.

As evidenced by the facts alleged with respect to Ms. Venditto's transaction, Defendant does not allow customers to terminate their Alarm Agreements early, because they have already agreed to pay the fixed "total cash price." As alleged in the Second Amended Complaint, Defendant represented to Plaintiff that she would be liable for the entire remaining balance of the Alarm Agreement if she canceled

13

the contract, even though Plaintiff had not yet used any services for the remaining months of her contract term. Compl. ¶58. This right of acceleration of the entire contract price is not a characteristic of the telephone, cable television, and utility contracts discussed by Defendant in its brief.  Instead, it shows that Defendant itself sees the contract as providing a single quantum of services that the customer becomes obligated to purchase at the time the contract is signed, as opposed to separate months of services billed on a "pay-as-you-go" basis.

### 3. The Alarm Agreement Comprises the Combined Installment Sale of Goods and Services.

The Second Amended Complaint alleges that the true cost of the alarm equipment installed at Plaintiff's residence was not $0, and that the cost of the equipment was effectively included in the installment payments for the 39 months of monitoring services. Compl. ¶¶37-39. These allegations are based upon both the separate prices listed for the alarm equipment on the Schedule of Protection attached to the Alarm Agreement, and the provisions of Sections 12 and 4.5 of the Alarm Agreement, which allow Defendant to enter the premises to remove certain equipment in the event of non-payment. At this stage in the litigation, the Court must accept Plaintiff's allegations as true, and draw all reasonable inferences in Plaintiff's favor. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

The Schedule of Protection lists several pieces of equipment that Defendant installed at Plaintiff's residence. It is difficult to ascertain exactly what some of

14

these items are, as they are identified only as "Door," "Window," and "Motion." Compl. Ex. A, Schedule of Protection. With respect to this equipment, Section 12 of the Alarm Agreement allows Defendant to "enter your premises to disconnect your system from our monitoring equipment and remove our communications equipment and software and all of our signs and decals from your premises for our then prevailing disconnect fee." Compl. Ex. A. This ongoing right of repossession is directly contrary to Defendant's argument that title to the equipment passed to Plaintiff at the conclusion of the three-day cancellation period. Plaintiff did not hold title to the equipment at the end of three days, because Defendant could retake possession of the equipment at any time if Plaintiff failed to make her monthly payments. Defendant retained an ownership interest in the equipment, enforceable by repossession upon Plaintiff's failure to make all installment payments required under the Alarm Agreement.

Neither the Schedule of Protection nor Section 12 of the Alarm Agreement distinguish between items over which Defendant retained ownership and items sold to the customer, i.e., there is no designation of "our equipment" and "your equipment" as suggested by Defendant. *See* Def. Brief at p. 11. It is not at all clear from the face of the Alarm Agreement which equipment Defendant would or would not repossess in the event of a default.

Moreover, Defendant's apparent acknowledgment that it retained ownership over some of the equipment and items provided to Plaintiff at the outset of the

contract term contradicts the claim that Plaintiff owned the equipment at the expiration of the three-day cancellation period. The Court correctly made note of the dispute between the parties concerning the ownership of the alarm equipment, Nov. 5, 2014 Opinion at p. 8, but this dispute cannot be resolved with reference only to the pleadings and the documents attached thereto and therefore should not be disposed of on a motion to dismiss.

At minimum, discovery is required in order to determine exactly what items were provided to Plaintiff to keep, and which items Defendant intended to recover at the end of the contract term. In a motion filed under Rule 12(b)(6), the Court is limited to an examination of "the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of America*, 361 F.3d 217, 222 n. 3 (3d Cir.2004) (citation omitted). Because the Second Amended Complaint, the Alarm Agreement, and the Schedule of Protection do not provide a definitive answer as to who owned the equipment at what time, Defendant's motion to dismiss on this ground must be denied.

### B. Defendant Violated RISA, Giving Rise to CFA Claims

In *Perez v. Rent-A-Center*, the New Jersey Supreme Court ruled that the imposition of charges in violation of RISA may also constitute unconscionable commercial conduct in violation of the CFA at *N.J.S.A.* 56:8-2. *Perez*, *supra*, 186

N.J. at 220. In *Korrow v. Aaron's, Inc.*, *supra*, the Hon. Joel A. Pisano summarized

this holding in *Perez* as follows:

> [T]here is no private right of action under RISA…The CFA, however,
> does provide a private right of action for any unconscionable
> commercial practice or fraud in connection with the sale of any
> merchandise. *N.J.S.A.* 56:8-2. The statute also instructs that it should
> be applied in conjunction with other statutes or common law: "The
> rights, remedies and prohibitions accorded by the provisions of this
> act are hereby declared to be in addition to and cumulative of any
> other right, remedy or prohibition accorded by the common law or
> statutes of this State." *N.J.S.A.* 56:8-2.13. **The Supreme Court of
> New Jersey clearly interpreted this as allowing RISA claims to be
> asserted under the CFA.**

*Id.* at *6 (emphasis added, some internal citations omitted). Judge Pisano

concluded that "it has been clearly established by the Supreme Court of New

Jersey that RISA claims may be asserted under the CFA and Defendant's motion to

dismiss on those grounds must be denied." *Id.* at *7.

### 1. The "Activation Fee" was Charged in Violation of RISA

The Second Amended Complaint alleges that Defendant charged Plaintiff

and others similarly situated an "Activation Fee" which was not permitted under

RISA. RISA at *N.J.S.A.* 17:16C-50 prohibits retail installment sellers from

charging fees that are not specifically authorized under the statute. Examples of

authorized charges include late fees (*N.J.S.A.* 17:16C-42(a)-(c)), attorneys' fees

and collection expenses (*N.J.S.A.* 17:16C-42 and -50), insurance premiums

(*N.J.S.A.* 17:16C-30 and -33), official fees (*N.J.S.A.* 17:16C-1 and -27), and

returned check fees (*N.J.S.A.* 17:16C-42(e)). The Activation Fee charged by Defendant is not among the charges permitted under the statute.

Defendant argues that *N.J.S.A.* 17:16C-50 only applies to fees charged in connection with a default or delinquency, as opposed to fees associated with the goods or services being contracted for. Again, Defendant urges the Court to impose an additional requirement that is simply not present in the text of the statute. RISA at *N.J.S.A.* 17:16C-50 encompasses all "costs, charges, insurance premiums, examination, appraisal service, brokerage, commission, expense, interest, discount, fees, fines, penalties or other things of value in connection with retail installment contracts" that are not expressly permitted elsewhere in the statute. The provision is in no way limited to default or delinquency charges, as evidenced by the presence of "examination, appraisal service, brokerage, [and] commission" fees, which would be charged prior to or at the outset of the contract term.

In addition, the Activation Fee was charged in addition to the monthly services fee. The Second Amended Complaint alleges that Plaintiff made an initial down payment consisting of the $99.00 Activation Fee, her first $44.99 monthly monitoring service fee, plus applicable taxes. Compl. ¶17.[4] If, as Defendant claims, the monthly monitoring service was the only "service" sold under the Alarm

---

[4] Plaintiff disputes that the Second Amended Complaint "mischaracterizes" the Activation Fee. The allegation merely sets forth the amount and the manner in which Vivint required Plaintiff to submit her initial payment.

Agreement, then the Activation Fee was an add-on charge imposed in excess of the cost of the monthly monitoring services.

Since the Activation Fee is not a charge permitted by RISA, Defendant violated *N.J.S.A.* 17:16C-50 by imposing and collecting the fee.

### 2. Defendant's Charging of the Activation Fee in Violation of RISA Resulted in an Ascertainable Loss to the Plaintiff

"To state a claim under the CFA, a plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 12-13 (N.J. Super. Ct. App. Div. 2003) (*citing Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 24 (N.J. 1994)).

Here, Plaintiff has sufficiently pleaded an ascertainable loss in the form of the Activation Fee that Defendant was prohibited from charging under RISA at *N.J.S.A.* 17:16C-50. This same theory of ascertainable loss was held in *Korrow v. Aaron's* to sustain a viable CFA claim sufficient to survive a motion to dismiss. *Korrow, supra*, at *8-9. Thus, Plaintiff has sufficiently pleaded a CFA claim based on Defendant's imposition of an Activation Fee that was unauthorized and therefore prohibited under RISA.

19

### III.   PLAINTIFF'S SECOND AMENDED COMPLAINT PROPERLY SETS FORTH CLAIMS FOR RELIEF UNDER THE TRUTH-IN-CONSUMER CONTRACT, WARRANTY AND NOTICE ACT

The New Jersey Truth-in-Consumer Contract, Warranty, and Notice Act prohibits the offering, giving, or displaying of any consumer warranty, notice, or sign that "includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed." *N.J.S.A.* 56:12-15.

"[T]he rights, remedies, and prohibitions conferred by the TCCWNA are 'in addition to and cumulative of any other right, remedy or prohibition accorded by common law, Federal law or statutes of this State.'" *Shelton v. Restaurant.com*, 214 N.J. 419, 428 (N.J. 2013) (*quoting* N.J.S.A. 56:12-18). Violations of the act entitle the aggrieved consumer to a civil penalty of not less than $100.00, actual damages, or both, together with attorney's fees and court cost *N.J.S.A.* 56:12-17.

In *McGarvey v. Penske Automotive Group, Inc.*, No. 08-5610, 2011 U.S. Dist. LEXIS 35408, at *15, 2011 WL 1325210 (D.N.J. March 31, 2011), the District Court identified "unambiguous statutory text, helpful legislative history, relevant precedent, or determinative regulatory interpretations" as examples of "clearly established" legal rights sufficient to support a TCCWNA claim. In this case, the Alarm Agreement contains multiple provisions which violate RISA,

20

DDRISA, the HIP Regulations, and DDHRSA, and thus violate TCCWNA at *N.J.S.A.* 56:12-15. These statutes and regulations constitute the source of the "clearly established" legal rights that Plaintiff contends to have been violated in Defendant's Alarm Agreement. The Alarm Agreement also contains a term which violates TCCWNA directly by failing to specify whether the contract's limitations on damages and maximum late charges are allowed in New Jersey, in violation of *N.J.S.A.* 56:12-16.

A.  **The Alarm Agreement Violates the Retail Installment Sales Act by Charging an Impermissible Fee, Omitting Plaintiff's Down Payment, and Misstating the Time Sales Price**

In addition to the imposition of the unlawful Activation Fee, the Alarm Agreement failed to set forth Plaintiff's down payment, and misstated the time sales price due on the contract. RISA provides that "[e]very retail installment contract shall set forth the following separate items" including the down payment made by the retail buyer and the time sales price. *N.J.S.A.* 17:16C-27. The Alarm Agreement's failure to accurately set forth these items constitutes a violation of RISA.

RISA sets forth the clearly-established rights of Plaintiff and responsibilities of Defendant's predecessor at the time the Alarm Agreement was signed. The definition of "retail installment contract" unambiguously states that the statute applies to "goods or services" sold in installments. The violations of RISA in the Alarm Agreement constitute violations of TCCWNA at *N.J.S.A.* 56:12-15.

21

**B. The Alarm Agreement Violates the Door-to-Door Retail Installment Sales Act by Providing an Improper Notice of Cancellation**

The Door-to-Door Retail Installment Sales Act ("DDRISA") applies to all retail installment contracts that are in excess of $25.00 and "entered into at a place other than the place of business of the retail seller…." *N.J.S.A.* 17:16C-61.5. DDRISA requires that all retail sellers must provide two copies of a receipt which "clearly and conspicuously sets forth: (1) The retail seller's name and place of business; (2) A description of the goods sold; and (3) The amount of money paid by the retail buyer or the cash value of any goods delivered to the retail seller at the time the retail installment sale or retail installment contract was entered into." *N.J.S.A.* 17:16C-61.6(a).

DDRISA provides that the retail buyer has a right to cancel the door-to-door retail installment sale and obtain a full refund of all amounts paid within three business days of the date the contract is signed. *N.J.S.A.* 17:16C-61.5(a). Upon receipt of a cancellation notice, among other requirements, the retail seller must pick up any goods delivered to the purchaser, and "[r]efund to the retail buyer **all amounts of money paid** by the retail buyer…." *N.J.S.A.* 17:16C-61.5(b) (emphasis added).

In this case, the Alarm Agreement was a retail installment contract entered into at Plaintiff's residence, subjecting the contract to the requirements of DDRISA. However, the Alarm Agreement states that the Activation Fee was non-

22

refundable, which misrepresented Plaintiff's right to obtain a refund of "all amounts of money paid" in the event she chose to cancel the contract within three business days pursuant to DDRISA at *N.J.S.A.* 17:16C-61.5(b). By designating the "Activation Fee" as non-refundable, the Alarm Agreement misrepresents Plaintiff's clearly-established right under DDRISA to cancel the contract and obtain a full refund. In addition, the "Notice of Cancellation" in the Alarm Agreement does not set forth the amount of money paid by Plaintiff, a description of the goods sold, or a statement that failure to exercise the cancellation option does not interfere with any other remedies the retail buyer may have against the retail seller. This information is required by DDRISA to be provided in the notice of cancellation. *N.J.S.A.* 17:16C-61.6(a)-(b).

DDRISA sets forth the clearly-established rights of Plaintiff and responsibilities of Defendant at the time the Alarm Agreement was signed. The violations of DDRISA in the Alarm Agreement constitute violations of TCCWNA at *N.J.S.A.* 56:12-15.

### C. **The Alarm Agreement Violates the Home Improvement Practices Regulations by Failing to Include the Activation Fee in the Disclosed Total Cash Price, and Therefore Violates TCCWNA**

The New Jersey Home Improvement Practices Regulations ("HIP Regulations") were promulgated by the Division of Consumer Affairs "to implement the provisions of the Consumer Fraud Act, *N.J.S.A.* 56:8-1 et seq., by providing procedures for the regulation and content of home improvement

contracts and establishing standards to facilitate enforcement of the requirements of the Act." *N.J.A.C.* 13:45A-16.1(a). The HIP Regulations apply to all "home improvements," which are defined to include the "construction, installation, replacement, improvement or repair" of "security protection devices". *N.J.A.C.* 13:45A-16.1A.

This Court previously noted that violations of the HIP Regulations constitute "unlawful acts" under the CFA, and that "intent is not an element of the unlawful practice" because "the regulations impose strict liability for such violations." Nov. 5, 2014 Opinion at p. 11 (quoting *Cox* 138 N.J. at 18).

The HIP Regulations require that all home improvement contracts "shall clearly and accurately set forth in legible form and in understandable language all terms and conditions of the contract, including, but not limited to, the following: … (iii) The total price or other consideration to be paid by the buyer, including all finance charges." *N.J.A.C.* 13:45A-16.2(a)(12)(iii). In this case, Defendant failed to do so, by omitting the "Activation Fee" from the "Total Cash Price" disclosed on the contract.

In *McGarvey*, *supra*, the District Court declined to find a TCCWNA violation because the statute in question was ambiguous with respect to its application to the alleged conduct of the defendant. *McGarvey*, *id.* at *11. Here, the plain text of the HIP Regulations encompasses the "installation" of "security protection devices." *N.J.A.C.* 13:45A-16.1A. Under the principles set forth by

Judge Simandle in *McGarvey*, the HIP Regulations were the source of the "clearly established" legal rights and responsibilities of consumers and sellers of home improvements, and the regulations unambiguously include the installation of security protection devices such as the equipment installed by Defendant at Plaintiff's residence.

The HIP Regulations define "home improvement contract" as "an oral or written agreement between a seller and an owner of residential or noncommercial property … and includes all agreements under which the seller is to perform labor *or render services* for home improvements, or furnish materials in connection therewith." *N.J.A.C.* 13:45A-16.1A (emphasis added). Accordingly, the regulatory provisions governing home improvement contracts encompass all labor, services, and materials rendered "in connection []with" a "home improvement" such as the installation of a security protection device. The Court must therefore examine the entire Alarm Agreement, including the terms related to the payment for monthly monitoring services, to determine whether Defendant complied with the HIP Regulations, and not limit its inquiry to the provisions concerning installation as Defendant argues.

The HIP Regulations require "clear and accurate" disclosures of the total price. Defendant admits that the preprinted Alarm Agreement form setting forth total cost of services was not changed to reflect the hand-written reductions of the Activation Fee and monthly service charge. Def. Brief at p. 3. Even assuming that

25

Defendant can prove that it did not ultimately charge Plaintiff the "Total Cash Price" of $1,949.61 clearly set forth in bold print in the contract, this misstatement of the total price does not constitute a "clear and accurate" disclosure of the actual price to be paid by the Plaintiff.

By misstating the "Total Cash Price" set forth in the contract, the Alarm Agreement violated the HIP Regulations at *N.J.A.C.* 13:45A-16.2(a)(12)(iii). The HIP Regulations were clearly-established law at the time the Alarm Agreement was executed. By offering and entering into a contract that contained a provision which violated Plaintiff's clearly-established legal rights and Defendant's clearly-established responsibilities under the HIP Regulations, Defendant violated TCCWNA at *N.J.S.A.* 56:12-15.

**D. The Alarm Agreement Violates the Door-to-Door Home Repair Sales Act by Misrepresenting Plaintiff's Cancellation Rights, and Therefore Violates TCCWNA.**

The Second Amended Complaint includes a new claim that the Alarm Agreement violates the New Jersey Door-to-Door Home Repair Sales Act, *N.J.S.A.* 17:16C-95, *et seq.* The DDHRSA includes mandatory cancellation provisions very similar to DDRISA, but applies to "home repair contract[s], for a purchase price in excess of $ 25.00, which is entered into at a place other than the place of business of the home repair contractor." *N.J.S.A.* 17:16C-99. "Home repair contract" is not defined in DDHRSA, but the term is defined in DDRISA as "an agreement, whether contained in one or more documents, between a home repair contractor

26

and an owner to pay the time sales price of *goods or services* in installments over a period of time greater than 90 days." *N.J.S.A.* 17:16C-62(c) (emphasis added). "Home repair contractor" is defined in DDRISA as "any person engaged in the business of selling goods or services pursuant to a home repair contract." *N.J.S.A.* 17:16C-62(d).

Like DDRISA, DDHRSA was declared "remedial legislation necessary for the protection of the consumers of this State, [and] shall be liberally construed to effectuate the purposes and intent thereof." *N.J.S.A.* 17:16C-96.

Similar to RISA itself, DDHRSA governs the installment sale of "goods or services", and encompass the alarm equipment, installation, and monitoring services sold by Defendant. The Alarm Agreement was for a price in excess of $25, was entered into at Plaintiff's residence, and was payable for a term of more than ninety days.

As set forth above with respect to Plaintiff's DDRISA claim, the Alarm Agreement states that the "Activation Fee" was non-refundable, which misrepresented Plaintiff's right to obtain a refund of "all amounts of money paid" in the event she chose to cancel the contract within three business days pursuant to DDHRSA at *N.J.S.A.* 17:16C-99. In addition, the "Notice of Cancellation" in the Alarm Agreement does not set forth the amount of money paid by Plaintiff, a description of any goods sold, or a statement that failure to exercise the cancellation option does not interfere with any other remedies the retail buyer may

27

have against the retail seller. This information is required by DDHRSA to be provided in the notice of cancellation. *N.J.S.A.* 17:16C-100(a)-(b).

DDHRSA sets forth the clearly-established rights of Plaintiff and responsibilities of Defendant at the time the Alarm Agreement was signed. The violations of DDHRSA in the Alarm Agreement therefore constitute violations of TCCWNA at *N.J.S.A.* 56:12-15.

**E.** **The Alarm Agreement Improperly Fails to Specify Whether the Limitation of Consequential and Incidental Damages Applies in New Jersey, in Direct Violation of TCCWNA at *N.J.S.A.* 56:12-16.**

TCCWNA at *N.J.S.A.* 56:12-16 prohibits contract terms which state that any provisions may be "void, unenforceable or inapplicable in some jurisdictions without specifying which provisions are or are not void, unenforceable or inapplicable within the State of New Jersey…." Section 5 of the Alarm Agreement is titled "Repair Service," and states, "We are not liable for consequential or incidental damages" arising out of a failure of the system or malfunction of system components. Compl. Ex. A. Subpart (D) of Section 5 then provides: "Some states do not allow a limitation on the duration of implied warranties **or the exclusion or the limitation of consequential or incidental damages, so the above limitations or exclusions may not apply to you**." *Ibid.* (emphasis added).

This term does exactly what TCCWNA at *N.J.S.A.* 56:12-16 prohibits: it states that Defendant is not liable for consequential or incidental damages, and that some states do not allow such an exclusion on consequential damages, but then

28

fails to set forth whether New Jersey is one of the states that does or does not allow the exclusion. Compl. ¶¶132-33. TCCWNA requires that the contract specifically disclose whether or not the exclusion and limitation term would apply in New Jersey, and the Alarm Agreement's failure to do so is a violation of *N.J.S.A.* 56:12-16.

Defendant argues that the contract's limitation on consequential and incidental damages is limited to damages arising out of a breach of warranty, which would remove the limitation from the scope of *N.J.S.A.* 56:12-16. However, as Defendant points out, the drafter of the contract used the term "warranty" ten times elsewhere in Section 5 of the Alarm Agreement, but not in the limitation on incidental and consequential damages. Defendant's assertion that the incidental and consequential damages limitation could only arise out of the warranty breach is also not consistent with the remaining terms of the Alarm Agreement. Sections 15 and 16 of the Alarm Agreement address limitations on damages and liability arising out of Defendant's negligence or failure to perform, and include theories of liability in addition to breach of warranty. *See* Compl. Ex. A, Section 15 ("…you agree that our liability shall be limited to the lesser of $1000.00 or twelve (12) times the monthly services fee, and this shall be your sole and exclusive remedy *regardless of what legal theory* (*including without limitation*, negligence, breach of contract, breach of warranty or product liability) *is used to determine that we were liable for the injury or loss*.") (emphasis added). Just as Defendant urges the Court

29

to examine the damages limitation clause in the context of the other provisions of Section 5, so must the clause be viewed in the context of the entire Agreement.

To the extent there is any ambiguity as to the scope of the limitation on incidental and consequential damages in Section 5 of the Alarm Agreement, the Court should construe the term against Defendant, the drafter, and find that the term is not limited to damages arising out of a breach of warranty. *Phila. Indem. Ins. Co. v. Healy*, 156 Fed. Appx. 472, 475 (3d Cir. 2005). Defendant's claim that an ambiguous contract term cannot comprise a TCCWNA violation under *N.J.S.A.* 56:12-16 is incorrect. TCCWNA at *N.J.S.A.* 56:12-16, unlike *N.J.S.A.* 56:12-15, does not pertain to violations of "clearly established" legal rights, but instead prohibits contract terms which state that they may be void, unenforceable or inapplicable in some jurisdictions without specifying whether they are void, unenforceable or inapplicable in New Jersey.

For these reasons, the Court should deny Defendant's motion to dismiss Plaintiff's claim that the incidental and consequential damages limitation in Section 5 of the Alarm Agreement violates TCCWNA at *N.J.S.A.* 56:12-16.

## IV. THE AMENDED COMPLAINT PROPERLY SETS FORTH PLAINTIFF'S INDIVIDUAL CFA CLAIM BASED ON DEFENDANT'S UNLAWFUL CONDUCT IN CONNECTION WITH THE RENEWAL OF PLAINTIFF'S CONTRACT.

The Consumer Fraud Act prohibits the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false

30

pretense, false promise, misrepresentation … in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid…." *N.J.S.A.* 56:8-2. "Merchandise" includes both goods and services. *N.J.S.A.* 56:8-1.

The New Jersey Courts have defined "unconscionability" as a lack of "good faith, honesty in fact and observance of fair dealing." *Kugler v. Romain*, 58 N.J. 522, 544 (N.J. 1971). An "unconscionable commercial practice" under the CFA is an "amorphous concept obviously designed to establish a broad business ethic" and therefore such claims are determined "on a 'case-by-case basis.'" *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 472 (N.J. 1988) (*quoting Kugler*, 58 N.J. at 543).

To establish that Defendant committed an unconscionable commercial practice or misrepresentation in violation of the CFA, it is not necessary for Plaintiff to prove actual deceit or an intent to mislead. *N.J.S.A.* 56:8-2 (unconscionable practices declared unlawful "whether or not any person has in fact been misled, deceived or damaged thereby"); *Meshinsky*, 110 N.J. at 472 ("To prove a violation of section 56:8-2, it is not necessary to show actual deceit or a fraudulent act; any unconscionable commercial practice is prohibited.").

To the extent an unconscionable commercial practice claim arises out of an alleged breach of contract or breach of warranty, the complaint must allege "substantial aggravating circumstances" to establish a violation of the CFA. *Suber*

31

*v. Chrysler Corp.,* 104 F.3d 578, 587 (3d Cir.1997) (Finding "substantial aggravating circumstances" where an employee represented that issues existed with a vehicles suspension and then drafted a report stating that no issues were present). The conduct in question must "stand outside the norm of reasonable business practice in that it will victimize the average consumer." *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 N.J. 392, 416 (N.J. 1995). In the federal courts, claims of an unlawful practice in violation of *N.J.S.A.* 56:8-2 must be pleaded with particularity in accordance with Rule 9(b). *Rait v. Sears, Roebuck and Co.,* No. 08–2461, 2009 U.S. Dist. LEXIS 7540, 2009 WL 250309, at *4 (D.N.J. Feb.3, 2009).

In its decision on Defendant's motion to dismiss Plaintiff's Amended Complaint, the Court held that Plaintiff was required to plead additional factual allegations in support of her claim that Defendant engaged in unlawful conduct in connection with the renewal of, and Plaintiff's subsequent attempts to cancel, the Alarm Agreement. The Second Amended Complaint includes additional details and explanation as to how Defendant violated the CFA.

The crux of Plaintiff's individual CFA claim is that Defendant flouted the requirements of its own contract to "lock in" Plaintiff to an additional forty-two months of service based only upon an unsolicited verbal communication, and then aggravated this initial contractual violation by unfairly refusing to honor Plaintiff's repeated cancellation efforts. Plaintiff alleges that Defendant's conduct was

32

contrary to Plaintiff's reasonable expectations and constitutes an unconscionable business practice. Plaintiff further claims that Defendant made several representations during the course of her cancellation attempts that had the effect of misleading her and interfering with her efforts to terminate the contract.

More specifically, the Second Amended Complaint now alleges the following facts concerning Plaintiff's continued and unavailing attempts to cancel her Alarm Agreement.

On or around March 5, 2012, prior to the expiration of the initial contract term, Plaintiff received an unsolicited phone call from Defendant's representative, offering to extend the term of the Alarm Agreement for forty-two months. Compl. at ¶46. The proposed modification of the contract was not reduced to writing, and Defendant failed to send Plaintiff a new contract to sign. *Id.* at ¶47. Plaintiff did not believe the telephone conversation by itself, without her signature on a new contract, bound her to the modifications of the Alarm Agreement. *Id.* at ¶48. Plaintiff never provided her written authorization for any modifications or extensions to the Alarm Agreement. *Id.* at ¶49.

On or about August 1, 2012, Plaintiff called Defendant to cancel the Alarm Agreement at the end of the initial 39-month term, on September 19, 2012. *Id.* at ¶50. Defendant's representative obtained Plaintiff's account information and Plaintiff was led to believe that Defendant was canceling the Alarm Agreement during the phone call. *Id.* at ¶51.

33

Defendant's representative failed to tell Plaintiff that she was required to take any further action to cancel, or that the Alarm Agreement required Plaintiff to send a written cancellation request at least 30 days before September 19, 2012. *Id.* at ¶52. Plaintiff alleges that had Defendant informed her that she was required to send written notice to cancel the Alarm Agreement, she would have mailed a written cancellation notice immediately. *Id.* at ¶53. Defendant's representative also failed to tell Plaintiff that her Alarm Agreement was renewed as of March 5, 2012. *Id.* at ¶54. Plaintiff alleges that had Defendant's representative told her that the Alarm Agreement had been renewed as of March 5, 2012, she would have mailed a written dispute and cancellation notice immediately. *Id.* at ¶55.

On or about September 5, 2012, Plaintiff called Defendant to see if the Alarm Agreement had been canceled as she requested in her August 1, 2012 phone call. Plaintiff spoke to an individual named Parker, who told Plaintiff that he would investigate her inquiry and call her back. *Id.* at ¶56. Parker then called Plaintiff back and informed her that the Alarm Agreement was not cancelled, but instead had been extended 42 months, effective March 5, 2012. *Id.* at ¶57. Parker would not cancel Plaintiff's contract, and told Plaintiff that the only way to get out of the contract was to pay for the balance of the contract or find someone to take over the contract. *Id.* at ¶58.

Defendant continued to take automatic monthly withdrawals from Plaintiff's bank account via Electronic Funds Transfer up to and including February 18, 2014,

34

when Plaintiff completed a bank form to stop the withdrawals. *Id.* at ¶59. Plaintiff called Defendant again to cancel the Alarm Agreement on or about February 21, 2013, and once more on May 6, 2013. Defendant refused to cancel the Alarm Agreement each time. *Id.* at ¶60.

On February 20, 2014, Plaintiff sent Defendant a cancellation letter via certified mail, return receipt requested, which Defendant received on February 24, 2014. *Id.* at ¶61, Ex. B. Defendant continued to refuse to honor Plaintiff's cancellation requests, and sent Plaintiff a letter dated March 21, 2014 informing her that it was unable to withdraw the March 2014 monthly service fee from her checking account and assessed a $15 processing fee and a $3 late fee to her Defendant account. *Id.* at ¶62, Ex. C. Defendant sent Plaintiff monthly invoices through June of 2014, the month that this action was filed in the Superior Court of New Jersey. *Id.* at ¶¶63-64, Ex. D.

Section 18 of the Alarm Agreement states that the contract "may only be changed by a written agreement signed by you (and if married, your spouse) and us. It may not be changed by any oral statements or representations made by our sales representative." Compl. Ex. A. Defendant breached the Alarm Agreement when it treated Plaintiff's contract as renewed for an additional forty-two months despite the absence of any writing signed by Plaintiff memorializing this change.

Contrary to Defendant's argument, the New Jersey Uniform Electronic Transactions Act, *N.J.S.A.* 12A:12-1 *et seq.* ("UETA"), is not applicable to

Defendant's attempt to renew Plaintiff's Alarm Agreement, and does not excuse Defendant's contravening the terms of its own contract. Defendant claims that Plaintiff's alleged oral agreement to extend the term of her contract constitutes an "electronic signature" sufficient to bind her under the UETA. However, the UETA defines "electronic signature" as "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person *with the intent to sign the record*." *N.J.S.A.* 12A:12-2 (emphasis added). The statute defines "record" in this context as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." *Id.* Defendant fails to explain how Plaintiff's conversation with its representative could comprise an "electronic signature" associated with any "record" within the meaning of UETA, or what that "record" might be. In order for Plaintiff to have provided a verbal "signature," there would have needed to be a new contract.

Defendant here is relying upon the content of a recording that has neither been produced in discovery nor submitted to the Court, and is therefore improperly raised on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."). To the extent Defendant's argument is based upon the Second Amended Complaint allegations concerning Plaintiff's telephone call with Defendant, Plaintiff specifically disputes

36

that she intended her conversation with Defendant's representative to serve as a "signature" on a new contract. The Second Amended Complaint alleges instead that Plaintiff did not believe the telephone call was sufficient to extend her agreement. Compl. ¶48. This allegation further undermines the applicability of UETA to the renewal conversation. *N.J.S.A.* 12A:12-5(b) ("This act applies only to transactions between parties each of which has agreed to conduct transactions by electronic means. Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct.").

Defendant's argument that the purported extension of the contract term from an initial thirty-nine months to an additional forty-two months (for a total term of seventy-five months) is not a "change" requiring a signed writing by Plaintiff is similarly unavailing. Section 18 of the Alarm Agreement simply states that the terms of the contract "may only be changed by a written agreement signed by you … and us." Compl. Ex. A. Section 2.3 of the Alarm Agreement states that the initial term was thirty-nine months. *Ibid.* At a minimum, the renewal and extension of the contract term from an initial thirty-nine months to forty-two additional months, which modifies Section 2.3, is a "change" necessitating a writing signed by Plaintiff. In its brief, Defendant correctly notes that ambiguities in contracts of adhesion, such as the Alarm Agreement in question in this case, "are construed against the drafting party." *Phila. Indem. v. Healy*, *supra,* 156 Fed. Appx. at 475.

37

To the extent that there is any ambiguity as to the scope of what "change" to the contract terms requires a writing signed by both parties, the term must be construed against Defendant and in favor of the writing requirement for the purported extension.

Following Defendant's initial breach of the contract by soliciting a purported oral extension of the contract term, the Second Amended Complaint alleges a series of additional acts related to Plaintiff's cancellation attempts, which Plaintiff contends to be "substantial aggravating circumstances" sufficient to elevate Defendant's conduct to an unlawful practice in violation of the CFA.

As set forth in paragraphs 46-60 of the Second Amended Complaint, during Plaintiff's phone calls, Defendant's representatives variously misrepresented the status of Plaintiff's account, falsely stated that Plaintiff was not permitted to cancel the contract, gave Plaintiff the false impression that her contract was cancelled, and informed Plaintiff that she would be required to make all payments towards the new 42-month term that began in March, 2012. Compl. ¶¶46-60, 143. Defendant aggravated its breach of Section 18 of the Alarm Agreement by misrepresenting the contract cancelation provisions and frustrating Plaintiff's attempts to cancel. *Id.* at ¶144.

Similar to the Activation Fee discussed above, the Second Amended Complaint alleges that the $15 processing fee which Defendant attempted to charge Plaintiff was not authorized under RISA, and therefore could not be

charged under *N.J.S.A.* 17:16C-50. *Ibid.* Plaintiff additionally alleges that the processing fee was not even authorized to be charged under the Alarm Agreement itself. *Ibid.* As noted by Judge Pisano in *Korrow*, "the Supreme Court of New Jersey has held that a contract that unlawfully imposes a debt upon a consumer necessarily constitutes a loss under the CFA…." *Korrow*, *supra* at *8-9 (citing *Cox*, 138 N.J. at 22). Defendant attempted to collect the $15 processing fee and would have obtained the fee had Plaintiff not canceled Defendant's automatic withdrawals from her bank account. Defendant's attempt to impose this unlawful debt on Plaintiff constitutes a violation of the CFA.

By referencing the dates of specific phone calls and individual misrepresentations, the Second Amended Complaint now includes information concerning "the date, place or time of the fraud" in a manner sufficient to meet Rule 9(b)'s pleading requirements. *Lum v. Bank of America*, 361 F.3d 217, 224 (3d Cir. 2004).

The Second Amended Complaint alleges that as a direct result of Defendant's unlawful conduct, Plaintiff suffered an ascertainable loss in the amount of all payments made and all fees that Defendant attempted to collect after the expiration of the initial Alarm Agreement term on September 19, 2012. *Id.* at ¶146. She seeks treble her ascertainable loss, as well as a declaratory judgment that her contract with Defendant expired at the end of the initial thirty-nine month period and was not renewed. *Id.* at ¶147.

Plaintiff respectfully submits that the pleading deficiencies identified by the Court in its November 5, 2014 opinion have been corrected, and that the Second Amended Complaint has adequately pleaded facts in support of Plaintiff's individual claim under the CFA.

## <u>CONCLUSION</u>

For all of the reasons set forth herein, Defendant Vivint Inc.'s motion to dismiss Plaintiff's Second Amended Complaint should be denied.

Dated:  February 13, 2015              Respectfully submitted,

   s/ Daniel I. Rubin_____
THE WOLF LAW FIRM, LLC
*Attorneys for Plaintiff and the putative class*