**NOT FOR PUBLICATION**                                                    **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAULETTE VENDITTO, on behalf of herself and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> VIVINT, INC., <br><br> Defendants. | Civil Action No. 14-4357 (JLL) (JAD) <br><br><br> **OPINION** |

**LINARES,** District Judge**.**

This matter comes before the Court by way of Defendant's motion to dismiss Plaintiff's Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) [Docket Entry No. 28]. The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendant's motion is **granted** in its entirety. Counts One, Two and Three of the Second Amended Complaint are hereby dismissed *with* prejudice.


## I.      BACKGROUND[1]

On June 19, 2009, Defendant's door-to-door salesman came to Plaintiff's home to sell a home alarm system and monitoring services to Plaintiff. (Sec. Am. Compl., ¶ 7). At that time, Defendant was known as APX Alarm Security Solutions, Inc. (*Id*., ¶ 8). After discussing the features of the system and services, and the terms and conditions of the agreement, Plaintiff agreed

---

[1] The following facts are accepted as true solely for purposes of this motion.

to purchase the alarm system and monitoring services from Defendant. (*Id*., ¶ 9).  As such, the parties executed an Alarm System Purchase and Service Agreement (hereinafter, the "Alarm Agreement") and Defendant installed the alarm system equipment and set up the monitoring service on the very same day.  (*Id*., ¶ 10).

Section 2 ("PRICE, PAYMENT, FINANCIAL DISCLOSURES AND TERMS") of the Alarm Agreement provided, in pertinent part:

a.   "**2.1 <u>ACTIVATION FEE</u>**. $198.00 (Non-Refundable)." [The $198.00 is crossed out, with "99" handwritten in its place];

b.   "**2.2 <u>INSTALLATION & EQUIPMENT CHARGES</u>**. $ _0__ (See SOP)

c.   "**2.3 <u>SERVICES FEE</u>**. FOR MONITORING YOU WILL PAY US AS FOLLOWS:   INITIAL TERM OF CONTRACT: 39 MONTHS MONTHLY SERVICES FEE: $49.99 (plus any applicable taxes). [The $49.99 is crossed out, with "44.99" handwritten in its place.]  THE TOTAL MONTHLY SERVICES FEE   IS PAYABLE MONTHLY IN ADVANCE. THE FIRST MONTHLY SERVICES FEE IS DUE WHEN THE SYSTEM IS INSTALLED AND OPERATIONAL. THE TOTAL CASH PRICE YOU WILL PAY US FOR THE SERVICES PROVIDED IS $1,949.61, NOT INCLUDING APPLICABLE TAXES. THERE IS NO FINANCING CHARGE OR COST OF CREDIT (0% APR) ASSOCIATED WITH THIS AGREEMENT;

d.   **2.4 <u>TERM FOR SERVICES</u>**. THE ORIGINAL TERM OF THIS AGREEMENT STARTS ON THE DAY THIS AGREEMENT IS SIGNED AND CONTINUES

FOR THIRTY-NINE (39) MONTHS, AND WILL AUTOMATICALLY CONTINUE FROM YEAR TO YEAR THEREAFTER UNLESS CANCELLED BY EITHER OF US IN WRITING NO LATER THAN THIRTY (30) DAYS BEFORE THE END OF THE ORIGINAL TERM OR ANY RENEWAL TERM;

e.  **2.6 <u>CREDIT CHECK; LATE FEES.</u>** YOU AUTHORIZE US TO CONFIRM YOUR CREDIT RECORD AND TO REPORT YOUR PAYMENT PERFORMANCE UNDER THIS AGREEMENT TO CREDIT AGENCIES AND CREDIT REPORTING SERVICES. IF YOU FAIL TO MAKE ANY PAYMENT WHEN DUE, WE MAY, BY GIVING YOU WRITTEN NOTICE, DISCONTINUE INSTALLATION, MONITORING, REPAIR SERVICE, TERMINATE THIS AGREEMENT, AND RECOVER ALL DAMAGES TO WHICH WE ARE ENTITLED, INCLUDING THE VALUE OF THE WORK PERFORMED AND OUR LOSS OF PROFIT. IN ADDITION, WE MAY IMPOSE A LATE CHARGE ON ALL PAYMENTS MORE THAN TEN (10) DAYS PAST DUE IN THE MAXIMUM AMOUNT PERMITTED BY STATE LAW.

(*Id.*, ¶ 12).

On or about March 5, 2012, Plaintiff received a phone call from Defendant regarding renewal of the Alarm Agreement. Defendant told Plaintiff that Defendant would extend the term of the Alarm Agreement for 42 months and that Defendant would not increase the monthly services fee during that time period.  (*Id.*, ¶ 46).  Plaintiff verbally agreed to a proposed extension of the Agreement term.  (*Id.*, ¶ 138).  Defendant failed to send a new contract for Plaintiff to sign. (*Id.*, ¶

47).  Plaintiff never provided her written authorization for any modifications or extensions to the Alarm Agreement.  (*Id*., ¶ 49).

On or about August 1, 2012 and September 5, 2012, Plaintiff called Defendant to cancel the Alarm Agreement at the end of the initial 39-month term. (*Id*., ¶ 50).  Defendant's representative led Plaintiff to believe that Defendant was canceling the Alarm Agreement during that phone call.  (*Id*., ¶ 51).  Defendant's representative failed to tell Plaintiff that she was required to take any further action to cancel the Alarm Agreement. (*Id.,* ¶ 52).

On or about September 5, 2012, Plaintiff called Defendant to see if the Alarm Agreement had been canceled. Plaintiff spoke to Defendant's representative, Parker, at extension 5020. Parker told Plaintiff that he would investigate her inquiry and call her back. When Parker called Plaintiff back, he told her that the Alarm Agreement was extended 42 months, effective March 5, 2012. (*Id*., ¶ 56-57).  Parker refused to cancel the contract, and instead told Plaintiff that the only way to get out of the contract was to pay for the balance of the contract or find someone to take over the contract.  (*Id*., ¶ 58).  Defendant continued to make automatic monthly withdrawals from Plaintiff's bank account via Electronic Funds Transfer up to and including February 18, 2014, when Plaintiff completed a bank form to stop the withdrawals.  (*Id*., ¶ 59).

Plaintiff called Defendant to cancel the Alarm Agreement on or about February 21, 2013, and again on May 6, 2013. Defendant refused to cancel the Alarm Agreement each time. (Id., ¶ 60).

On February 20, 2014, Plaintiff sent Defendant a cancellation letter via certified mail, return receipt requested. The return postcard indicates that Defendant received the cancellation letter on February 24, 2014. (*Id*., ¶ 61).

Defendant sent Plaintiff a letter dated March 21, 2014 informing her that it was unable to

withdraw the March 2014 monthly service fee from Plaintiff's checking account and assessed a $15 processing fee and a $3 late fee to her Vivint account.  (*Id.*, ¶ 62).

Defendant continued to refuse to cancel Plaintiff's contract, and instead sent Plaintiff an invoice dated April 15, 2014. The invoice covers the service period from April 15, 2014 to May 14, 2014 and includes a past due amount of $66.14.  Plaintiff continued to receive monthly invoices from Defendant through June of 2014.   (*Id*., ¶¶ 63, 64).

In light of the foregoing, Plaintiff commenced this action on July 10, 2014 on behalf of herself and "all persons who, at any time on or after June 6, 2008, entered into an Alarm System Purchase and Services Agreement ("Alarm Agreement") with Defendant for a residence in New Jersey with terms the same as or substantially similar to the Alarm Agreement signed by Plaintiff." (*Id*., ¶ 48).   Plaintiff filed an Amended Complaint on September 2, 2014, alleging the following claims on behalf of the purported class: (1) violation of the Retail Installment Sales Act ("RISA"), N.J.S.A. 17:16C-1, et seq., and the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8–1 et seq.; (2) violation of the Door-to-Door Retail Installment Sales Act ("DDRISA"), N.J.S.A. 17:16C-61.5; (3) violation of the Home Improvement Practices Regulations, N.J.A.C. 13:45A-16.1 et seq.; and (4) violation of the Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA"), N.J.S.A. 56:12-14 – 18.  In addition, the Amended Complaint asserts a claim for violation of the NJCFA on behalf of the named Plaintiff, alone.  This Court's jurisdiction over this matter is premised on 28 U.S.C. § 1332(d).

On November 5, 2014, this Court granted Defendant's motion to dismiss Plaintiff's Amended Complaint.  Plaintiff filed a Second Amended Complaint on December 12, 2014. Plaintiff's Second Amended Complaint contains the following claims: (1) violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8–1 et seq., based on violations of the Retail

5

Installment Sales Act ("RISA"), N.J.S.A. 17:16C-1, et seq., (2) violation of the Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA"), N.J.S.A. 56:12-14 – 18 based on, *inter alia*, violations of RISA, the Door-to-Door Retail Installment Sales Act ("DDRISA"), N.J.S.A. 17:16C-61.5, the Home Improvement Practices Regulations ("HIP"), N.J.A.C. 13:45A-16.1 et seq., and the Door-to-Door Home Repair Sales Act ("DDHRSA"), N.J.S.A. 17:16C-99, and (3) violation of the NJCFA on behalf of the named Plaintiff alone.

Currently before the Court is Defendant's motion to dismiss Plaintiff's Second Amended Complaint pursuant to Rule 12(b)(6).

## II.    LEGAL STANDARD

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).   Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994).

## III.    DISCUSSION

### A.    Count One – Violation of NJCFA and RISA

Count One alleges that the Alarm Agreement is a "retail installment agreement" as defined by RISA and that Defendant's actions in charging an Activation Fee constitutes a violation of RISA inasmuch as said charge is not authorized by any provision of RISA.  Defendant moves to dismiss Count One on the basis that the Alarm Agreement is not a "retail installment contract" within the meaning of RISA.  In particular, Defendant maintains that the Alarm Agreement is a contract for the provision of an ongoing service and not for the timed sale of goods; as such, it is not a "retail installment contract" within the meaning of RISA.  Alternatively, Defendant maintains that Count One fails to state an ascertainable loss arising from the alleged RISA violation, as required under the NJCFA.

RISA prohibits:

> [Any] seller, sales finance company, or holder [from] charg[ing], contract [ing] for, collect[ing] or receiv[ing] from any retail buyer, directly or indirectly, any further or other amounts for costs, charges, insurance premiums, examination, appraisal service, brokerage, commission, expense, interest, discount, fees, fines, penalties or other things of value in connection with retail installment contracts or retail charge accounts other than the charges permitted by this act, except court costs, attorney fees and the expenses of retaking and storing repossessed goods which are authorized by law.

N.J.S.A. § 17:16C–50.  "Retail installment contract" means:

> [A]ny contract, other than a retail charge account or an instrument reflecting a sale pursuant thereto, entered into in this State between a retail seller and a retail buyer evidencing an agreement to pay the retail purchase price of goods or services, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time. This term includes a security agreement, chattel mortgage, conditional sales contract, or other similar instrument and any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation

7

> a sum substantially equivalent to or in excess of the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.

N.J.S.A. § 17:16C-1.

Count One alleges that Defendant's RISA violation constitutes a violation of, *inter alia*, the New Jersey Consumer Fraud Act.[2]  In particular, Plaintiff alleges that "Defendant's violations of RISA constitute unconscionable commercial practices and that she and members of the purported class suffered an ascertainable loss in the amount of $99.00—the amount they were charged for the Activation Fee.

The Court previously dismissed this claim on the basis that it was not entirely clear based on the facts pled whether the Alarm Agreement, which clearly provides for the provision of an ongoing monitoring service, also provides for the sale of the alarm equipment that was installed in Plaintiff's house.  In particular, the Court stated that "it is not clear to the Court based on the facts pled whether, at the end of the original 39 month term, Plaintiff retained all ownership rights in the alarm equipment or whether Plaintiff was obligated to return the equipment to Defendant."

The Court agrees with Defendant that the key criteria in determining whether a transaction is an installment sale is whether the plaintiff comes to own anything (or has the option to own anything) that she did not own at the beginning of the contract term, as a result of making the periodic payments.  *See, e.g., Perez v. Rent-A-Ctr., Inc.*, 186 N.J. 188, 207 (2006) ("[A] RISA

---

[2] *See generally Perez v. Rent-A-Center, Inc.,* 186 N.J. 188, 220 (2006) ("Here, Rent–A–Center has not suggested, even obliquely, any conflict between the CFA and RISA, let alone one of a direct and unavoidable nature, nor do we perceive one. Accordingly, the acts must be construed in concert with each other and Rent–A–Center's contention that only one can be applicable at a time must be rejected.").

contract includes a lease, pursuant to which the bailee or lessee is 'bound to become or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.' ").

Defendant argues that Plaintiff's RISA claim fails as a matter of law because "Plaintiff had full ownership of the equipment free of charge at the outset of the Agreement regardless of the payment of the monthly service fee." (Def. Opp'n Br. at 10). Defendant also points to Section 2.3 of the Alarm Agreement, which provides that "there is no financing charge or cost of credit (0% APR) associated with this agreement." (*Id*.). Finally, Defendant maintains that "had Plaintiff canceled the Agreement after a single month, she would have still owned the equipment installed in her home." (*Id*.).

But Section 12 of the Alarm Agreement provides that "if the service is canceled or this agreement is terminated for any reason, you authorize us to . . . remove our communication equipment and software and all of our signs and decals from your premises for our then prevailing disconnecting fee." (Sec. Am. Compl., ¶ 25). While Defendant speculates that this statement only refers to materials that remained the property of Vivint and not to what Section 12 of the Alarm Agreement refers to as "your system," beyond the "signs and decals" specifically referenced in Section 12, it is not clear to the Court what type of "communication equipment" owned by Vivint had been installed in Plaintiff's home, separate and apart from the alarm equipment referenced in paragraph 35 of the Second Amended Complaint.

Notwithstanding the dispute as to whether the "communication equipment" referenced in Section 12 includes the "alarm equipment" referenced Schedule of Protection referenced in Section 2.2 of the Alarm Agreement, the Court agrees with Defendant that Plaintiff still fails to state a viable RISA claim inasmuch as the Second Amended Complaint fails to allege any facts

that would allow the Court to draw the reasonable inference that: (a) Plaintiff agreed to pay the value of any goods in order to eventually own them, or (b) that Plaintiff would own (or had the option to own) *any* alarm equipment (or "goods") at the end of the term of the Alarm Agreement, or (c) that the Alarm Agreement required Plaintiff to pay the monthly fee in order to eventually own any such goods. *See, e.g., Perez*, 186 N.J. at 209-10 ("[W]e are satisfied that the language of RISA was intended to cover agreements like the ones between Rent–A–Center and Perez. Like most rent-to-own consumers, Perez entered into the transactions with Rent–A–Center in order to become the owner of the goods. . . Perez "agreed" that she would have to pay the value of the goods in order to own them."). The absence of any such facts is particularly problematic given Section 12 which, as stated above, suggests to the Court that Defendant retained ownership rights in at least some of the alarm equipment in the event of the cancellation or termination of the Alarm Agreement.

To the extent Count One is premised on the sale of the monitoring services, rather than the sale of any "goods," the Court finds that Plaintiff has failed to allege sufficient facts to nudge any such claim across the line from conceivable to plausible. In particular, Plaintiff has failed to allege sufficient facts that would allow the Court to draw the reasonable inference that Defendant's ongoing monitoring services, billed monthly, amount to an installment sale of that service. "RISA was one of several laws designed to protect consumers from over-reaching by others, to protect them from over-extending their resources, and to promote the availability of financing to purchase various goods and services." *Green v. Cont'l Rentals*, 292 N.J. Super. 241, 252 (Ch. Div. 1994) (citing *Girard Acceptance Corp. v. Wallace*, 76 N.J. 434, 439 (1978)). There are no facts alleged in the Second Amended Complaint suggesting any type of financing arrangement between the parties for the monitoring services. To the contrary, Section 2.3 of the Alarm Agreement provides

10

that "there is no financing charge or cost of credit (0% APR) associated with this agreement." (Sec. Am. Compl., ¶ 13).

In light of the foregoing, Plaintiff has failed to allege sufficient facts that would allow the Court to draw the reasonable inference that the misconduct alleged in Count One constitutes a violation of RISA. *See, e.g., Turner v. Aldens, Inc*., 179 N.J. Super. 596, 602 (App. Div. 1981) ("We have no doubt that the evil sought to be remedied by N.J.S.A. 17:16C-1 et seq. is the charging of excessive interest to New Jersey consumers."). Having already afforded Plaintiff with an opportunity to cure the pleading deficiencies in this claim, the Court finds that any future amendment of this claim would be futile. Such claim is now dismissed *with* prejudice.

### B.      Count Two—Violation of the Truth-in-Consumer Contract, Warranty and Notice Act

Count Two alleges that Defendant violated New Jersey's Truth–in–Consumer Contract, Warranty & Notice Act ("TCCWNA"), N.J.S.A. 56:12–15-16. In particular, the Second Amended Complaint alleges that a variety of provisions contained in the Alarm Agreement violate Plaintiff's clearly established statutory rights (pursuant to, *inter alia*, RISA, DDRISA and the HIP Regulations) and that such violations, in turn, constitute a violation of the TCCWNA. Count Two also alleges that the Alarm Agreement's "Repair Service" provision  (Section 5) violates clearly established New Jersey law and/or are unenforceable under New Jersey law and thus independently constitute violations of the TCCWNA.

N.J.S.A. 56:12–15 provides that:

> No seller, lessor, creditor, lender or bailee shall in the course of his business ... enter into any written consumer contract ... which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor,

> lender or bailee as established by State or Federal law at the time ...
> the consumer contract is signed or the warranty, notice or sign is
> given or displayed.

N.J.S.A. 56:12–15.  N.J.S.A. 56:12-16, in turn, provides that:

> No consumer contract, warranty, notice or sign, as provided for in
> this act, shall contain any provision by which the consumer waives
> his rights under this act. Any such provision shall be null and void.
> No consumer contract, notice or sign shall state that any of its
> provisions is or may be void, unenforceable or inapplicable in some
> jurisdictions without specifying which provisions are or are not
> void, unenforceable or inapplicable within the State of New Jersey;
> provided, however, that this shall not apply to warranties.

N.J.S.A. 56:12-16.  A person who violates the TCCWNA is liable for a $100 civil penalty or actual

damages, at the election of the consumer. N.J.S.A. 56:12–17.

   Defendant moves to dismiss this claim on the basis that Plaintiff has failed to adequately

plead the violation of any clearly established legal right (under state or federal law).  Having

determined that Plaintiff has failed to adequately allege a claim for violation of RISA, to the extent

Plaintiff's TCCWNA is premised on violations of this statute, it too must be dismissed, with

prejudice.

### a.    Violation of DDRISA

   To the extent Count Two is premised on the alleged violation of the Door-to-Door Retail

Installment Sales Act (DDRISA), N.J.S.A. 17:16C–61.1 to −61.9, such claim also fails as a matter

of law inasmuch as it applies only to "retail installment sales contracts for goods,"[3] and the Court

---

[3] *See* N.J.S.A. § 17:16C-61.3  ("The Legislature hereby finds and declares that the consumer is
frequently induced to enter into retail installment sales contracts for goods which he does not need
through the unsolicited and often unethical persuasion of certain door-to-door sellers.  It is the
purpose of this act to enable the consumer to reconsider his purchase within a reasonable period
of time and to rescind the sale if he acts before 5 p.m. of the third business day following the day
on which the contract is executed.").

has already determined that the Second Amended Complaint fails to allege any facts that would allow the Court to draw the reasonable inference that: (a) Plaintiff agreed to pay the value of any goods in order to eventually own them, or (b) that Plaintiff would own (or had the option to own) *any* alarm equipment (or "goods") at the end of the term of the Alarm Agreement, or (c) that the Alarm Agreement required Plaintiff to pay the monthly fee in order to eventually own any such goods.  Because the Second Amended Complaint fails to allege sufficient facts establishing that the Alarm Agreement constituted a retail installment contract for the sale of goods, Plaintiff's DDRISA claim must also be dismissed, *with* prejudice.

### b.      Violation of HIP Regulations

This aspect of Count Two alleges that the Alarm Agreements entered into by Plaintiff and those similarly situated are "Home Improvement Contracts" as defined by the HIP regulations at N.J.A.C. 13:45A-16.1A. It further alleges that by omitting the cost of the "Activation Fee" from the "Total Cash Price" listed on the face of the contract, the Alarm Agreements entered into by Plaintiff and those similarly situated fail to set forth the total price or other consideration to be paid by the buyer in violation of the HIP regulations at N.J.A.C. 13:45A-16.2(a)(12)(iii).

The Division of Consumer Affairs has promulgated extensive "Home Improvement Practices" regulations "to deal with practices susceptible to consumer-fraud violations, such as may be found under home-improvement contracts." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 16 (1994).  Violations of those regulations constitute "unlawful acts" within the meaning of [the New Jersey Consumer Fraud Act] N.J.S.A. 56:8-2.  "In those instances, intent is not an element of the unlawful practice, and the regulations impose strict liability for such violations." *Id*. at 18.

The HIP regulations, which were thus adopted to implement the statutory provisions set forth in the CFA and Contractor's Registration Act,[4] expand upon the definition of "home improvement" set forth in the Contractor's Registration Act to further specify that:

> "**Home improvement" means the** remodeling, altering, painting, repairing, renovating, restoring, moving, demolishing, or modernizing of residential or noncommercial property or the making of additions thereto, and includes, but is not limited to, the construction, **installation**, replacement, improvement, or repair **of** driveways, bathrooms, garages, basements and basement waterproofing, fire protection devices, **security protection devices**, central heating and air conditioning equipment, water softeners, heaters, and purifiers, solar heating or water systems, insulation installation, siding, wall-to-wall carpeting or attached or inlaid floor coverings, and other changes, repairs, or improvements made in or on, attached to or forming a part of the residential or noncommercial property, but does not include the construction of a new residence. The term extends to the conversion of existing commercial structures into residential or noncommercial property and includes any of the above activities performed under emergency conditions.

N.J.A.C. 13:45A-16.1A.   This aspect of Count Two is premised upon Defendant's alleged violation of N.J.A.C. 13:45A-16.2(a)(12)(iii) which provides that "home improvement contracts which are required by this subsection to be in writing, and all changes in the terms and conditions thereof, shall be signed by all parties thereto, and shall clearly and accurately set forth in legible form and in understandable language all terms and conditions of the contract, including, but not limited to, the following . . . the total price or other consideration to be paid by the buyer, including all finance charges. If the contract is one for time and materials, the hourly rate for labor and all other terms and conditions of the contract affecting price shall be clearly stated."

---

[4] *See Murnane v. Finch Landscaping, LLC,* 420 N.J. Super. 331, 334 (App. Div. 2011).

To the extent Count Two is premised on a violation of the HIP Regulations, the Court finds that such claim also fails as a matter of law.[5]  Although the term "home improvement" includes the installation of a "security protection device," as stated above, the Court now concludes that the Second Amended Complaint fails to allege any facts that would allow the Court to draw the reasonable inference that: (a) Plaintiff agreed to pay the value of any goods in order to eventually own them, or (b) that Plaintiff would own (or had the option to own) *any* alarm equipment (or "goods") at the end of the term of the Alarm Agreement, or (c) that the Alarm Agreement required Plaintiff to pay the monthly fee in order to eventually own any such goods.  In the absence of any such facts, the Court cannot conclude that the ongoing monitoring services provided for in the Alarm Agreement—which made no structural change to Plaintiff's house and the title of which did not flow with the ownership of Plaintiff's house—constituted a "home improvement" within the meaning of the statute.  The Court makes this finding based upon: (a) a practical and common sense reading of the statute, and (b) the lack of helpful legislative history, relevant precedent, or determinative regulatory interpretations concerning the term "home improvement" or "security protection devices" as the terms are utilized in the HIP Regulations.  In the absence of any type of established standard indicating that "home improvement" or "security protection devices" includes security monitoring services, the Court cannot draw the reasonable inference, based on the facts pled, that Defendant's alleged misconduct—in failing to include the "Activation Fee" in the "Total Cash Price"—violated any right that was "clearly established" by virtue of the HIP Regulations.

---

[5] The Court recognizes that it previously allowed this claim to proceed.  Defendant renewed its motion to dismiss this claim to the extent it was reasserted in the Second Amended Complaint and Plaintiff did not object.  Now that Plaintiff's theory of the case has been more clearly articulated, and for the reasons discussed herein, the Court finds that Plaintiff has failed to state a viable TCCWNA claim premised on a violation of the HIP Regulations.

Even assuming, *arguendo*, that the provisions of the Alarm Agreement fell within the scope of the HIP Regulations, the Court would in any event dismiss this aspect of Count Two inasmuch as the facts alleged do not allow the Court to draw the reasonable inference that the "Total Cash Price" *understated* the 39 monthly payments plus the Activation Fee to be paid by Plaintiff pursuant to the terms of the Agreement.  In particular, the Court notes that certain discounts were handwritten into the Alarm Agreement, attached as Exhibit A to Plaintiff's Second Amended Complaint.  Taking into account such handwritten discounts, the Alarm Agreement provided for: (a) an Activation Fee of $99.00, and (b) a Monthly Service Fee of $44.99 for a term of 39 months. The sum of both amounts equals $1,853.61.  The Alarm Agreement provides that the "total cash price you will pay us for the services provided is $1,949.61."  As stated above, the HIP Regulations were promulgated "to deal with practices susceptible to consumer-fraud violations." *Cox,* 138 N.J. at 16. To conclude that Defendant's overstatement of the total cash price owed (i.e., failure to include discounts that were expressly accounted for in other parts of the Alarm Agreement), *per se*, amounts to a violation of the HIP Regulations would run contrary to the spirit of the statute— which was to prevent deceptive practices in the context of home improvement contracts.  This is particularly so given that Plaintiff does not allege that she was, in fact, charged the overstated figure ($1,949.61) as opposed to the discounted figure ($1853.61).  Certainly, based on the facts actually pled—which must take into account the handwritten discounts notated on the Alarm Agreement—the Court cannot draw the reasonable inference that "total cash price" amount of $1,949.61 failed to include the $99.00 "activation fee."   As such, to the extent Count Two is premised on a violation of the HIP Regulations, said aspect of Count Two is dismissed *with* prejudice.

c.      **Violation of the DDHRSA**

The purpose of the Door-to-Door Home Repair Sales Act of 1968 ("DDHRSA"), N.J.S.A. 17:16C-95 to -103, is to allow consumers who have been induced to execute a home repair contract for goods and services a reasonable period of time to reconsider and rescind the contract, as they are often pressured into signing such contracts "through the unsolicited and often unethical persuasion of certain door-to-door sellers." N.J.S.A. 17:16C-97.   To that end, the purchaser is allowed to rescind the contract at any time before "5 p.m. of the third business day following the day on which the home repair contract is executed[.]" N.J.S.A. 17:16C-99(a)(1).   Within 10 business days after receipt of such notice of intent to rescind the home repair contract, a home repair contractor shall, *inter alia*, "refund to the owner all amounts of money paid by the owner (less reasonable charges for any damages to such goods which occurred while in the possession of the owner)." N.J.S.A. 17:16C-99 (b)(2).

Plaintiff maintains that the Alarm Agreement violates the DDHRSA by misrepresenting Plaintiff's cancellation rights, in violation of the TCCWNA.   In particular, Plaintiff maintains that the aspect of the Alarm Agreement stating that the "Activation Fee" is "Non-Refundable" violates the DDHRSA by misstating Plaintiff's 3-day right to rescind the contract and receive a full refund thereunder.   Defendant moves to dismiss this aspect of Count Two on the basis that a security monitoring service is not a home repair and therefore the Alarm Agreement falls outside the scope of the DDHRSA.   Based on the reasons that follow, the Court agrees that the Alarm Agreement falls outside the scope of the DDHRSA.

The phrase "home repair contract" and "home repair contractor" are "not defined in the DDHRSA itself, but are given content and meaning by the definitions contained in companion legislation regulating door-to-door retail installment sales [RISA] adopted at the same time,

17

N.J.S.A. 17:16C–61.1 et seq.  *See Swiss v. Williams*, 184 N.J. Super. 243, 249 (Dist. Ct. 1982), *reversed on other grounds by Skeer v. EMK Motors, Inc*., 187 N.J. Super. 465, 473 (App.Div. 1982).  There, the phrase "home repair contract" is defined as "an agreement, whether contained in one or more documents, between a home repair contractor and an owner to pay the time sales price of goods or services in installments over a period of time greater than 90 days." N.J.S.A. § 17:16C-62(c).  "Goods" are defined as: "all chattels personal which are furnished or used in the modernization, rehabilitation, repair, alteration or improvement of real property except those furnished or used for a commercial or business purpose or for resale, and except stoves, freezers, refrigerators, air conditioners other than those connected with a central heating system, hot water heaters and other appliances furnished for use in a home and designed to be removable therefrom without material injury to the structure . . ." N.J.S.A. 17:16C-62 (a).

To the extent this claim is premised on the provision of "goods"—i.e., the alarm equipment referenced in paragraph 35 of the Second Amended Complaint—the Court has already held that Plaintiff fails to state a viable RISA claim inasmuch as the Second Amended Complaint fails to allege any facts that would allow the Court to draw the reasonable inference that: (a) Plaintiff agreed to pay the value of any goods in order to eventually own them, or (b) that Plaintiff would own (or had the option to own) *any* alarm equipment (or "goods") at the end of the term of the Alarm Agreement, or (c) that the Alarm Agreement required Plaintiff to pay the monthly fee in order to eventually own any such goods.  Moreover, even assuming, *arguendo*, that there were sufficient facts establishing that Plaintiff would own (or had the option to own) any alarm equipment at the end of the term of the Alarm Agreement, the Court finds that "goods" referenced in paragraph 35 of the Second Amended Complaint—a keypad, siren, motion sensors and a key fob—are more akin to the "appliances furnished for use in a home and designed to be removable

therefrom without material injury to the structure" referenced in and excluded from the scope of RISA, N.J.S.A. 17:16C-62 (a).   Certainly there are no allegations in the Second Amended Complaint that Defendant made any improvements to Plaintiff's house that were designed to be non-removable therefrom due to the potential of causing material injury to the structure of Plaintiff's house.

To the extent this claim is premised on the sale of the monitoring services, rather than the sale of any "goods," the Court finds, as stated above, that Plaintiff has failed to allege sufficient facts to nudge any such claim across the line from conceivable to plausible.   In particular, Plaintiff has failed to allege sufficient facts that would allow the Court to draw the reasonable inference that Defendant's ongoing monitoring services, billed monthly, amount to an installment sale of that service, particularly in light of Section 2.3 of the Alarm Agreement which provides that "there is no financing charge or cost of credit (0% APR) associated with this agreement." (Sec. Am. Compl., ¶ 13).

As such, to the extent Count Two is premised on a violation of the DDHRSA, said aspect of Count Two is dismissed *with* prejudice.

d.   **Violation of TCCWNA**

This aspect of Count Two alleges that the incidental and consequential damages limitation contained in Section 5 of the Alarm Agreement violates TCCWNA, N.J.S.A. 56:12–16, which provides that:

> No consumer contract, warranty, notice or sign, as provided for in this act, shall contain any provision by which the consumer waives his rights under this act. Any such provision shall be null and void. No consumer contract, notice or sign shall state that any of its provisions is or may be void, unenforceable or inapplicable in some jurisdictions without specifying which provisions are or are not void, unenforceable or inapplicable within the State of New Jersey; provided, however, that this shall not apply to warranties.

19

N.J.S.A. 56:12-16.  Defendant moves to dismiss this aspect of Count Two on the basis that the

language at issue necessarily applies to "warranties" and is therefore excluded from the scope of

TCCWNA, N.J.S.A. 56:12-16.  In particular, the language at issue provides that:

> (C) What is not included:  This warranty does not include batteries
> or alarm screens.  We make no other express warranty including any
> warranty of merchantability of the system or its fitness for any
> special purpose.  We do not warrant that the system will always
> detect, or help prevent any burglary, fire, hold-up or other event.
> We do not warrant that the system cannot be defeated or
> compromised or that it will always operate.  This warranty does not
> cover repairs that are needed because of an accident, acts of God,
> your failure to properly use the system, or any other reason except a
> defect in the equipment or our installation.  We are not liable for
> consequential or incidental damages.  You agree that this is our only
> warranty and we have given you no other warranty for the system.
> (D)     State Law: Some states do not allow a limitation on the
> duration of implied warranties or the exclusion or the limitation of
> consequential or incidental damages, so the above limitations or
> exclusions may not apply to you.

The Court recognizes that it already addressed the issue now raised by Defendant in its

previous Opinion—namely, whether the provision that "[w]e are not liable for consequential or

incidental damages" necessarily applies to warranties and allowed the claim to proceed.

(November 5, 2014 Opinion at 16-17).  Defendant has now renewed its motion to dismiss this

claim and has focused its analysis to Section 5 of the Alarm Agreement.   In particular, Defendant

maintains that "[a]s the context of Section 5 makes clear, the subject of the entire section is the

warranty provided by Vivint, and the exclusion of consequential or incidental damages necessarily

relates to an alleged breach of warranty." (Def. Br. at 19).  In support of its position, Defendant

points out that the word "warranty" appears ten times in the relevant subsections of Section 5,

thereby confirming that its limitation on consequential or incidental damages relates to an alleged

breach of warranty.  Plaintiff opposes this aspect of Defendant's motion, arguing, "as Defendant

20

points out, the drafter of the contract used the term 'warranty' ten times elsewhere in Section 5 of the Alarm Agreement, but not in the limitation on incidental and consequential damages. Defendant's assertion that the incidental and consequential damages limitation could only arise out of the warranty breach is also not consistent with the remaining terms of the Alarm Agreement," which address limitations on damages and liability arising out of Defendant's negligence or failure to perform, as well as other theories of liability in addition to breach of warranty. (Pl. Opp'n Br. at 29).

Having carefully considered the parties' arguments, the Court finds that, when read in the context of Section 5—as a whole—the limitation on consequential or incidental damages necessarily relates to a claim for breach of warranty.  Section 5 is entitled "Repair Service." Subsection (a) describes "what is covered"—i.e., "For one hundred and twenty (120) days after we complete the installation, we will repair or replace any defective part of the system without charge to you."  Subsection (b) describes "how to get service"—"call or write us at the address and telephone number at the top of this agreement and tell us what is wrong with the system." Subsection (c) describes "what is not included"—"repair of the system is our only duty. **This warranty** does not include batteries or alarm screens."  Read in its proper context, Section 5 is a warranty provision that provides that the "repair of the system" is the only warranty.    As such, the Court finds that its inclusion of a limitation on incidental and consequential damages necessarily relates to the warranty at issue in Section 5 ("repair of the system"), and, in particular, a claim for breach of that warranty.  Because N.J.S.A. 56:12-16 provides that it "shall not apply to warranties," Plaintiff has failed to state a viable claim for violation of TCCWNA premised on Section 5 of the Alarm Agreement.  This aspect of Count Two is therefore dismissed *with* prejudice.

21

### C.        Count Three—Violation of NJCFA

Count Three of Plaintiff's Second Amended Complaint contains an individual claim for violation of the NJCFA premised on Defendant's alleged efforts to extend the term of the Alarm Agreement for an additional 42 months and Plaintiff's subsequent alleged efforts to cancel the Alarm Agreement and/or its renewal.

The Second Amended Complaint alleges in relevant part that on or about March 5, 2012, Plaintiff received a phone call from Defendant regarding renewal of the Alarm Agreement. Plaintiff verbally agreed to a proposed extension of the Agreement term, but expected that Defendant would send her a new contract to sign. Defendant failed to send a new contract for Plaintiff to sign.  Plaintiff never provided her written authorization for any modifications or extensions to the Alarm Agreement.   The Second Amended Complaint further alleges that subsequent to the March 5, 2012 phone call from Defendant's representative, Plaintiff made numerous attempts to cancel the Alarm Agreement, including telephone calls on August 1, 2012 and September 5, 2012 (prior to the expiration of the initial 39-month term), on or about February 21, 2013, and again on May 6, 2013, and then in writing on February 20, 2014.  Plaintiff alleges that during Plaintiff's phone calls, Defendant's representative led Plaintiff to believe that Defendant was canceling the Alarm Agreement during that phone call and/or failed to tell Plaintiff that she was required to take any further action to cancel the Alarm Agreement.  In short, Plaintiff claims that "Defendant breached Section 18 of the Alarm Agreement by attempting to verbally change the term of the Alarm Agreement, and then aggravated this breach by misrepresenting the Alarm Agreement's cancelation provisions and frustrating Plaintiff's attempts to cancel." (Sec. Am. Compl., ¶ 144).  Count Three further alleges that Plaintiff has suffered ascertainable losses—

in the amount of all fees charged by Defendants and payments she made after the expiration of the initial term of Alarm Agreement—because of Defendant's alleged violations of the CFA.

To state a claim pursuant to the New Jersey Consumer Fraud Act ("CFA"), a plaintiff must generally allege three elements: (1) unlawful conduct, (2) an ascertainable loss, and (3) a causal relationship between the defendants' unlawful conduct and the plaintiffs' ascertainable loss. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 929 A.2d 1076 (2007) (internal quotations omitted). The broad definition of unlawful practice covers affirmative acts and knowing omissions, as well as regulatory violations. C*ox v. Sears Roebuck & Co.,* 138 N.J. 2, 647 A.2d 454 (1994). When the alleged unlawful act consists of an affirmative act, "intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act. However, when the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent is an essential element of the fraud." *Id.* at 17–18. While a "breach of warranty or contract is unfair to the non-breaching party," a breach of warranty alone is not a *per se* unlawful practice. *Id*. A claim under the NJCFA requires more; it requires that a plaintiff allege "substantial aggravating circumstances." *Suber v. Chrysler Corp.,* 104 F.3d 578, 587 (3d Cir.1997); *see also Cox*, 647 A.2d at 462. To meet this standard, a plaintiff must demonstrate that the business behavior in question "stand[s] outside the norm of reasonable business practice in that it will victimize the average consumer." *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 N.J. 392, 655 A.2d 417, 430 (1995). Additionally, to adequately state a claim under the CFA, not only must a plaintiff allege facts sufficient to establish the aforementioned elements, but such allegation must be plead with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *See Rait v. Sears, Roebuck and Co.,* No. 08–2461, 2009 WL 250309, at *4 (D.N.J.Feb.3, 2009); *Parker v.*

23

*Howmedica Osteonics Corp*., No. 07–2400, 2008 WL 141628, at *3 (D.N.J.Jan.14, 2008). These requirements may be satisfied "by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into [the] allegations of fraud." *Lum v. Bank of Am*., 361 F.3d 217, 224 (3d Cir.2004) (internal quotations omitted).

Notwithstanding Plaintiff's efforts to cure the deficiencies in this claim, Count Three remains deficient.  It is clear from the Second Amended Complaint that Plaintiff's biggest gripe is that "Defendant breached the Alarm Agreement when it treated Plaintiff's contract as renewed for an additional forty-two months despite the absence of any writing signed by Plaintiff memorializing this change." (Pl. Opp'n Br. at 35).  In this regard, the Second Amended Complaint alleges that "On or about March 5, 2012, Plaintiff received an unsolicited phone call from Defendant regarding renewal of the Alarm Agreement. Defendant told Plaintiff that Defendant would extend the term of the Alarm Agreement for 42 months and that Defendant would not increase the monthly services fee during that time period." (Sec. Am. Compl., ¶ 46).  The Second Amended Complaint also alleges that "Plaintiff verbally agreed to a proposed extension of the Agreement term." (Id., ¶ 138).  While Plaintiff goes on to allege that she nevertheless "expected that Defendant would send her a new contract to sign" and/or that she "did not believe the telephone conversation by itself, without her signature on a new contract, bound her to the modifications of the Alarm Agreement," Plaintiff alleges no facts to substantiate or provide proper context for these conclusory statements.  (*Id*., ¶ 48).  *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

While Plaintiff has attempted to frame her gripe as one sounding in fraud, critically absent from the Second Amended are any allegations that Plaintiff's verbal agreement to extend the term

24

of the Alarm Agreement was based on any particular misrepresentations by Defendant's "representative" during the March 5, 2012 telephone conversation. All of the alleged misrepresentations concerning the status of her account occurred *after* she had already verbally agreed to renew the term of the Alarm Agreement.[6] Based on these facts, the Court cannot draw the reasonable inference that Plaintiff's alleged ascertainable loss—the amount of all monthly service fees paid following the expiration of the initial 39 month contract term—was attributable to any misconduct by Defendant. To the contrary, based on the facts pled, the Court finds that the ascertainable loss alleged by Plaintiff was the "but for" consequence of her verbal renewal.

At most, Plaintiff challenges the enforceability of her verbal renewal of the term of the Alarm Agreement. In particular, Plaintiff points to Section 18 of the Alarm Agreement which states that the contract may only be changed by a written agreement signed by both parties, and that the terms cannot be changed by oral statements or representations made by Defendant's sales representative. (Sec. Am. Compl., ¶ 140). Although the parties dispute whether a renewal of the

---

[6] Plaintiff concedes that she first attempted to cancel her March 5, 2012 renewal five (5) months later—in August 2012. (Sec. Am. Compl., ¶ 142). Plaintiff alleges no facts that would allow the Court to reasonably infer that such a cancellation—five months after the fact—was legally, statutorily or contractually permissible. *See, e.g.*, N.J.S.A. 17:16C-99(a)(1) ("Any home repair contract, for a purchase price in excess of $25.00, which is entered into at a place other than the place of business of the home repair contractor may be rescinded by the owner if the owner . . . [f]urnishes to the home repair contractor a notice of intent to rescind the home repair contract by certified mail, return receipt requested, postmarked not later than 5 p.m. of the third business day following the day on which the home repair contract is executed . . . ."); Sec. Am. Compl., ¶ 13 ("TERM FOR SERVICES. THE ORIGINAL TERM OF THIS AGREEMENT STARTS ON THE DAY THIS AGREEMENT IS SIGNED AND CONTINUES FOR THIRTY-NINE (39) MONTHS, AND WILL AUTOMATICALLY CONTINUE FROM YEAR TO YEAR THEREAFTER UNLESS CANCELLED BY EITHER OF US IN WRITING NO LATER THAN THIRTY (30) DAYS BEFORE THE END OF THE ORIGINAL TERM OR ANY RENEWAL TERM.").

Alarm Agreement constitutes a "change" as the term is used in Section 18, thereby requiring a new written agreement signed by both parties, this dispute sounds in contract—not consumer fraud.[7] *See, e.g., Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 416 (1995) ("To constitute consumer fraud sufficient to trigger the actual-malice standard, the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer, and thus most clearly and directly involve a matter of legitimate public concern.").

Certainly, Plaintiff has failed to allege any facts flowing from the March 5th telephone call that would allow the Court to draw the reasonable inference that substantial aggravating circumstances exist. *See generally Cox*, 138 N.J. at 18 ("Because any breach of warranty or contract is unfair to the non-breaching party, the law permits that party to recoup remedial damages in an action on the contract; however, by providing that a court should treble those damages and should award attorneys' fees and costs, the Legislature must have intended that substantial aggravating circumstances be present in addition to the breach."). For example, she does not allege that her decision to renew the term of the Alarm Agreement was based on any particular

---

[7] The same rationale applies to the extent Plaintiff's NJCFA claim is premised on the $15 processing fee allegedly charged to Plaintiff's account on March 21, 2014 by Defendant, which, according to the Second Amended Complaint, was not authorized by the Alarm Agreement. Whether or not the Alarm Agreement permitted Defendant to charge Plaintiff a $15 processing fee is a dispute sounding in contract. Plaintiff fails to allege any substantial aggravating circumstances flowing from Defendant's attempt to collect the $15 fee, nor has Plaintiff alleged any facts that would allow the Court to draw the reasonable inference that there is a causal nexus between Plaintiff's alleged ascertainable loss—all monthly service fees paid following expiration of the initial 39 month term—and Defendant's imposition of the $15 processing fee. To the contrary, as stated above, based on the facts actually pled, the Court finds that the ascertainable loss alleged by Plaintiff was the "but for" consequence of her own verbal renewal of the original contract term.

representation made by Defendant's representative that later proved to be false.  Plaintiff does not allege any difference in value between the product or services promised and those that she actually received.  Nor does Plaintiff otherwise allege any other factual circumstances that would support an inference of a practice of deception on Defendant's part as it pertains to the March 5, 2012 telephone call.  *See, e.g., Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 N.J. 392 (1995) (finding substantial aggravating circumstances  to support NJCFA claim where undercover tests run by a journalist revealed the following repair practices of a lawn-mover repair shop: recommendation of unnecessary tune-up and blade sharpening, "rebuilding of the carburetor in a mower that apparently was in good condition and the installation of new points in a machine that did not need points"); *Levin v. Lewis,* 179 N.J. Super. 193, 201 (App. Div. 1981) (finding substantial aggravating circumstances to support NJCFA claim where "Desert and Farrell both testified that they were originally given firm prices for the completion of work.  In Desert's case he was subsequently billed more than twice the original price and Lewis refused to set a price for the completion of work, and to date the car is incomplete. Farrell was told the engine would cost $1,000 and later, when he received notice that the engine was finished, the bill would be twice the estimated price."); *Hyland v. Zuback*, 146 N.J. Super. 407, 409 (App. Div. 1976) (finding substantial aggravating circumstances to support NJCFA claim where plaintiff was told that the cost of the work would be $50 for four hours labor plus the cost of parts; once work was completed, plaintiff was sent a bill for $467.65, representing $80.15 for parts and $362.50 for 29 hours labor at $12.50 an hour; defendant threatened to increase the charges if payment was withheld).

At most, Plaintiff has pled a claim for breach of the Alarm Agreement without substantial aggravating circumstances.[8] Defendant's motion to dismiss Count Three is granted.  Having

---

[8] Plaintiff does not, however, assert a breach of contract claim.

27

already afforded Plaintiff an opportunity to amend the deficiencies in this claim, the Court finds

that any future amendment of this claim would be futile.  Count Three is therefore dismissed with

prejudice.


**IV.    CONCLUSION**

For the reasons set forth above, Defendant's motion to dismiss is **granted.**  Counts One,

Two and Three of the Second Amended Complaint are dismissed *with* prejudice.  This case is

hereby **CLOSED**.

An appropriate Order accompanies this Opinion.


DATED:  March 2, 2015

                                        s/ Jose L. Linares
                                        JOSE L. LINARES
                                        U.S. DISTRICT JUDGE